JOHN J. WALLER, JR. (State Bar No. 094449)
JAY STEIN (State Bar No. 141042)
Members of
FINESTONE & RICHTER,
A Professional Corporation
11601 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
Telephone: (310) 575-0800
Facsimile: (310) 575-0170
E-Mail: jwaller@frlawcorp.com
jstein@frlawcorp.com

Attorneys for Defendants
Stups, Inc. and Stuart Berk

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MAIL BOXES ETC., INC.,<br><br>Plaintiff,<br><br>vs.<br><br>STUPS, INC. and STUART BERK,<br><br>Defendants. | Case No.: 3:08-CV-00491-JAH- POR<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date: April 1, 2008<br>Time: 2:30 p.m.<br>Judge: Hon. John A. Houston<br>Place: Courtroom 11 |

Defendants Stups, Inc. and Stuart Berk, by and through their attorneys of record herein, hereby submit the following points and authorities in opposition to Plaintiff's Motion for Temporary Restraining Order:

# I

# INTRODUCTION

The question presented by these proceedings is whether a franchisor may unilaterally terminate, without notice and opportunity to cure, a franchisee's franchise rights on the basis of disputed facts and grounds not specified in the Franchise Agreement and then use that purported termination as the sole basis for obtaining post-termination injunctive relief against the franchisee who disputes the propriety of the franchise termination.

In its Notice of Motion and Motion for Temporary Restraining Order, Plaintiff Mail Boxes Etc., Inc. ("MBE" or "Plaintiff") seeks a temporary restraining order "enforcing the binding terms of the Franchise Agreements [sic] between MBE and the Defendants." MBE's Memorandum of Points and Authorities in Support of Plaintiff's Application for Temporary Restraining Order ("TRO Application"), in essence, seeks an order restraining Defendants Stups, Inc. ("Stups") and Stuart Berk ("Berk") (collectively "Defendants") from using any trademark owned by MBE.

While Defendants in their own right seek the enforcement of the terms of the Franchise Agreement, Defendants oppose the issuance of any injunctive orders against them on the grounds that Plaintiff will suffer no immediate and irreparable injury, loss or damage if provisional relief is denied. In addition, having breached the Franchise Agreement by unilaterally terminating the franchise granted to Stups without notice and opportunity to cure, and by attempting to improperly circumvent

the initial mediation requirement imposed by the Franchiser Agreement, Plaintiff has unclean hands and is not entitled to any post-termination remedy.

## II

## <u>THE FACTS DO *NOT* SUPPORT</u>

## <u>PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF</u>

A. <u>The Franchise Obligations</u>.

In July 2005, MBE entered into a 10-year Franchise Agreement with Stups, governing the respective rights and obligations of the parties in connection with the operation of a Mail Boxes Etc. franchise doing business under the name The UPS Store. Stups obligations under the Franchise Agreement were guaranteed by Stups' principal, Berk.[1] (The parties' Franchise Agreement is attached as Exhibit "A" to the Declaration of Stuart Berk ("Berk Decl., ¶ 3")). Between franchise fees and start-up costs, Defendants initially paid MBE approximately $150,000. In addition, under the Franchise Agreement, Defendants committed to paying MBE substantial monthly franchise fees and other monies. (Berk Decl., ¶ 3.)

As consideration for becoming a MBE franchisee, MBE granted Stups various rights, including the following: a license to use various portions of MBE's and UPS's intellectual property, including their trademarks and written materials; Stups was supposed to obtain the benefit of the goodwill associated with

---

[1] MBE is a wholly owned subsidiary of United Parcel Service of America, Inc. ("UPS"). (See Plaintiff's Rule 7.1 Statement.)

use of MBE's and UPS' brands; access to many of MBE's and UPS' systems for transacting business, including preferred arrangements for shipping packages via UPS; discounted shipping rates and commissions on UPS shipping transactions processed through Stups franchise; scheduled daily shipping pick-ups and deliveries at Defendants' UPS Store; use of MBE's and UPS' shipping materials; the benefits of MBE's and UPS' advertising, marketing and promotions; the benefits associated with being identified as a franchised UPS Store through MBE's and UPS' central call centers, directory and internet listings; and purported access to the services provided by MBE's and UPS' network of technical and service support to assist Defendants in the operation of their franchise. (Berk Decl., ¶ 3.)

