JOHN J. WALLER, JR. (State Bar No. 094449)
JAY STEIN (State Bar No. 141042)
Members of
FINESTONE & RICHTER,
A Professional Corporation
11601 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
Telephone: (310) 575-0800
Facsimile: (310) 575-0170
E-Mail: jwaller@frlawcorp.com
jstein@frlawcorp.com

Attorneys for Defendants and Counter-Claimants
Stups, Inc. and Stuart Berk

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MAIL BOXES ETC., INC.,<br><br>Plaintiff,<br><br>v.<br><br>STUPS, INC. and STUART BERK,<br><br>Defendants. | Case No.: 3:08-CV-00491-JAH- POR<br><br>**VERIFIED COUNTER-CLAIM FOR:**<br><br>**1) Breach of Contract;**<br>**2) Unfair Competition;**<br>**3) Declaratory Relief; and**<br>**4) Injunctive Relief**<br><br>**DEMAND FOR JURY TRIAL** |
| STUPS, INC. and STUART BERK,<br><br>Counter-Claimants,<br><br>v.<br><br>MAIL BOXES ETC., INC.,<br><br>Counter-Defendant. | |

Defendants and Counter-Claimants Stups, Inc. and Stuart Berk (collectively "Stups"), hereby allege as follows:

I

**JURISDICTION, VENUE AND PARTIES**

1. This Court has subject matter jurisdiction of the Counter-Claim pursuant to 28 U.S.C. § 1332, in that this is a civil action between citizens of different states and wherein the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

2. Stups objects to venue in this matter and is contemporaneously filing a Motion to Dismiss for Improper Venue under FRCP 12(b).

3. Stups, Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 1936 Hempstead Turnpike, East Meadow, New York 11554.

4. Stuart Berk ("Berk") is the President of Stups, Inc. and is a resident of the state of New York.

5. Stups is informed and believes, and thereon alleges, that Counter-Defendant Mail Boxes Etc., Inc. ("MBE") is a corporation organized and existing under the laws of the State of California, with its principal place of business located in La Puente, California.

///

///

///

///

## II

## COMMON FACTUAL ALLEGATIONS

6. On July 25, 2005, MBE entered into a 10-year Franchise Agreement with Stups, governing the respective rights and obligations of the parties in connection with the operation of a Mail Boxes Etc. franchise doing business as "The UPS Store." Stups' obligations under the Franchise Agreement were guaranteed by Stups' principal, Berk.[1] (The parties' Franchise Agreement is attached as Exhibit "A" to this Counter-Claim). Between franchise fees and start-up costs, Defendants initially paid MBE approximately $150,000. In addition, under the Franchise Agreement, Defendants committed to paying MBE substantial monthly franchise fees and other monies.

7. As consideration for becoming a MBE franchisee, MBE granted Stups various rights, including, but not limited to,: a license to use various portions of MBE's and UPS's intellectual property, including their trademarks and written materials; Stups was supposed to obtain the benefit of the goodwill associated with use of MBE's and the United Parcel Service, Inc.'s ("UPS") brands; access to many of MBE's and UPS' systems for transacting business, including preferred arrangements for shipping packages via UPS; discounted shipping rates and commissions on UPS shipping transactions processed through Stups' franchise; scheduled daily shipping pick-ups and deliveries at Defendants' UPS Store; use of MBE's and UPS's

---

[1] MBE is a wholly owned subsidiary of United Parcel Service of America, Inc. ("UPS").

shipping materials; the benefits of MBE's and UPS's advertising, marketing and promotions; the benefits associated with being identified as a franchised UPS Store through MBE's and UPS's central call centers, directory and internet listings; and purported access to the services provided by MBE's and UPS's network of technical and service support to assist Defendants in the operation of their franchise.

8. In reliance upon MBE's grant to Stups of the aforesaid franchise, licenses and benefits, including MBE's promise to perform its obligations to Stups under the Franchise Agreement, Stups also entered into a 10-year lease with a third-party for occupancy of a retail space, which space was located by MBE and into which lease MBE directed Stups and Berk to enter. Berk was required to personally guarantee that lease. The financial obligation currently remaining on that lease is at least $226,000.

