JOHN J. WALLER, JR. (State Bar No. 094449)
JAY STEIN (State Bar No. 141042)
Members of
FINESTONE & RICHTER,
A Professional Corporation
11601 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
Telephone: (310) 575-0800
Facsimile: (310) 575-0170
E-Mail: jwaller@frlawcorp.com
jstein@frlawcorp.com

Attorneys for Defendants
Stups, Inc. and Stuart Berk

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MAIL BOXES ETC., INC.,<br><br>Plaintiff,<br><br>vs.<br><br>STUPS, INC. and STUART BERK,<br><br>Defendants. | Case No.: 3:08-CV-00491-JAH- POR<br><br>**COUNTER-CLAIMANT STUPS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date: TBD<br>Time: TBD<br>Judge: Hon. John A. Houston<br>Place: Courtroom 11 |

Cross-complainant Stups, Inc. submits the following points and authorities in support of its motion for the issuance of a temporary restraining order:

## I.

## THE RELIEF SOUGHT

Counter-claimant Stups, Inc. seeks an order from this Court restraining Counter-defendant Mail Boxes Etc., Inc. from doing any act or omission which interferes with Stups' franchise and license rights and benefits as set forth in, and resulting from, the parties' Franchise Agreement executed on July 6, 2005 and July 25, 2005.

## II.

## THE UNDERLYING FACTS SUBSTANTIATING THE NECESSITY OF ISSUING A TEMPORARY RESTRAINING ORDER.

In July 2005, Counter-defendant Mail Boxes Etc., Inc. ("MBE") entered into a franchise agreement with Counter-claimant Stups, Inc. ("Stups") with respect to the establishment and operation of a private mailbox, packaging and shipping store located within a designated territory in Nasau County, New York (hereinafter referred to as the "Franchise Agreement"). A copy of the Franchise Agreement is attached to the Declaration of Stuart Berk as Exhibit "A."

Between franchise fees and start-up costs, Defendants initially paid MBE approximately $150,000. In addition, under the Franchise Agreement, Defendants committed to paying MBE substantial monthly franchise fees and other monies. In reliance upon MBE's grant to Stups of the aforesaid franchise, licenses and benefits, including MBE's promise to perform its obligations to Stups under the Franchise Agreement, Stups also entered into a 10-year lease with a third-party for occupancy of

a retail space, which space was located by MBE and into which lease MBE directed Stups and Berk to enter. Berk was required to personally guarantee that lease. The financial obligation currently remaining on that lease is at least $226,000. (Berk Decl., ¶ 4.)

The Franchise Agreement conferred to Stups certain rights and benefits for a ten year period, with the right of renewal, including, but not limited to: (i) licenses to use certain intellectual property, such as trademarks, service marks, and copyrighted materials, belonging to MBE and/or its parent company, United Parcel Service of America, Inc. ("UPS"); (ii) the use of MBE's and UPS' brand names and the benefits of the good will associated therewith; (iii) the use of certain of MBE's and UPS' systems and procedures, including its computerized systems; (iii) the benefit of MBE's and UPS' support and assistance services, such as MBE's and UPS' staff whose job it is to advise the franchisee and to facilitate smooth operation of the franchise and to serve as a liason between the franchisee and MBE and UPS; (iv) preferred rates and commissions with respect to packages shipped through UPS; (v) regularly scheduled UPS truck pick-ups and deliveries; and, (vi)an exclusive territory in which to operate. (Berk Decl., ¶ 3.)

Commencing early in the franchise relationship and escalating in severity with time, Stups experienced many problems with MBE's performance of its obligations under the Franchise Agreements and was treated either unfairly or improperly, including by doing the following:

1) Directing Defendants to enter into a lease of a property designated by MBE, notwithstanding that the retail complex in which that space was located was then in foreclosure and/or receivership, which fact was concealed by MBE from Defendants and which fact rendered the property highly undesirable. As a result of its being in foreclosure, necessary repairs to the overall retail complex were deferred or cancelled by its owner(s) and the condition of the property was allowed to seriously deteriorate. In addition, there was a significant decline in occupancy of the other retail spaces in the retail complex, which has had a significant adverse impact on Stups' MBE-related business as the flow of customers into the retail complex, and into Stups' store, has thereby foreseeably diminished. (Berk Decl., ¶ 5.1.)

2) Failing to install the "UPS Store" signage for months after MBE's obligation to do so arose. A copy of an email message from me to Jones Rodney of MBE, dated October 4, 2005, referencing this issue is attached as Exhibit "B" to the Berk Decl., ¶ 5.2.

3) Insisting, through its District Consultant, that Stups purchase more supplies through MBE at one time than Stups needed in an entire year and a half. (Berk Decl., ¶ 5.3.)

