JOHN J. WALLER, JR. (State Bar No. 094449)
JAY STEIN (State Bar No. 141042)
Members of
FINESTONE & RICHTER,
A Professional Corporation
11601 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
Telephone: (310) 575-0800
Facsimile: (310) 575-0170
E-Mail: jwaller@frlawcorp.com
jstein@frlawcorp.com

Attorneys for Defendants
Stups, Inc. and Stuart Berk

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MAIL BOXES ETC., INC.,<br><br>Plaintiff,<br><br>vs.<br><br>STUPS, INC. and STUART BERK,<br><br>Defendants. | Case No.: 3:08-CV-00491-JAH- POR<br><br>**DECLARATION OF STUART BERK IN SUPPORT COUNTER-CLAIMANT'S MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date: TBD<br>Time: TBD<br>Judge: Hon. John A. Houston<br>Place: Courtroom 11 |

I, Stuart Berk, declare as follows:

1. I am a Defendant in the above-captioned matter and am also the principal of another named defendant AND THE Counter-claimant, Stups, Inc. In those capacities, I have personal knowledge of the facts set forth in this declaration and could competently testify thereto if called as a witness.

2. After my retirement from a successful career as a business owner, I formed a New York corporation named Stups, Inc.

3. In July 2005, Stups purchased from Mail Boxes, Etc., Inc., a California corporation ("MBE"). certain franchise and licensing rights to operate a retail private mail, packaging and photocopy store using names such as "UPS Store" and "Mail Boxes, Etc." The Franchise Agreement that Stups entered into with MBE obligated Stups, among numerous other obligations dictated by MBE, to use the package delivery services of MBE's parent company, United Parcel Service, Inc. ("UPS"). In turn, the Franchise Agreement afforded Stups the right to use MBE's and UPS's branding, trademarks, and certain other aspects of its intellectual property, access to UPS's computerized package delivery system, scheduled daily pickups and deliveries by UPS to Stups' store, discounted shipping rates and preferred commission rates with UPS, use of certain MBE and UPS equipment and supplies, certain benefits afforded by access to or use of MBE's and UPS's central call centers, directory and internet listings, commissions for UPS packages dropped off by customers at Stups' store, and technical and service support, amongst other rights and benefits. In exchange for the foregoing rights, Stups initially paid paid MBE approximately $150,000.00 in franchise and start-up fees, and agreed to make additional payments to MBE, including paying MBE monthly fees equal to 8.5% of Stups' sales, plus another $300. In addition to the initial franchise and start-up fees, Stups invested thousand of dollars more in setting up its UPS store. A true and correct copy of

the Franchise Agreement between MBE and Stups, including some but not all of its Exhibits, is attached hereto as Exhibit "A."

4. In reliance upon MBE's grant of the aforesaid franchise, including the licenses and benefits conferred thereby, and with the reasonable expectation that MBE would perform its obligations to Stups under the Franchise Agreement, Stups also entered into a 10-year lease with a third-party for occupancy of a retail space for Stups' UPS Store, performance of which was personally guaranteed by me. That retail space was located by MBE and MBE directed Stups and I to enter the referenced lease. The financial obligation currently remaining on that lease is at least $226,000.

**MBE's History of Breaches and Failures to Perform its Obligations**

5. Although Stups has substantially performed all obligations required of it by the terms of the Franchise Agreement, MBE has engaged in a pattern and practice of failing to perform its obligations thereunder, and of mistreating me as the franchise operator. Some examples of MBE's breaches of its obligations and its mistreatment of me include the following:

5.1 Directing Stups and I to enter into a lease of a property designated by MBE, notwithstanding that the retail complex in which that space was located was then in foreclosure and/or receivership, which fact was concealed from me and which fact rendered the property highly undesirable. As a result of its being in foreclosure, necessary repairs to the overall retail complex have been deferred or cancelled and the condition of the property has seriously deteriorated. In addition, there

has been a significant decline in occupancy of the other retail spaces, which has had a significant adverse impact on Stups' MBE related business as the flow of customers into the retail complex, and into Stups' store, has thereby foreseeably diminished.