In reliance upon MBE's grant to Stups of the aforesaid franchise, licenses and benefits, including MBE's promise to perform its obligations to Stups under the Franchise Agreement, Stups also entered into a 10-year lease with a third-party for occupancy of a retail space, which space was located by MBE and into which lease MBE directed Stups and Berk to enter. (Berk Decl., ¶ 4.) Berk was required to personally guaranteed that lease. (Id.) The financial obligation currently remaining on that lease is at least $226,000. (Id.)

B. <u>MBE Breaches and Malperformance of its Obligations to Defendants</u>.

Notwithstanding MBE's entry into the Franchise Agreement with Stups, its receipt of both the initial franchise fees and

subsequent monthly franchise payments from Stups, all of which were substantial, and the other benefits that MBE derived from having Stups act as one of its franchisees, throughout the 2½ year duration of Stups' franchise with MBE, MBE engaged in a pattern and practice of breaching its obligations under the Franchise Agreement and/or poorly performing its obligations to Stups. Those deficiencies in MBE's performance of its obligations to Stups caused Defendants to lodge a series of complaints about those deficiencies with MBE and UPS, and to make numerous requests to MBE for remedial assistance to attempt to correct or mitigate MBE's and UPS' failures to fully and properly perform their obligations to Stups. (Berk Decl., ¶ 5.)

MBE's chronic breaches of its duties to Defendants and its poor performance and mistreatment of them included the following noteworthy events:

1) Directing Defendants to enter into a lease of a property designated by MBE, notwithstanding that the retail complex in which that space was located was then in foreclosure and/or receivership, which fact was concealed by MBE from Defendants and which fact rendered the property highly undesirable. As a result of its being in foreclosure, necessary repairs to the overall retail complex were deferred or cancelled by its owner(s) and the condition of the property was allowed to seriously deteriorate. In addition, there was a significant decline in occupancy of the other retail spaces in the retail complex, which has had a significant adverse impact on Stups' MBE-related business as the flow of customers into the retail

complex, and into Stups' store, has thereby foreseeably diminished. (Berk Decl., ¶ 5.1.)

2) Failing to install the "UPS Store" signage for months after MBE's obligation to do so arose. A copy of an email message from me to Jones Rodney of MBE, dated October 4, 2005, referencing this issue is attached as Exhibit "B" to the Berk Decl., ¶ 5.2.

3) Insisting, through its District Consultant, that Stups purchase more supplies through MBE at one time than Stups needed in an entire year and a half. (Berk Decl., ¶ 5.3.)

4) Losing, misdelivering or damaging so many packages sent from or to Stups' UPS Store due to MBE's and/or UPS' errors that Stups' UPS Store experienced a disproportionately high lost and damaged package rate. The lost or damaged package rate that Stups' UPS Store has experienced has been as high as 1 out of every 163 packages, instead of the expected rate of 1 in 500. (Berk Decl., ¶ 5.4.)

5) Chronically failing to pick up packages from Stups' UPS Store as and when scheduled, including during the busy Christmas season when a disproportionate amount of a UPS Store's annual volume and profits are made, thereby rendering Stups unable to meet its obligations to its customers at that critical time. (Berk Decl., ¶ 5.5.)

6) Requiring Stups and other MBE franchisees to accept and process packages for UPS pick-up from E-Bay customers at a severely discounted commission rate to the franchisee. Reference to that issue was raised by Defendants in an email message to Steve D'Andrea, copied to Jay Schlessinger and Robert

Kaufman, dated June 25, 2007, a copy of which is attached as Exhibit "C" to the Berk Decl. (¶ 5.6).

7) Undercutting Stups' and other MBE franchisees' franchise and license rights by giving better shipping rates and promotional materials to Staples stores, even though those Staples stores directly compete with MBE's UPS Stores for packaging, shipping and photocopy services. (A copy of an email message, dated March 15, 2007, that Defendants sent to MBE President Stuart Mathis discussing this issue is attached as Exhibit "D" to the Berk Decl. (¶ 5.7).)