9. Notwithstanding MBE's entry into the Franchise Agreement with Stups, its receipt of both the initial franchise fees and subsequent monthly franchise payments from Stups, all of which were substantial, and the other benefits that MBE derived from having Stups act as one of its franchisees, throughout the 2½ year duration of Stups' franchise with MBE, MBE engaged in a pattern and practice of breaching its obligations under the Franchise Agreement and/or poorly performing its obligations to Stups.

10. Those deficiencies in MBE's performance of its obligations to Stups caused Stups to lodge a series of complaints about those deficiencies with MBE and UPS, and to

make numerous requests to MBE for remedial assistance to attempt to correct or mitigate MBE's and UPS's failures to fully and properly perform their obligations to Stups.

11. MBE's chronic breaches of its duties to Counter-claimants and its poor performance and mistreatment of them included the following noteworthy events:

1) Directing Stups to enter into a lease of a property designated by MBE, notwithstanding that the retail complex in which that space was located was then in foreclosure and/or receivership, which fact was concealed by MBE from Defendants and which fact rendered the property highly undesirable. As a result of its being in foreclosure, necessary repairs to the overall retail complex were deferred or cancelled by its owner(s) and the condition of the property was allowed to seriously deteriorate. In addition, there was a significant decline in occupancy of the other retail spaces in the retail complex, which has had a significant adverse impact on Stups' MBE-related business as the flow of customers into the retail complex, and into Stups' store, has thereby foreseeably diminished.

2) Failing to install the "UPS Store" signage for months after MBE's obligation to do so arose.

3) Insisting, through its District Consultant, that Stups purchase more supplies through MBE at one time than Stups needed in an entire year-and-a-half.

4) Losing, misdelivering, failing to deliver, or damaging so many packages sent from or to Stups' UPS Store due to MBE's and/or UPS's errors and negligence that Stups' UPS

Store experienced a disproportionately high lost and damaged package rate. The lost or damaged package rate that Stups' UPS Store has experienced has been as high as 1 out of every 163 packages, instead of the expected rate of 1 in 500.

5) Chronically failing to pick up packages from Stups' UPS Store as and when scheduled, including during the busy Christmas season when a disproportionate amount of a UPS Store's annual volume and profits are made, thereby rendering Stups unable to meet its obligations to its customers at that critical time.

6) Requiring Stups and other MBE franchisees to accept and process packages for UPS pick-up from E-Bay customers at a severely discounted commission rate to the franchisee.

7) Undercutting Stups' and other MBE franchisees' franchise and license rights by giving better shipping rates and promotional materials to Staples stores, even though those Staples stores directly compete with MBE's UPS Stores for packaging, shipping and photocopy services.

8) Undermining Stups' and other MBE franchisees' ability to earn drop-off commissions on UPS shipments by changing UPS's shipping policies to allow customers to use UPS drop boxes instead of MBE's UPS Store locations for many UPS deliveries.

9) Providing increasingly poor franchisee support, particularly with respect to lost packages and claims, and even making extra demands of Stups' customers for the presentment of claims against UPS or delaying the payment of their claims, even

when the packages were specifically insured for such claims and amounts.

10) Publishing directions to Stups' store on MBE's website that were inaccurate and unfamiliar to local residents.

11) Failing to timely place an advertisement for Stups' store in the local telephone directories. MBE first claimed the problem occurred because of an alleged failure by Stups to communicate with MBE, but ultimately acknowledged that the failure was caused by MBE.

12) Promising, but not performing, for months, and still not having completed performance of, the mitigation of MBE's agent's error in failing to cause the publication of Stups' store advertisement in the telephone directories.

13) MBE's District Consultant's (i.e., the district manager) purported requirement that Berk attend a 5-hour "meeting" of local store operators at a horse race track, even though no business was actually to be transacted at the gathering.

14) MBE's District Consultant's making disparaging remarks about Berk's caring for his 92-year old mother.

12. In the two-and-a-half years Stups has been a franchisee, Counter-claimants complained to MBE multiple times about the foregoing breaches by MBE of its obligations to Stups, but were generally unable to obtain a satisfactory resolution of those issues. With each successive complaint, however, MBE became increasingly unresponsive and the attitude of its personnel toward Stupss became increasingly disapproving and critical.