4) Losing, misdelivering or damaging so many packages sent from or to Stups' UPS Store due to MBE's and/or UPS' errors that Stups' UPS Store experienced a disproportionately high lost and damaged package rate. The lost or damaged package rate that Stups' UPS Store has experienced has been as high as 1 out of

every 163 packages, instead of the expected rate of 1 in 500. (Berk Decl., ¶ 5.4.)

5) Chronically failing to pick up packages from Stups' UPS Store as and when scheduled, including during the busy Christmas season when a disproportionate amount of a UPS Store's annual volume and profits are made, thereby rendering Stups unable to meet its obligations to its customers at that critical time. (Berk Decl., ¶ 5.5.)

6) Requiring Stups and other MBE franchisees to accept and process packages for UPS pick-up from E-Bay customers at a severely discounted commission rate to the franchisee. Reference to that issue was raised by Defendants in an email message to Steve D'Andrea, copied to Jay Schlessinger and Robert Kaufman, dated June 25, 2007, a copy of which is attached as Exhibit "C" to the Berk Decl., ¶ 5.6.

7) Undercutting Stups' and other MBE franchisees' franchise and license rights by giving better shipping rates and promotional materials to Staples stores, even though those Staples stores directly compete with MBE's UPS Stores for packaging, shipping and photocopy services. (A copy of an email message, dated March 15, 2007, that Defendants sent to MBE President Stuart Mathis discussing this issue is attached as Exhibit "D" to the Berk Decl., ¶ 5.7.)

8) Undermining Stups' and other MBE franchisees' ability to earn drop-off commissions on UPS shipments by changing UPS' shipping policies to allow customers to use UPS drop boxes instead of MBE's UPS Store locations for many UPS deliveries. (A copy of the email message trail discussing this deficiency,

bearing dates from January 12, 2008 through January 14, 2008, is attached as Exhibit "E" to the Berk Decl., ¶ 5.8.)

9) Providing increasingly poor franchisee support, particularly with respect to lost packages and claims, and even making extra demands of Stups' customers for the presentment of claims against UPS or delaying the payment of their claims, even when the packages were specifically insured for such claims and amounts. One example of these problems is reflected in the email message chain, bearing dates from January 16, 2008 through January 22, 2008, discussing MBE's/UPS' refusal to refund the payment on a package of a Stups customer that was lost for a month, a copy of which is attached as Exhibit "F" to the Berk Decl., ¶ 5.9. Another example is illustrated by the email message, dated May 23, 2007, about delays in paying a claim for lost goods, a copy of which is attached as Exhibit "G" to the Berk Decl., ¶ 5.9.

10) Publishing directions to Stups' store on MBE's website that were inaccurate and unfamiliar to local residents. (Berk Decl., ¶ 5.10.)

11) Failing to timely place an advertisement for Stups' store in the local telephone directories. MBE at first claimed the problem to have arisen because of an alleged failure by Defendants to communicate with MBE, but ultimately acknowledged that the failure was on MBE's end. (Berk Decl., ¶ 5.11.)

12) Promising, but not performing, for months, and still not having completed performance of, the mitigation of MBE's agent's error in failing to cause the publication of Stups' store advertisement in the telephone directories. This error is

documented in part by the email messages starting on November 14, 2007, and continuing through March 11, 2008, copies of which are collectively attached as Exhibit "H" to the Berk Decl., ¶ 5.12.

13) MBE's District Consultant's (i.e., the district manager) purported requirement that Berk attend a 5-hour "meeting" of local store operators at a horse race track, even though no business was actually to be transacted at the gathering. (Berk Decl., ¶ 5.13)

14) MBE's District Consultant's making disparaging remarks about Berk's caring for his 92-year old mother. (Berk Decl., ¶ 5.14)

Stups frequently communicated its concerns to MBE about those problems and, generally, was unable to receive satisfactory resolutions from MBE. Stups' principal also perceived that he was receiving the "cold shoulder" from MBE as the result of his communications, and especially experienced that chilly reception last year, after he had complained to MBE's president about MBE's/UPS' actions of undercutting the franchisees by giving more favorable shipping rates and terms to Staples stores that were in direct competition with the franchisees, including Stups. (Berk Decl., ¶ 7.)

As the product of Stups' growing dissatisfaction with MBE's performance as a franchisor and its increasing unresponsiveness to Stups' concerns and complaints, starting in January 2008, Stups proposed to MBE that the situation be resolved either by MBE's repurchase of Stups' franchise, or by Stups' sale of the franchise to a third party and that MBE contribute to the sale

price so as to make Stups whole. On or about March 10, 2008, Stups was informed that MBE had agreed to a meeting to discuss Stups' concerns, which meeting would occur at Stups' store on March 13th. (Berk Decl., ¶ 21.)