5.2 Failing to install the "UPS Store" signage for months after MBE's obligation to do so arose. A true and correct copy of an email message from me to Jones Rodney of MBE, dated October 4, 2005, referencing this issue is attached hereto as Exhibit "B."

5.3 Insisting, through its District Consultant, that Stups purchase more supplies through MBE at one time than Stups needed in even an entire year and a half.

5.4 Losing, misdelivering or damaging so many packages sent from or to Stups' store due to MBE's and/or UPS's errors that Stups' store has experienced a disproportionately high lost and damaged package rate. The lost or damaged package rate that Stups has experienced has been as high as 1 out of every 163 packages in January 2008, instead of the expected rate of 1 in 500.

5.5 Chronically failing to pick up packages from Stups' store as and when scheduled, including during the busy Christmas season when a disproportionate amount of a UPS Store's annual volume and profits are made, thereby rendering Stups unable to meet its obligations to its customers at that critical time.

5.6 Requiring Stups and other franchisees to accept and process packages for UPS pick-up from E-Bay customers at a severely discounted commission rate to the franchisee. Reference to that issue was raised by me in an email message to Steve D'Andrea, copied to Jay Schlessinger and Robert Kaufman, dated June 25, 2007, a true and correct copy of which is attached hereto as Exhibit "C."

5.7 Undercutting Stups' and other franchisees' franchise and license rights by giving better shipping rates and promotional materials to Staples stores, even though those Staples stores directly compete with MBE stores for packaging, shipping and photocopy services. A true and correct copy of an email message, dated March 15, 2007, that I sent to MBE President Stuart Mathis discussing this issue is attached hereto as Exhibit "D."

5.8 Undermining Stups' and other MBE franchisees' ability to earn drop-off commissions on UPS shipments by changing UPS' shipping policies to allow customers to use UPS drop boxes instead of MBE store locations for many UPS deliveries. Attached hereto as Exhibit "E" is a true and correct copy of the email message trail from January 12, 2008 through January 14, 2008 discussing this issue.

5.9 Providing increasingly poor franchisee support, particularly with respect to lost packages and claims, and even making extra demands of Stups' customers for the presentment of claims or delaying the payment of their claims, even when the packages were specifically insured for such claims and amounts. One example of these problems is reflected in the email message

chain from January 16, 2008 through January 22, 2008, a true and correct copy of which is attached hereto as Exhibit "F," discussing MBE's/UPS' refusal to refund the payment on a package of a Stups customer that was lost for a month. Another example is illustrated by the email message, dated May 23, 2007, about delays in paying a claim for lost goods, a true and correct copy of which is attached hereto as Exhibit "G."

5.10 Publishing directions to Stups' store on MBE's website that were inaccurate and unfamiliar to local residents.

5.11 Failing to timely place an advertisement for Stups' store in the local telephone directories. MBE at first claimed the problem to have arrisen because of an alleged failure by me to communicate with MBE, but ultimately acknowledged that the failure was on MBE's end.

5.12 Promising, but not performing, for months, and still not having completed performance of, the mitigation of MBE's agent's error in failing to cause the publication of Stups' store in the telephone directories. This error is documented in part by the email messages starting on November 14, 2007, and continuing through March 11, 2008, true and correct copies of which are collectively attached hereto as Exhibit "H."

5.13 MBE's District Consultant's (i.e., the district manager) purported requirement that I attend a 5-hour "meeting" of local store operators at a horse race track, even though no business was actually to be transacted at the gathering.

5.14 MBE's District Consultant's making disparaging remarks about my caring for my 92 year old mother.

6. In the two and a half years Stups has been a franchisee, I complained to MBE multiple times about the foregoing breaches by MBE of its obligations to Stups, but was generally unable to obtain a satisfactory resolution of those issues. With each successive complaint, however, MBE became increasingly unresponsive and the attitude of its personnel toward me became increasingly disapproving and critical. Despite the many complaints and requests for assistance that I made of various MBE personnel, MBE never once advised me that MBE disputed the accuracy or legitimacy of my complaints. Rather, MBE largely ignored them. Notwithstanding MBE's numerous failures to honor its obligations to Stups, to date I have not communicated to persons outside of the MBE/UPS family any of my concerns, disputes or grievances with MBE, nor have I taken any public action adverse to MBE. I have not misused or made any unauthorized use of MBE's trademarks or done anything that would materially impair the goodwill associated therewith. I have not taken any public action. Nor have I engaged in the unauthorized use of confidential information as MBE claims.