8) Undermining Stups' and other MBE franchisees' ability to earn drop-off commissions on UPS shipments by changing UPS' shipping policies to allow customers to use UPS drop boxes instead of MBE's UPS Store locations for many UPS deliveries. (A copy of the email message trail discussing this deficiency, bearing dates from January 12, 2008 through January 14, 2008, is attached as Exhibit "E" to the Berk Decl. (¶ 5.8).)

9) Providing increasingly poor franchisee support, particularly with respect to lost packages and claims, and even making extra demands of Stups' customers for the presentment of claims against UPS or delaying the payment of their claims, even when the packages were specifically insured for such claims and amounts. One example of these problems is reflected in the email message chain, bearing dates from January 16, 2008 through January 22, 2008, discussing MBE's/UPS' refusal to refund the payment on a package of a Stups customer that was lost for a month, a copy of which is attached as Exhibit "F" to the Berk Decl. (¶ 5.9). Another example is illustrated by the email

message, dated May 23, 2007, about delays in paying a claim for lost goods, a copy of which is attached as Exhibit “G” to the Berk Decl. (¶ 5.9).

10) Publishing directions to Stups’ store on MBE’s website that were inaccurate and unfamiliar to local residents. (Berk Decl., ¶ 5.10.)

11) Failing to timely place an advertisement for Stups’ store in the local telephone directories. MBE at first claimed the problem to have arisen because of an alleged failure by Defendants to communicate with MBE, but ultimately acknowledged that the failure was on MBE’s end. (Berk Decl., ¶ 5.11.)

12) Promising, but not performing, for months, and still not having completed performance of, the mitigation of MBE’s agent’s error in failing to cause the publication of Stups’ store advertisement in the telephone directories. This error is documented in part by the email messages starting on November 14, 2007, and continuing through March 11, 2008, copies of which are collectively attached as Exhibit “H” to the Berk Decl. (¶ 5.12).

13) MBE’s District Consultant’s (i.e., the district manager) purported requirement that Berk attend a 5-hour “meeting” of local store operators at a horse race track, even though no business was actually to be transacted at the gathering. (Berk Decl., ¶ 5.13.)

14) MBE’s District Consultant’s making disparaging remarks about Berk’s caring for his 92-year old mother. (Berk Decl., ¶ 5.14.)

In the two and a half years Stups has been a franchisee, Defendants complained to MBE multiple times about the foregoing breaches by MBE of its obligations to Stups, but were generally unable to obtain a satisfactory resolution of those issues. With each successive complaint, however, MBE became increasingly unresponsive and the attitude of its personnel toward Defendants became increasingly disapproving and critical. Despite the many complaints and requests for assistance made of various MBE personnel, MBE never once advised Stups or Berk that MBE disputed the accuracy or legitimacy of their complaints. Rather, MBE largely ignored them. Notwithstanding MBE's numerous failures to honor its obligations to Stups, to date defendants have not communicated to persons outside of the MBE/UPS family any of those concerns, disputes or grievances with MBE, nor have Defendants taken any public action adverse to MBE. Defendants have not misused or made any unauthorized use of MBE's trademarks or done anything that would materially impair the goodwill associated therewith. Nor have Defendants engaged in the unauthorized use of confidential information. (Berk Decl., ¶ 6.)

C. <u>The Beginning of MBE's Malevolence Toward Defendants</u>.

The turning point in Stups' relationship with MBE came on March 15, 2007, when Defendants sent an email to MBE's President, Stuart Mathis, expressing the grievance that MBE was improperly undercutting its franchisees and engaging in unfair and unlawful business practices by giving better shipping rates

and marketing materials to Staples stores, even though those Staples stores were in direct competition with MBE franchises, including Stups, and were located within franchisees' exclusive territories. (Berk Decl., ¶ 7; See email message attached as Exhibit "D" to the Berk Decl., ¶ 5.7.) Thereafter, the mediocre franchise support Stups had already been receiving became even more anemic and MBE employees became largely unresponsive to Defendants' concerns and requests. Beyond apathy, MBE actually started looking for things about which to criticize Stups and for ways in which to make Stups' operations more difficult or costly. (Berk Decl., ¶ 8.)