13. Despite the many complaints and requests for assistance made of various MBE personnel, MBE never once advised Stups that MBE disputed the accuracy or legitimacy of their complaints. Rather, MBE largely ignored them. Notwithstanding MBE's numerous failures to honor its obligations to Stups, to date Stups have not communicated to persons outside of the MBE/UPS family any of those concerns, disputes or grievances with MBE, nor have Stups taken any public action adverse to MBE. Stups have not misused or made any unauthorized use of MBE's trademarks or done anything that would materially impair the goodwill associated therewith. Nor have Stups engaged in the unauthorized use of confidential information.

14. On March 15, 2007, Stups sent an email to MBE's President, Stuart Mathis, expressing the grievance that MBE was improperly undercutting its franchisees and engaging in unfair and unlawful business practices by giving better shipping rates and marketing materials to Staples stores, even though those Staples stores were in direct competition with MBE franchises, including Stups, and were located within franchisees' exclusive territories.

15. Thereafter, the mediocre franchise support Stups had already been receiving became even more anemic and MBE employees became largely unresponsive to Stups' concerns and requests. Beyond apathy, MBE actually started looking for things about which to criticize Stups and for ways in which to make Stups' operations more difficult or costly.

16. Although Stups' franchise was run consistently pursuant to MBE's standards, MBE supervisors started "nit-picking" – trying to find even little things to harass Stups about. For example, even though Stups had its storefront windows professionally cleaned on a weekly basis, MBE supervisors complained that the windows were dirty and demanded that they be cleaned immediately. To drive up Stups' costs, MBE supervisors also demanded that Stups' interior store lights all remain on 24 hours per day, seven days per week, even when the store was closed. MBE started sending in "mystery customers" with forty cent copy jobs to see if Stups's personnel would give the expected sales pitch about all of the other services the franchise offers. And those "mystery customers" made a point of coming in when there was a line of packaging customers so that they could then report that they did not receive "full and undivided attention."

17. MBE's malfeasance and mistreatment of Stups heightened after Stups discussed with MBE in January 2008 their utter dissatisfaction with MBE's performance of its obligations and Stups's consequent desire either to have MBE buy back Stups's franchise or to allow them to sell it.

18. After persistently seeking a meeting on this proposal for two months, finally, MBE personnel informed Berk that there would be a meeting held at Stups's store on March 13th in which a resolution would be discussed. However, the promise of a meeting to discuss a resolution proved to be a ruse. MBE scheduled to purported meeting solely to ensure Berk was present

to be served by MBE's lawyer with a letter that purported to terminate Stups's franchise without notice or opportunity to cure any alleged breach.

19. Notwithstanding the ongoing negotiations prompted by the termination letter between MBE's lawyer and Stups's lawyer regarding MBE's purported termination of the franchise and regarding the timing of Stups's prospective sale of the franchise, by the night of March 14, 2008, MBE disabled Stups's access to the MBE/UPS computer system, thereby disabling Stups's access to the MBE/UPS point of sale (i.e., cash register) system, to the MBE/UPS shipping manifest system, to the MBE/UPS administrative system, to Stups' own financial data kept on QuickBooks on said computer system, and Stups's own email.

20. MBE's disabling of Stups' access to the foregoing systems, equipment and data effectively put Defendants out of business. Moreover, MBE's conduct is denying Stups unfettered use and enjoyment of their substantial investment, is denying Stups their livelihood and is a continuing interference with Stups' relationships with their customers.

**III**

**FIRST CLAIM FOR RELIEF**

**(Breach of Contract)**

21. Stups realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1 through 20, inclusive.

22. On July 25, 2005, MBE entered into a 10-year Franchise Agreement with Stups, governing the respective rights and

obligations of the parties in connection with the operation of a Mail Boxes Etc. store. (The parties' Franchise Agreement is attached as Exhibit "A" to this Counter-Claim). Between franchise fees and start-up costs, Stups initially paid MBE approximately $150,000. In addition, under the Franchise Agreement, Stups committed to pay MBE substantial monthly franchise fees and other monies.