Instead of meeting with Stups about its concerns regarding MBE's malperformance of its Franchise Agreement obligations, MBE served Stups with a letter from MBE's lawyer (the "Termination Letter") purporting to terminate Stups' franchise – without notice and opportunity to cure. A copy of the Termination letter is attached to the Declaration of Stuart Berk as Exhibit "B." On March 14, 2008, MBE unilaterally cut off all of Stups' access to the use of MBE's and UPS' systems and procedures, including the computerized systems and use of the cash register, the benefit of MBE's and UPS' support and assistance services, its ability to ship packages through UPS and at the preferred rates and commissions, and Stups' ability to access its own computerized books and records and email communications. As the result of MBE's interference with Stups' rights, Stups' is effectively unable to conduct business and is losing customers and suffering injury to its goodwill, although Stups remains obligated to pay rent and other operating costs. Without the revenues generated as a direct benefit of the franchise rights, Stups is unable to pay its bills, which will ultimately result in adverse and irreparable consequences such as the entry of judgments and damage to the principal's credit. Soon, perhaps within days, Stups will be unable to remain open for business if its franchise rights continue to be impeded and Stups will thereby suffer the loss of hundreds of thousands of

dollars of investment and work and the loss of Stups' principal's means of earning a living. In addition, in the next few days, Stups' employees will become unemployed. (Berk Decl., ¶ 24.)

MBE's Termination Letter cites a clause of Section 12.4(k) as the grounds for MBE's purported termination without notice or opportunity to cure, that Stups has taken action that "reflects materially and unfavorably upon the operation and reputation of the Center" (the "Reputation Clause"). The actions that MBE's Termination Letter identifies as violating that clause consist exclusively of conversations and voicemail messages to MBE/UPS personnel which MBE characterizes as being "offensive and profane." MBE has cited no public act and no statements to third parties allegedly taken or made by Stups that have injured MBE's "reputation."

Even as to those internal communications within the MBE/UPS family MBE's Termination Letter attributes to Stups' principal, Berk, Stups and Berk dispute the accuracy of the statements and also testify that some are taken out of their proper contexts or are strung together misleadingly. (Berk Decl., ¶ 25.4.) Accordingly, Stups disputes that its franchise rights were lawfully terminated and contends that they exist and are enforceable. On that basis, and as discussed below, Stups seeks an order from this Court enjoining MBE's interference with Stubs' operation of the franchise.

Concurrent with the filing of this motion, Stups is filing a verified counter-claim against MBE seeking injunctive and

declaratory relief and damages. That verified counter-claim is incorporated herein by reference.

## III.

## MBE BREACHED THE FRANCHISE AGREEMENT BY UNILATERALLY TERMINATING THE FRANCHISE ON IMPROPER AND PRETEXTUAL GROUNDS AND WITHOUT NOTICE AND OPPORTUNITY TO CURE AND, NOW WRONGFULLY INTERFERES WITH STUPS' FRANCHISE OPERATION.

### A. California Law Favors Protecting Franchisees From Summary Terminations of Their Franchise Rights by Franchisors.

The California Franchise Relations Act, Business and Professions Code Section 20000, et seq., governs the relationship between franchisors and franchisees.

"The motivating purpose behind the CFRA was to protect franchisees, not franchisors, from contracts of adhesion and abrupt terminations without cause." *Gabana Gulf Distribution, Ltd., et al. v. GAP International Sales, Inc.,* 2006 U.S. Dist. LEXIS 59799 (N.D. California, 2006). The Act's purpose "to protect franchisees" was recognized in *JRS Products, Inc. v. Matsushita Electric Corp. of America,* 115 Cal App 4th 168, at 174 (2004), which amplifies that the Act is "legislation designed to expand, not retract, a franchisee's remedies."

Business and Professions Code Section 20020 precludes a franchisor from "terminat[ing] a franchise prior to the expiration of its term, except for good cause." "Good cause" is defined in that Section as being "the failure of the franchisee to comply with any lawful requirement of the franchise agreement after being given notice thereof and a reasonable opportunity

. . . to cure the default."

Business and Professions Code Section 20021 limits the instances in which a franchisor may terminate the franchise without notice and opportunity to cure to eleven circumstances: (a) bankruptcy; (b) abandonment of the franchise; (c) mutual agreement to terminate; (d) if the franchisee made material misrepresentations in acquiring the franchise; (e) the franchisee's failure to comply with laws governing the operation of the business after being given ten days' notice; (f) multiple non-compliances with the franchise agreement for which notice has previously been given; (g) repeated failures to comply with franchise agreement requirements; (h) the seizure of the business or business premises; (i) conviction of a felony or other crime relevant to the operation of the franchise; (j) the failure to pay franchise fees after the giving of a five day notice; and (k) the continued operation of the franchise will result in imminent danger to public health or safety. None of those circumstances is applicable to the facts in this case.