7. The turning point in Stups' relationship with MBE came on March 15, 2007, when I sent an email to MBE's President, Stuart Mathis, expressing the grievance that MBE was improperly undercutting its franchisees and engaging in unfair and unlawful business practices by giving better shipping rates and marketing materials to Staples stores, even though those Staples stores were in direct competition with MBE franchises, including Stups, and were located within franchisees' exclusive territories.

(See email message referenced above and attached hereto as Exhibit "D.")

8. Thereafter, the mediocre franchise support Stups had already been receiving became even more anemic and MBE employees became largely unresponsive to my concerns and requests. Beyond apathy, MBE actually started looking for things about which to criticize Stups and for ways in which to make Stups' operations more difficult or costly. Although my franchise was run consistently pursuant to MBE's standards, MBE supervisors started "nit-picking" – trying to find even little things to harass me about. For example, even though Stups had its storefront windows professionally cleaned on a weekly basis, MBE supervisors complained that the windows were dirty and demanded that they be cleaned immediately. To drive up Stups' costs, MBE supervisors also demanded that Stups' interior store lights all remain on 24 hours per day, seven days per week, even when the store was closed. MBE started sending in "mystery customers" with forty cent copy jobs to see if Stups' personnel would give the expected sales pitch about all of the other services the franchise offers. And those "mystery customers" made a point of coming in when there was a line of packaging customers so that they could then report that they did not receive my "full and undivided attention." My letter to Mr. Mathis about MBE's undermining our franchise rights by offering better deals to our competitors caused me to be *persona non grata* with MBE. It certainly explains why, as is evident by the statements in MBE's franchise cancellation letter (discussed below) and in the Affidavit of Robert Kaufman submitted in support of MBE's Motion

for Temporary Restraining Order, MBE apparently started collecting a dossier on me a year ago.

9. MBE's malfeasance and mistreatment of me heightened after I discussed with MBE in January 2008 my utter dissatisfaction with MBE's performance of its obligations and my consequent desire either to have MBE buy back Stups' franchise or to allow me to sell it.

10. It is in the context of that long, escalating history of MBE's failures and rebukes that the most recent incident occurred upon which MBE now attempts to justify its interference with Stup's operation of its franchise.

**MBE's Exagerations of an Alleged "Threat"**

11. My status with MBE as *persona non grata* became even more apparent when, in late February 2008, MBE/UPS once again lost one of my customer's packages (as it had done so twice previously with this same customer) and no matter which person or call center I contacted, no one solved the problem, nor did they even seem interested in solving the problem. The tenor of the response that I received was that, to MBE, losing a package was merely a statistically acceptable fact and that I was not a franchisee worthy of assistance. In fact, in response to my complaint about the lost package, MBE's District Consultant retorted flippantly, "Well, at least you got four of the five boxes."

12. Specifically, on Monday, February 25, 2008, one of Stups' regular customers received at Stups' UPS store four out of the five boxes that were shipped using Stups' shipper account number, the fifth box being unaccounted for and one of the boxes

arrived opened. The delivery driver searched the truck and the fifth box was not on it. I searched on-line and the missing box was listed as being on the truck for delivery to Stups' store, although both the driver and I had already ascertained that it was not on the truck. I caused to be placed on the message board for all UPS drivers an alert to search for the fifth box, without success. I placed several urgent telephone calls to MBE personnel and the UPS call center to try to track down my customer's missing package, all being acts of futility. I even placed multiple calls throughout the day to the District Consultant requesting assistance, which calls he never returned. Because the computer tracking system indicated that the missing box had arrived at the Uniondale, New York distribution center (which is located about 3 miles from Stups' UPS store) and was thereafter supposedly put on the truck, and because it was a "logical scan" of the tracking number, rather than a "physical scan," I reasonably surmised that the box had never made it on the truck and that it was still located at the Uniondale Center.