Although Stups' franchise was run consistently pursuant to MBE's standards, MBE supervisors started "nit-picking" – trying to find even little things to harass Defendants about. For example, even though Stups had its storefront windows professionally cleaned on a weekly basis, MBE supervisors complained that the windows were dirty and demanded that they be cleaned immediately. To drive up Stups' costs, MBE supervisors also demanded that Stups' interior store lights all remain on 24 hours per day, seven days per week, even when the store was closed. MBE started sending in "mystery customers" with forty cent copy jobs to see if Stups' personnel would give the expected sales pitch about all of the other services the franchise offers. And those "mystery customers" made a point of coming in when there was a line of packaging customers so that they could then report that they did not receive my "full and undivided attention." Defendant's sending of the email to Mr. Mathison seemingly explains why, as is evident by the

statements in MBE's franchise cancellation letter MBE apparently started collecting a dossier on Defendant Berk. (Berk Decl., ¶ 8.)

D. Defendants' Proposal that MBE Buy Back Defendants' Franchise as a Remedy for MBE's Breaches and Malperformance.

MBE's malfeasance and mistreatment of Defendants heightened after Defendants discussed with MBE in January 2008 their utter dissatisfaction with MBE's performance of its obligations and his consequent desire either to have MBE buy back Stups' franchise or to allow them to sell it. (Berk Decl., ¶ 8.) After persistently seeking a meeting on this proposal for two months, finally, MBE personnel informed Berk that there would be a meeting held at Stups' store on March 13th in which a resolution would be discussed. However, the promise of a meeting about a resolution proved to be a ruse to ensure that Berk was present so that he could be served with a letter from MBE's lawyer purporting to terminate Stups' franchise without notice or opportunity to cure any alleged breach. (Affidavit of Don Higginson, ¶ 24 and Exh. A.)

E. MBE's Unlawful Interruption of Defendants' Franchise Rights.

Notwithstanding the ongoing negotiations prompted by the termination letter between MBE's lawyer and Defendants' lawyer regarding MBE's purported termination of the franchise and regarding the timing of Defendants' prospective sale of the

franchise, by the night of March 14, 2008, MBE disabled Defendants' access to the MBE/UPS computer system, thereby disabling Stups' access to the MBE/UPS point of sale (i.e., cash register) system, to the MBE/UPS shipping manifest system, to the MBE/UPS administrative system, to Stups' own financial data kept on QuickBooks on said computer system, and Stups' own email. (Affidavit of Don Higginson, ¶ 26.) MBE's disabling of Defendants' access to the foregoing systems, equipment and data effectively put Defendants out of business. Moreover, Plaintiff's conduct is denying Defendants unfettered use and enjoyment of their substantial investment, is denying Defendants their livelihood and is a continuing interference with Defendants' relationships with their customers.

## III

## PLAINTIFF BREACHED THE FRANCHISE AGREEMENT BY UNILATERALLY TERMINATING THE FRANCHISE ON IMPROPER AND PRETEXTUAL GROUNDS AND WITHOUT NOTICE AND OPPORTUNITY TO CURE

### A. California Law Favors Protecting Franchisees From Summary Terminations of Their Franchise Rights by Franchisors.

The California Franchise Relations Act, Business and Professions Code Section 20000, et seq., governs the relationship between franchisors and franchisees.

"The motivating purpose behind the CFRA was to protect franchisees, not franchisors, from contracts of adhesion and abrupt terminations without cause." *Gabana Gulf Distribution, Ltd., et al. v. GAP International Sales, Inc.,* 2006 U.S. Dist.

LEXIS 59799 (N.D. California, 2006). The Act's purpose "to protect franchisees" was recognized in *JRS Products, Inc. v. Matsushita Electric Corp. of America,* 115 Cal App 4th 168, at 174 (2004), which amplifies that the Act is "legislation designed to expand, not retract, a franchisee's remedies."

Business and Professions Code Section 20020 precludes a franchisor from "terminat[ing] a franchise prior to the expiration of its term, except for good cause." "Good cause" is defined in that Section as being "the failure of the franchisee to comply with any lawful requirement of the franchise agreement after being given notice thereof and a reasonable opportunity . . . to cure the default."