23. As consideration for becoming a MBE franchisee, MBE granted Stups various rights, including the following: a license to use various portions of MBE's and UPS's intellectual property, including their trademarks and written materials; Stups was supposed to obtain the benefit of the goodwill associated with use of MBE's and UPS' brands; access to many of MBE's and UPS' systems for transacting business, including preferred arrangements for shipping packages via UPS; discounted shipping rates and commissions on UPS shipping transactions processed through Stups franchise; scheduled daily shipping pick-ups and deliveries at Defendants' UPS Store; use of MBE's and UPS' shipping materials; the benefits of MBE's and UPS' advertising, marketing and promotions; the benefits associated with being identified as a franchised UPS Store through MBE's and UPS' central call centers, directory and internet listings; and purported access to the services provided by MBE's and UPS' network of technical and service support to assist Defendants in the operation of their franchise.

24. In reliance upon MBE's grant to Stups of the aforesaid franchise, licenses and benefits, including MBE's promise to perform its obligations to Stups under the Franchise Agreement,

Stups also entered into a 10-year lease with a third-party for occupancy of a retail space, which space was located by MBE and into which lease MBE directed Stups and Berk to enter. Berk was required to personally guarantee that lease. The financial obligation currently remaining on that lease is at least $226,000.

25. Stups fully performed all obligations required of them under the terms of the Franchise agreement with MBE, except those which may be excused by virtue of MBE's breach or by the failure of consideration therefor.

26. MBE breached the Franchise agreement with Stups by, among other things,:

1) Directing Counter-claimants to enter into a lease of a property designated by MBE, notwithstanding that the retail complex in which that space was located was then in foreclosure and/or receivership, which fact was concealed by MBE from Defendants and which fact rendered the property highly undesirable. As a result of its being in foreclosure, necessary repairs to the overall retail complex were deferred or cancelled by its owner(s) and the condition of the property was allowed to seriously deteriorate. In addition, there was a significant decline in occupancy of the other retail spaces in the retail complex, which has had a significant adverse impact on Stups' MBE-related business as the flow of customers into the retail complex, and into Stups' store, has thereby foreseeably diminished.

2) Failing to install the "UPS Store" signage for months after MBE's obligation to do so arose.

3) Insisting, through its District Consultant, that Stups purchase more supplies through MBE at one time than Stups needed in an entire year and a half.

4) Losing, misdelivering or damaging so many packages sent from or to Stups' UPS Store due to MBE's and/or UPS' errors that Stups' UPS Store experienced a disproportionately high lost and damaged package rate. The lost or damaged package rate that Stups' UPS Store has experienced has been as high as 1 out of every 163 packages, instead of the expected rate of 1 in 500.

5) Chronically failing to pick up packages from Stups' UPS Store as and when scheduled, including during the busy Christmas season when a disproportionate amount of a UPS Store's annual volume and profits are made, thereby rendering Stups unable to meet its obligations to its customers at that critical time.

6) Requiring Stups and other MBE franchisees to accept and process packages for UPS pick-up from E-Bay customers at a severely discounted commission rate to the franchisee.

7) Undercutting Stups' and other MBE franchisees' franchise and license rights by giving better shipping rates and promotional materials to Staples stores, even though those Staples stores directly compete with MBE's UPS Stores for packaging, shipping and photocopy services.

8) Undermining Stups' and other MBE franchisees' ability to earn drop-off commissions on UPS shipments by changing UPS' shipping policies to allow customers to use UPS

drop boxes instead of MBE's UPS Store locations for many UPS deliveries.

9) Providing increasingly poor franchisee support, particularly with respect to lost packages and claims, and even making extra demands of Stups' customers for the presentment of claims against UPS or delaying the payment of their claims, even when the packages were specifically insured for such claims and amounts.

10) Publishing directions to Stups' store on MBE's website that were inaccurate and unfamiliar to local residents.

11) Failing to timely place an advertisement for Stups' store in the local telephone directories. MBE at first claimed the problem to have arisen because of an alleged failure by Defendants to communicate with MBE, but ultimately acknowledged that the failure was on MBE's end.

12) Promising, but not performing, for months, and still not having completed performance of, the mitigation of MBE's agent's error in failing to cause the publication of Stups' store advertisement in the telephone directories.