Moreover, the Act requires all notices to be given in writing, stating the intent to terminate as of a particular date, and stating the reasons for the termination. (Business and Professions Code § 20030.)

B. <u>The Franchise Agreement Limits the Grounds for the Termination of Defendants' Franchise Rights</u>.

The Franchise Agreement contains a choice of law provision, at 20.1 thereof, requiring the application of the substantive law of California. Thus, the provisions of the California Franchise Relations Act govern the interpretation and

enforcement of the Franchise Agreement.

Section 12 of the Franchise Agreement sets forth the contractual scheme agreed to by the parties for the termination of the parties' Franchise Agreement. Section 12.1 governs the grounds for termination of Stups as its franchisee. Section 12.2 restricts MBE's right to terminate the Agreement to termination "only for 'cause.'" Section 12.3 requires MBE to give 30 days written notice and opportunity to cure any default under the Agreement, other than certain limited items of default listed in Section 12.4. Section 12.4 lists events of default that are similar, but not identical, to those set forth in Business and Professions Code Section 20021. However, once again, none of the categories of grounds for which termination without notice or opportunity to cure is applicable to the facts in this case.

C. <u>Having Wrongfully Declared Stups' Franchise Terminated, MBE's Continuing Interference with Stups' Exercise of its Franchise Rights is Unlawful</u>.

MBE had no grounds to declare unilaterally and without notice or opportunity to cure the termination of Stups' franchise. As a result, MBE's interruption of Stups' access to all of the materials, processes and services necessary to operate its business is unlawful.

///

///

///

IV.

**STUPS WILL SUFFER IMMEDIATE AND IRREPARABLE INJURY IF A TEMPORARY RESTRAINING ORDER IS NOT GRANTED.**

Federal Rules of Civil Procedure ("FRCP") 65(b)(1)(A) empowers this Court to issue a temporary restraining order when it appears from an affidavit or verified complaint that immediate and irreparable injury, loss or damage will result if an injunctive order is not issued before a full adjudication of the matter.

There is no way to repair the loss of and damage to goodwill occurring every day that MBE continues to interfere with Stup's franchise rights. And, without immediate injunctive relief, Stups' employees will become unemployed. As well, the loss of an entire investment of hundreds of thousands of dollars by virtue of MBE's unfettered interference with Stups' rights is so substantial that it merits preservation.

The Court is further invited to apply the standard for preliminary injunctive relief enunciated in Grocery Outlet, Inc. v. Albertson's, Inc., 497 F3d 949, 951 (9th Cir. 2007) that the injunctive relief should be granted when either there is (i) a demonstration of "probable success on the merits and the possibility of irreparable injury," or (ii) "the existence of serious questions going to the merits and that the balance of hardships tips sharply in [the moving party's] favor.

The application of the facts to the law here favor greatly the issuance of the injunctive relief order, as to either test. It is patently evident even from MBE's own Termination Letter that MBE has identified no action by Stups that has injured

MBE's reputation so as to come within the Reputation Clause of Section 12.4(k). As a result, MBE was not authorized to terminate the Franchise Agreement and interfere with Stups' franchise rights as it did, without notice and opportunity for cure. And, even in the most charitable of readings of MBE's Termination Letter and of views of the evidence, there is at least serious questions raised as to the lawfulness of MBE's termination of the franchise and interference with Stups' franchise rights. When the existence of those questions is coupled with the view that forcing Stups' out of business, losing valuable rights, losing good will, putting Stups' employees out of work, and saddling an ordinary individual with substantial residual business obligations and debt with the corresponding benefits which Stups' contemplated when taking on those obligations, demonstrates that the hardships that are being and will be suffered by Stups are manifestly more severe to Stups than would be any harm resulting to MBE if Stups is permitted to continue operating its franchise in the ordinary course.

## V.

## THE RESTRAINING ORDER MUST BE GRANTED

The Court is presented here with clear evidence that MBE continues daily to interfere with Stups' franchise rights and the operation of Stups' business. MBE's apparent justification for that interference is that it claims to have terminated Stups' franchise, under color of the authority of the Reputation Clause of the Franchise Agreement. However, even on the face of

MBE's Termination Letter, none of the acts described (even if taken as true) constitute acts violative of the Reputation Clause, particularly as none were ever public acts.

Given the great hardship and irreparable damage that MBE's daily interference imposes upon Stups, the immediate issuance of a temporary restraining order is necessary.

DATED: March 28, 2008

JOHN J. WALLER, JR.
JAY STEIN
FINESTONE & RICHTER

By_______________________
Jay Stein

Attorneys for Defendants
Stups, Inc. and Stuart Berk

F:\CLIENTS\Stups-Berk\Pleadings\Stups TRO Application\Stups TRO Memo of Ps and As.1.doc