13. In order to satisfy my customer and to save a day or more's further delay in the location and delivery of my customer's missing box, later in the day on February 25th I called the UPS call center and recounted to the customer service representative the history of the missing box. I asked her to arrange for someone to look for the missing box on the floor at the Uniondale distribution center and, since the distribution center was located nearby, I even requested the opportunity to go to the distribution center and assist UPS' personnel in finding the missing box if MBE/UPS would not assign a staff

member to do that without my assistance. The customer service representative offered nothing but excuses for why no one could look for the box at the distribution center and said that the center was off-limits to me, as a matter of policy. As the culmination of over two years of dissatisfaction with MBE and as the product of a day of frustration with the lack of response MBE/UPS was giving me, I told the representative that I didn't care about MBE/UPS's excuses or what the UPS policy was concerning the distribution center; I just wanted to get the package. I further noted that I don't care even if the center blows up, UPS and I would still need to locate my customer's missing package. I **never** threatened to blow up the distribution center, as is stated in the Affidavit of Latasha Chatman submitted in support of MBE's Motion for Temporary Restraining Order. That is a complete distortion and manipulation of the conversation and it has been wholly taken and used out of context. That one mischaracterization and "turn of phrase" out of an entire conversation is being exploited to suit MBE's purposes in justifying its interference with Stups' franchise rights. In fact, rendering Ms. Chatman's Affidavit somewhat suspect in veracity, I observe that Ms. Chatman states in her Affidavit, as well as on the document attached to her Affidavit, that the conversation occurred on February 26, 2008, even though it occurred on February 25th.

14. Similar to the discrepancies regarding the date of the occurrence with respect to Latasha Chatman's Affidavit, my voicemail messages to District Consultant Robert Kaufman occurred on February 25th, not "on or about February 26th," as

attested to by him in his Affidavit. Although I also believe there to be inaccuracies in the purported transcriptions of those voicemail messages recited in Mr. Kaufman's Affidavit, the most notable confirming truths of those voicemail messages as reported are: (i) that Mr. Kaufman – whose primary job responsibility it was to address and resolve these sorts of problems for franchisees -- ignored my calls all day; (ii) that despite all of my calls and efforts to track down and retrieve the missing box, it was earnestly apparent to me that "Nobody seems to care – nobody wants to contact me;" and, (iii) that MBE's accusations that I made threats were "false accusations" made by "liars." In other words, that the allegation that I made a threat to blow up the Center was disputed by me minutes after it supposedly happened.

15. Despite the ambiguous statement in the Affidavit of Stephen Hernandez that the alleged "threat" was reported to the Nassau County Police Department (how, when and in what form was it purportedly reported), I have never been contacted by the police regarding that alleged threat.

16. On the morning of February 26, 2008, MBE sent a representative from its security department to inquire about the alleged threat and to investigate the open box and the missing box. It was a very cordial conversation wherein the issue of the alleged threat was disposed of immediately – within about a minute -- and the balance of the time was spent discussing the problem of the open box and the missing box. The security department representative took pictures of the cartons and of the opened box.

17. In the afternoon of February 26, 2008, I was able to have a conversation with Ed Diorio, MBE/UPS's Sales Support Representative who brainstormed with me to try to figure out the whereabouts of the missing box. Based on that conversation, I was able to track the missing box through an old, incorrect tracking number as being in Columbus, Ohio. Mr. Diorio promised to arrange for the package to be sent to New York via airplane that night so that we would receive it the next morning, Wednesday, February 27th. Despite that promise, it did not occur and the package was finally delivered via ground transit on Thursday, February 28th. True and correct copies of some of the emails which address these events and MBE's lack of assistance dated on February 26, 2008 through February 29, 2008 are attached collectively hereto as Exhibit "I."

**MBE's Interruption of Stups' Franchise Rights**

18. In a further effort to try to get MBE to have a serious and meaningful discussion with me about MBE's breaches of its obligations and my desire to be bought out or to sell, on February 27, 2008, I contacted MBE's franchisee relations department and asked for assistance in resolving the on-going problems. I followed up that conversation with an email to the representative with whom I spoke, Esther Xjiang (apparently also sometimes spelled "Chiang"), outlining the situation. A true and correct copy of that email is attached hereto as Exhibit "J."