Business and Professions Code Section 20021 limits the instances in which a franchisor may terminate the franchise without notice and opportunity to cure to eleven circumstances: (a) bankruptcy; (b) abandonment of the franchise; (c) mutual agreement to terminate; (d) if the franchisee made material misrepresentations in acquiring the franchise; (e) the franchisee's failure to comply with laws governing the operation of the business after being given ten days' notice; (f) multiple non-compliances with the franchise agreement for which notice has previously been given; (g) repeated failures to comply with franchise agreement requirements; (h) the seizure of the business or business premises; (i) conviction of a felony or other crime relevant to the operation of the franchise; (j) the failure to pay franchise fees after the giving of a five day notice; and (k) the continued operation of the franchise will result in imminent danger to public health or safety. None of

those circumstances is applicable to the facts in this case.

Moreover, the Act requires all notices to be given in writing, stating the intent to terminate as of a particular date, and stating the reasons for the termination. (Business and Professions Code § 20030.)

B. The Franchise Agreement Limits the Grounds for the Termination of Defendants' Franchise Rights.

The Franchise Agreement contains a choice of law provision, at 20.1 thereof, requiring the application of the substantive law of California. Thus, the provisions of the California Franchise Relations Act govern the interpretation and enforcement of the Franchise Agreement.

Section 12 of the Franchise Agreement sets forth the contractual scheme agreed to by the parties for the termination of the parties' Franchise Agreement. Section 12.1 governs the grounds for termination of Stups as its franchisee. Section 12.2 restricts MBE's right to terminate the Agreement to termination "only for 'cause.'" Section 12.3 requires MBE to give 30 days written notice and opportunity to cure any default under the Agreement, other than certain limited items of default listed in Section 12.4. Section 12.4 lists events of default that are similar, but not identical, to those set forth in Business and Professions Code Section 20021. However, once again, none of the categories of grounds for which termination without notice or opportunity to cure is applicable to the facts in this case.

C. On its Face, MBE's Termination Letter Fails to Comply with both the law and the Franchise Agreement.

Plaintiff's March 13, 2008 letter, wherein it purports to terminate Defendants' franchise, declared Defendants to be "in material breach" of the Franchise Agreement "as the result of [Defendants'] ongoing pattern of erratic and abusive behavior." The termination letter further states that MBE deems the foregoing to constitute "an incurable default" justifying its termination of the Franchise Agreement "without further notice from, or other action required by, MBE to cancel [Defendants'] franchise rights to own and operate the Center." (Termination Letter, Paragraph 1, attached as Exhibit "A" to the Affidavit of Don Higginson.) In the seventh paragraph of the Termination letter, MBE concludes that Defendants' conduct referenced therein violates Section 12.4(k) of the Franchise Agreement based upon MBE's contention that Defendants' actions "'reflect materially and unfavorably upon the operation and reputation of the Center.'"

There is no dispute that Plaintiff failed to give any notice or opportunity to cure any alleged default and, therefore, does not seek termination pursuant to the provisions of Business and Professions Code Section 20020 or any section of the Franchise Agreement other than Section 12.4(k). As a result, MBE's purported termination of Defendants' franchise can only be supported if adequate grounds exist under Section 12.4(k) to terminate Defendants' franchise. As explained below, Plaintiff cannot meet its burden in that regard.

It is evident from the face of Plaintiff's Termination Letter that the conduct that MBE attributes to Defendants, even assuming *arguendo* that it were true, which it is not (Berk Decl., ¶¶ 6 and 12), does not properly fit within the "reflects materially and unfavorably upon the operation and reputation of" Defendants' UPS Store or MBE's network of UPS Stores language of Section 12.4(k). As noted above, that is the only section of the Franchise Agreement that MBE relies upon as grounds for its termination of Defendants' franchise without notice or opportunity to cure.

It is self-evident that an action by Defendants could only violate Section 12.4(k) if the action was made known to or otherwise published by Defendants to an individual or entity outside of the MBE/UPS family of companies. However, no such publication was made by Defendants. (Berk Decl., ¶¶ 6 and 12.) In fact, not a single thing that MBE has complained of is a public act and not a single offending conversation was with any person outside of MBE's/UPS' organization. In this regard it is noteworthy that MBE does not make any allegation that there was ever any publication by Defendants of any allegedly damaging remarks to any third-party. As a result, the public "reputation" of the Defendants' franchise and of MBE's/UPS' family of companies cannot have been injured.