13) MBE's District Consultant's (i.e., the district manager) purported requirement that Berk attend a 5-hour "meeting" of local store operators at a horse race track, even though no business was actually to be transacted at the gathering.

14) MBE's District Consultant's making disparaging remarks about Berk's caring for his 92-year old mother.

27. On or about March 14, 2008, MBE further breached the Franchise Agreement when it purported to terminate the Stups'

franchise and thereafter refused to supply and service Stups' business as called for under the Franchise Agreement. That termination was improper because good cause did not exist for the termination and no cause existed to allow MBE to terminate the Franchise Agreement without first providing notice to Stups and an opportunity to cure any purported default. Thus, MBE breached the Franchise Agreement when it failed to send Stups proper notice of termination and afford Stups a reasonable opportunity to cure any alleged default, which was required under the terms of the Franchise Agreement.

28. When MBE purported to terminate the franchise, it was obligated under the provisions of the Franchise Relations Act, Business and Professions Code Sections 20000-20041, to offer to repurchase from Stups the resalable current inventory of the franchise that met MBE's then present standards and was held for use or sale in Stups' business. MBE's failure to offer to repurchase Stups' resalable current inventory was a violation of the Franchise Relations Act and a breach of the Franchise Agreement.

29. As proximate result of MBE's breaches, Stups has been damaged in an amount yet to be ascertained, but which is believed to be in excess of $75,000. Stups will amend its Counter-Claim at such time as its damages have been ascertained, or provide proof of such damages at the time of trial. In addition, Stups is entitled to recover their reasonable attorneys' fee incurred.

/ / /

IV

**SECOND CLAIM FOR RELIEF**

**(Unfair Competition)**

30. Stups realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1 through 20, inclusive.

31. In engaging in the conduct alleged herein, MBE engaged in unlawful business acts or practices, unfair business acts and practices, and fraudulent business acts or practices, all as proscribed by Business and Professions Code Section 17200, et seq.

32. MBE has engaged in acts of unfair competition as defined in Business and Professions Code section 17200 by failing to terminate the franchise with Stups for good cause in violation of Business and Professions Code section 20020. MBE also engaged in unfair competition by terminating the franchise without notice and an opportunity to cure in violation of Business and Professions Code section 20021. Such conduct on the part of MBE was unlawful and unfair.

33. Pursuant to Business and Professions Code section 17203, Stups is entitled to preliminary and permanent injunctive relief ordering MBE to cease this unfair competition and an order prohibiting MBE from interfering with Stups' rights and benefits conferred by the parties' Franchise Agreement dated July 25, 2005.

///

///

34. Stups also requests that the Court order MBE to pay restitution and/or disgorge all ill-gotten gains associated with MBE's unfair competition.

V

**THIRD CLAIM FOR RELIEF**

**(Declaratory Relief)**

35. Stups realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1 through 20, inclusive.

36. An actual controversy has arisen and now exists between Stups and MBE concerning their respective rights and duties in that Stups contends that MBE does not have any grounds for terminating the Franchise Agreement without notice and/or opportunity to cure, whereas Stups disputes these contentions and contends that it may terminate Stups' franchise and franchise rights under the parties' Franchise Agreement without notice and opportunity to cure for what MBE has determined subjectively to be offensive comments made solely to MBE's personnel and not to any third party, which is not a valid basis to terminate the Franchise Agreement under the written terms therein.

37. Stups desires a judicial determination of its rights and duties, and a declaration as to whether MBE may terminate Stups' franchise and franchise rights under the parties' Franchise Agreement without notice and opportunity to cure for what MBE has determined subjectively to be offensive comments made to MBE's personnel.

38. A judicial declaration is necessary and appropriate at this time under the circumstances in order that Stups may ascertain its rights and duties under the Franchise agreement.

**VI**

**FOURTH CLAIM FOR RELIEF**

**(Injunctive Relief)**

39. Stups realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1 through 20, inclusive.

40. Since Stups entered into a Franchise Agreement with MBE approximately two-and-a-half years ago, and continuing to the present time, MBE has wrongfully and unlawfully denied Stups their rights and benefits under the Franchise Agreement, including improper termination of the franchise in violation of California's Franchise Relations Act.