19. Having not heard any response to the conversation with the franchise relations representative and to the summary email sent to that representative, I followed up further with an email

message to MBE's Area Consultant, Steve D'Andrea, about MBE's mistreatment of me. A true and correct copy of that email is attached hereto as Exhibit "K." I received a verbal response from MBE's Regional Consultant, Jay Schelssinger, in which he said that there would be no discussions about the problems I was experiencing with MBE, using words as close as I can recall, saying that it was a "dead issue."

20. Having "hit a brick wall" with the local MBE supervisors, I sent an email to MBE's President, Stuart Mathis, on March 6, 2008, inviting a discussion with him or "with any other members at MBE" regarding a resolution, a true and correct copy of which email is attached hereto as Exhibit "L."

21. Finally, after many requests on my part for a serious discussion with MBE personnel, I was informed that a meeting would occur at Stups' store with the District Consultant, the Area Consultant, and the Regional Consultant on March 13, 2008. I referenced this upcoming meeting in my email of March 10, 2008 to the District Consultant, Robert Kaufman, a true and correct copy of which is attached hereto as Exhibit "M." The District Consultant's statement (that will prove a few days later to be ironic) is also reflected in the March 9th email trail to the aforementioned email, insofar as the District Consultant praises me for increasing sales of "pack and ship" and encourages me to "keep it up."

22. Although I finally felt as if my concerns with MBE's malperformance and breaches of its franchise obligations were about to be addressed in the scheduled March 13, 2008 meeting, it turns out that the promise of such a meeting was just a ruse

to have me present so that I could be served personally with MBE's lawyer's letter purporting to cancel Stups' franchise without notice or an opportunity to cure.

23. Even though I tendered the cancellation letter to my counsel and my counsel was in discussions with MBE's counsel within a couple of hours of my being served with the cancellation letter, and even though, as I understand it, those discussions were continuing in the following business days, nevertheless, by Friday night, March 14, 2008, MBE started interfering with Stups' exercise of any and all of its franchise rights. Amongst other things, MBE terminated Stups' access to the MBE/UPS computer system, its access to the point of sale (i.e., cash register) system, its access to the shipping manifest system, its access to the administrative system, its use of UPS' services, its daily scheduled UPS truck pick-ups and deliveries, its access to its own financial data kept on QuickBooks, and its access to its own email.

24. As the result of MBE's interference with Stups' rights, Stups' is effectively unable to conduct business and is losing many regular customers and suffering injury to its goodwill. Stups remains obligated to pay rent and other operating costs, though. Without the revenues generated as a direct benefit of the franchise rights, Stups is unable to pay its bills, which will ultimately result in adverse and irreparable consequences such as the entry of judgments and damage to the principal's credit. If its franchise rights continue to be impeded, soon, perhaps within days, Stups will be unable to remain open for business and Stups will thereby suffer

the loss of hundreds of thousands of dollars of investment and work and the loss of my means of earning a living. In addition, in the next few days, Stups' employees will become unemployed.

**MBE's False and Misleading Statements**

25. The franchise termination letter from MBE's attorney, Samuel B. Isaacson, of the law firm of DLA Piper US, LLP, contains a number of falsehoods and distortions, including the following:

25.1 The lawyer's statement that I engaged in a "pattern of erratic and abusive behavior" is truly a false and exaggerated conclusion. The only patterns of behavior I have engaged in as operator of the Stups MBE franchise are (i) complying with my obligations under the Franchise Agreement and (ii) consistently seeking support and remedies from MBE for its own malperformance. It is a distortion to characterize my legitimate complaints and requests for assistance as being an erratic and abusive pattern.

25.2 Notwithstanding MBE's critcism of me for having expressed my concern that MBE's mistreatment of me might be the product of prejudice against my religious faith and ethnicity, and notwithstanding the lawyer's statement that the suggestion of there having been anti-Semitism is "abhorrent" to MBE and UPS, it is perhaps a tell-tale fact that no one at MBE ever followed up with me as to those concerns, never inquiring further and never investigating those concerns. Those concerns were not even addressed in the cursory fashion in which they are now being summarily dismissed in MBE's lawyer's letter.