Of course, Defendants also vehemently reject the factual allegations and characterizations set forth in Plaintiff's Termination Letter. As is exposed by the accompanying Declaration of Stuart Berk, and the exhibits attached thereto, and as set forth more fully therein, Plaintiff's Termination

Letter is insidiously dishonest. In addition to the inaccuracy of some of the statements ascribed to Defendant Berk in the letter, Plaintiff excerpts a few phrases from lengthy communications, takes them out of their proper contexts, and strings them together to attempt to manufacture a misleadingly inflammatory connotation.

For example, Plaintiff's termination letter portrays Berk as having made allegations of anti-Semitism and discriminatory treatment and as having tried to extort money from MBE for that treatment. A reading of the entire email message from which those two issues were derived, however, reveals that the two were not connected at all and that Berk's statement about MBE "coming up with money" related to the proposal that he had been making for a while that, given his dissatisfaction with MBE, he proposed to sell the franchise to a third party but, because that was not likely to yield enough money to make him whole from his investment in the franchise, MBE would have to contribute some additional money. There was no "extortion." (Berk Decl., ¶ 24.6, and Exhibits "J," "K" and"L.")

There also was no "terrorist threat." As Berk testified in his declaration, his statements that MBE characterizes as threats, and the reasonable meaning thereof, were completely misreported by MBE and its personnel. Within minutes after the referenced conversation had taken place, and after he had been accused by MBE of making threats, Berk vehemently and in writing disavowed the accusation by MBE that he had made any threat. In addition, the next morning, MBE's own security person quickly verified that there had been no threat. (Berk Decl., ¶ 24.3.)

Nevertheless, weeks later, MBE resurrected that accusation to suit its goal of terminating Defendants' franchise rights without notice or opportunity to cure under the pretext that he had made various threats to MBE and UPS personnel.

At odds with Plaintiff's claim that there is a long history of offensive remarks and behavior by Berk, never once in that time did Plaintiff ever tell Berk that his words or actions were offensive, nor had anyone complained to him or warned him about, his choice of words or actions. Moreover, Plaintiff never communicated any information or contention that Plaintiff construed the use of profane language to its employees as a violation of the Franchise Agreement. Of course, this latter point is exactly why Business and Professions Code 20020 requires that notice of all violations not enumerated in Section 20021 be given to the franchisee. In non-exigent circumstances, it is manifestly unfair to terminate a person's valuable rights without ever first telling them that their conduct constitutes a violation of the franchise agreement.

## IV

## PLAINTIFF'S ACTION TO ENFORCE ITS POST-TERMINATION RIGHTS IS PREMATURE

Before Plaintiff may exercise its rights to enforce any of the post-termination provisions of the Franchise Agreement, such as the preclusion post-termination of Stups' use of Plaintiff's trademarks, Plaintiff must first demonstrate that Defendants' franchise rights have been lawfully terminated. That requirement is a necessary prerequisite for the relief that MBE

seeks by its application for a temporary restraining order, but has been given short shrift by Plaintiff, obviously because it lacks a proper basis for its purported termination of Defendants' franchise.

As analyzed above, Defendants' franchise rights have not been properly terminated. Accordingly, all of Plaintiff's evidence and arguments in its Motion for Temporary Restraining Order concerning the wrongfulness of Defendants' post-termination use of the marks that have been licensed to Defendants is of no relevance to the Court in deciding the instant motion.

Moreover, because Defendants' franchise rights have not been properly terminated, the post-termination trademark protection issue that is the central focus of MBE's application for a temporary restraining order is not yet ripe for decision. Rather, because the first determination that must be made is whether Defendants' franchise rights have been properly terminated, an attempt to first mediate that issue is imposed by the Franchise Agreement (Section 20.2). As Plaintiff is well aware, Section 20.2 requires it to attempt to mediate the instant disputes before instituting ***any*** other legal action. Notwithstanding that mediation requirement, Plaintiff has not made any effort to request, demand, arrange or conduct any mediation of any of its purported disputes with Defendants. For that reason alone, the Court should deny Plaintiff's application.