41. MBE's wrongful conduct, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to Stups because Stups cannot carry on its usual business without the benefits and rights of the franchise. Without such rights and benfits, Stups' business will be irreparably damage in an amount that is not easily ascertainable and moreover, every day that MBE's wrongful and unlawful conduct is not enjoined, Stups' business goodwill suffers further damage and Stups risks further loss of its customer base which is not easily recoverable and may be permanently lost.

42. Stups have no adequate remedy at law for the injuries being suffered because it will be impossible for Stups to

determine the precise amount of damage which they will suffer if MBE's conduct is not restrained.

**PRAYER FOR RELIEF**

WHEREFORE, Defendants and Counter-Claimants Stups, Inc. and Stuart Berk pray that judgment be entered in their favor and against MBE as follows:

**First Claim for Relief -- (Breach of Contract)**

1. For compensatory damages in an amount according to proof at the time of trial, plus interest thereon at the legal rate;

2. For Stups' costs of suit incurred herein, including a reasonable attorneys' fee award;

3. For such other and further relief as the Court may deem just and proper.

**Second Claim for Relief -- (Unfair Competition)**

1. For restitution and/or disgorgement of profits and ill-gotten gain by MBE in an amount according to proof at the time of trial, plus interest thereon at the legal rate;

2. For issuance of a temporary restraining order, preliminary injunction, and permanent injunction restraining and enjoining Mail Boxes Etc., Inc. from terminating the Franchise Agreement and/or denying Stups, Inc. and Stuart Berk the rights and benefits afforded them under the Franchise Agreement.

3. For Stups' costs of suit incurred herein;

4. For such other and further relief as the Court may deem just and proper.

**<u>Third Claim for Relief</u> -- (Declaratory Relief)**

1. For a declaration that Mail Boxes Etc., Inc. does not have any grounds to terminate the Franchise Agreement without first providing to Stups, Inc. and Stuart Berk notice and an opportunity to cure;

2. For issuance of a temporary restraining order, preliminary injunction, and permanent injunction restraining and enjoining Mail Boxes Etc., Inc. from terminating the Franchise Agreement.

3. For Stups' costs of suit incurred herein, including a reasonable attorneys' fee award; and

4. For such other and further relief as the Court may deem just and proper.

**<u>Fourth Claim for Relief</u> -- (Injunctive Relief)**

1. For issuance of a temporary restraining order, preliminary injunction, and permanent injunction restraining and enjoining Mail Boxes Etc., Inc. from terminating the Franchise Agreement and/or denying Stups, Inc. and Stuart Berk their rights and benefits afforded under the terms of the Franchise Agreement.

2. For Stups' costs of suit incurred herein, including a reasonable attorneys' fee award; and

3. For such other and further relief as the Court may deem just and proper.

DATED: March 28, 2008

Respectfully submitted,

FINESTONE & RICHTER

By ______________________
John J. Waller, Jr.

Attorneys for Defendants and Counter-Claimants Stups, Inc. and Stuart Berk

**DEMAND FOR JURY TRIAL**

Demand for trial by jury is hereby made as provided for in Rule 38(b) of the Federal Rules of Civil Procedure, and as specified by CivLR 38.1 of the Local Civil Rules of Practice for the United States District Court for the Southern District of California.

DATED: March 28, 2008

JOHN J. WALLER, JR.
JAY STEIN
FINESTONE & RICHTER

By ______________________
John J. Waller, Jr.

Attorneys for Defendants and Counter-Claimants Stups, Inc. and Stuart Berk

## VERIFICATION

STATE OF CALIFORNIA )
) SS:
COUNTY OF SAN DIEGO )

I, Stuart Berk, declare:

That I am a party to this action. I am also the President of Stups, Inc., which is also a party to this action and am authorized to make this verification for and on its behalf. I make this verification in both capacities. I have read the foregoing Defendants' Verified Counter-Claim and am informed and believe, and on that basis allege, that the matters stated in the Verified Answer are true.

I declare under penalty of perjury that the above is true and correct.

Executed this 28th day of March, 2008, at Bellemore, New York.

Stuart Berk