25.3 As set forth above, Attorney Isaacson's

references to my having made terrorist threats to MBE two and a half weeks before the March 13th letter, are patently false. Even if there had been some misunderstanding by the customer service representative who reported the conversation, on the very day that it allegedly occurred, MBE knew that there was no actual threat, given that my voicemail to Robert Kaufman that day denied such a threat. MBE also had verification from its own security department person the very next morning that there had been no threat. Yet, MBE continues to characterize it as a "terrorist threat" to suit its own purposes.

25.4 MBE's termination letter misleadingly and inaccurately excerpts and italicizes some of my statements from a February 26, 2008 email to "MBE's regional coordinator." A true and correct copy of the entire email message to MBE Regional Consultant Steve D'Andrea from which the cited statements are derived is attached hereto as Exhibit "N." The email summarizes MBE's lack of response to the February 25th missing package problem. In addition to complimenting the "PCA" team for doing their jobs, the email concludes with "please let me know if there is a UPS corporate contact for UPS" [that could help me with these problems instead of the local personnel with the attitude problems].

25.5 MBE's lawyer inaccurately and misleadingly strings together excerpts from the above-referenced February 26th email to Steve D'Andrea with excerpted statements allegedly made the previous day - not the same day -- in a voicemail message to the District Consultant (which voicemail message is more specifically addressed hereinabove) wherein I was extremely

upset about MBE's false accusation made minutes earlier that I had made some sort of threat to MBE, referring to MBE personnel as "liars" for making that accusation. The two communications were not related, other than to the extent that they both concern MBE's failure to perform its obligations.

25.6 MBE's lawyer's letter also portrays as an "unlawful threat" a statement in my email to MBE's president, Stuart Mathis, that MBE would have to come up with some money to resolve the situation. However, a review of the entire email to Mr. Mathis and doing so in the context of my prior and contemporaneous communications with other MBE personnel will reveal the omitted context is that there is a two year history problems with MBE's performance, that most of my concerns during that time were disregarded by MBE, that MBE's malfeasance was costing me customers and revenue, and that I had been asking for MBE to resolve the problems by buying me out. I further explain in the email that I thought that "The ideal situation would be to have another store buy my store and let either MBE or UPS make up the difference." There was no threat made by me, just a proposal to buy me out since the franchisor-franchisee relationship was not proceeding well and since MBE's breaches of their obligations had caused me to suffer economic damages. The email to Mr. Mathis was previously attached hereto as Exhibit "L" and some other emails messages to Esther Jiang (February 27, 2008) and to Steve D'Andrea (March 5, 2008) placing the Mathis email in context were appended hereto as Exhibits "J" and "K." In fact, MBE had even sent me a package to use in connection with the sale of Stups' franchise that included a brochure on

the procedures for the sale of the franchise, a transfer fee schedule, and a proposed Non-Exclusive Finder's Agreement if MBE found the prospective buyer. All of those documents are attached collectively hereto as Exhibit "O."

25.7 The reference to there have been several discourteous communications between me and MBE representatives over a two year period are inaccurate and are unfairly presented in excerpted form and out of context. For example:

25.7.1 The comments attributed to me on June 20, 2007 regarding the inspectors approving of the package is a misquote – I never said that I would do anything *to* the inspectors. The proper context was that Stups' customer's package arrived damaged and that MBE/UPS was giving the customer difficulty in honoring the claim. After MBE/UPS refused to send out a claims inspector to verify the damage and approve of the claim, I demanded that the claims inspector come inspect the package and the damage to its contents and approve of the claim.

25.7.2 The purported August 24, 2007 statement attributed to me to the effect that I would call the police if "certain personnel" came to Stups' store is similar to a statement I made after the District Consultant had insulted my mother, it being true that I did not want to see him in my store anymore. I did not want to deal anymore with someone who was insulting to me.

25.8 Notwithstanding MBE's claim that there is a long history of offensive remarks and behavior, never once in that time has anyone from MBE ever told me that my words or actions

had been offensive, nor had anyone complained, nor had anyone warned me about my words or actions. Moreover, no one from MBE has ever informed me or otherwise contended that MBE construed the use of profane language as a violation of the Franchise Agreement.

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct and that this declaration was executed by me this 28th day of March, 2008, at Bellemore, New York.

Stuart Berk

F:\CLIENTS\Stups-Berk\Pleadings\Stups TRO\Berk Declaration.1doc