## V

## PLAINTIFF'S ACTION TO ENFORCE ITS POST-TERMINATION RIGHTS IS *NOT* PROPERLY BEFORE THIS COURT

Although some post-termination provisions exist in the body of the Franchise Agreement, the operative provisions for affirmative relief relied on by Plaintiff are contained in the parties' Non-Competition and Non-Solicitation Agreement, attached to the Franchise Agreement as Exhibit D (Exhibit "C" to the Complaint on file in this action). However, Paragraph 10 of the Non-Competition and Non-Solicitation Agreement vests exclusive jurisdiction of any suit brought thereon in the jurisdiction where the "Center" (i.e., the franchise store) is located. In this case, that location is New York. Paragraph 20.1(a) of the Franchise Agreement specifically recites that "the Non-Competition and Non-Solicitation Agreement (Exhibit "D" to the Franchise Agreement) shall be deemed made and entered into, and governed and construed under and in accordance with, the laws of the State that is determined by the 'Choice of Law' provision" of that Agreement.

Because Stups' Center is located in East Meadow, New York, jurisdiction and venue for claims covered by the Non-Competition Agreement is in New York, not in California.

///

///

///

## VI

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER MUST BE DENIED BECAUSE PLAINTIFF CANNOT ESTABLISH A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS, IRREPARABLE INJURY, OR EVEN EQUITABLE FACTORS IN ITS FAVOR

A plaintiff is not entitled to preliminary injunctive relief unless it demonstrates a strong likelihood of success on the merits, the possibility of suffering irreparable injury without the injunctive relief, that the balancing of the hardships favors the Plaintiff, and that it is in the public interest to grant such relief. *Lands Council v. Martin*, 479 F3d 636, 639 (9th Cir. 2007). Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1120 (9th Cir. 2005)

For the reasons set forth above, Plaintiff has not, and cannot, demonstrate a strong likelihood of success on the merits inasmuch as it acted patently improper in purporting to terminate Defendants' franchise rights. Having not terminated those rights lawfully, Plaintiff has no claim for the enforcement of any post-termination remedies.

It also follows that Plaintiff will suffer no injury if preliminary injunctive relief is denied insofar as Plaintiff has licensed its intellectual property rights to Defendants and, therefore, there is no improper use of those intellectual property rights.

Indisputably, it is the Defendants who are suffering great hardship, not the Plaintiff. Plaintiff's and Defendants' business arrangement is one where there is vastly disparate economic and bargaining power in favor of the Plaintiff-

franchisor. Defendants, the franchisees, made a comparatively large investment into this business and depend upon it for their livelihood. And, Plaintiff here has acted malevolently with respect to Defendants, mistreating them throughout the franchise relationship, wrongfully terminating the Defendants' rights, and shading the truth in its Termination Letter so deviously that all equities preponderate in favor of Defendants.

## VII

## PLAINTIFF'S MOTION MUST BE DENIED

It requires little imagination to appreciate that Plaintiff considered Defendant Berk to be a "thorn in its side" because of his various complaints about the poor service Stups was receiving from MBE, the lack of assistance Stups was receiving from MBE, and the threat Berk posed by challenging MBE's scheme of undercutting its UPS Store franchisees by offering better prices to Staples stores, by diverting package drop-off business to drop boxes, and by giving deep discounts to E-Bay customers. And, the quickest way to dispose of that "thorn" was to terminate Defendants' franchise rights with no notice and no opportunity to cure. By filing this action and this motion seeking to enforce post-termination trademark rights on an ex parte basis, Plaintiff undoubtedly aimed to have this Court ratify its termination of Defendants' franchise.

Plaintiff is not entitled to any post-termination relief, however, because the predicate termination of Stups' MBE franchise has not been effected, at least not lawfully or as

required by the Franchise Agreement. As a result, no preliminary injunctive relief is appropriate.

DATED: March 24, 2008

JOHN J. WALLER, JR.
JAY STEIN
FINESTONE & RICHTER

By: /s/John J. Waller, Jr.
John J. Waller, Jr.

Attorneys for Defendants
Stups, Inc. and Stuart Berk

F:\CLIENTS\Stups-Berk\Pleadings\TRO Opposition\Memo of Ps and As.doc