# EXHIBIT A

# FRANCHISE AGREEMENT

**THIS AGREEMENT IS ENTERED INTO BY AND BETWEEN MAIL BOXES ETC., INC., ("MBE") A DELAWARE CORPORATION AND THE PERSON OR PERSONS OR LEGAL ENTITY LISTED BELOW DESCRIBED AS "FRANCHISEE".**

FRANCHISOR "MBE": MAIL BOXES ETC., INC., A DELAWARE CORPORATION

FRANCHISEE: FULL LEGAL NAME
See attached Ownership Information Form
Stups, Inc

LOCATION OF FRANCHISEE'S THE UPS STORE® CENTER:

1938 A Hempstead Tpke, East Meadow
**(Street address)**

East Meadow NY 11554
(City) (State) (Zip code)

THE UPS STORE® CENTER NO. 5603

**IN THIS AGREEMENT, CAPITALIZED WORDS AND PHRASES SHALL HAVE THE MEANINGS SET FORTH IN SECTION 23.**

MBE (either directly or through its Affiliate) owns and has the right to license certain Marks, including "THE UPS STORE®", the distinctiveness and value of which are acknowledged by Franchisee;

MBE has developed and continues to develop know-how and a comprehensive System for operating Centers which provide authorized postal, packaging, shipping, business and communication services, and other authorized goods and services at retail locations;

MBE has developed and continues to develop and provide services, sales development programs and other related benefits for use by its franchisees under the Marks and System;

Franchisee acknowledges substantial goodwill and business value in the Marks, System and services and Franchisee understands and accepts the importance of MBE's Standards and Specifications for quality, appearance, and service to the value of the System, and the necessity of operation of Franchisee's business activities in conformity with the System as it exists now and as it may be modified from time to time; and

Franchisee desires to acquire from MBE, and MBE is willing to grant Franchisee, a franchise upon the terms and subject to the conditions set forth in this Agreement.

NOW THEREFORE, IN CONSIDERATION OF THE FOREGOING, THE FEES AND OTHER SUMS PAYABLE BY FRANCHISEE AND THE MUTUAL COVENANTS CONTAINED IN THIS AGREEMENT, THE PARTIES AGREE AS FOLLOWS:

1. GRANT OF FRANCHISE, RELOCATION, TERRITORRY & SPECIAL VENUE RIGHT OF FIRST REFUSAL

1.1 Grant of Franchise and Relocation

a. MBE hereby grants Franchisee, and Franchisee hereby accepts, the limited right and license during the Term, to use and display the Marks, and to use the System to operate one (1) Center at, and only at, the Location, upon the terms and subject to provisions of this Agreement and all ancillary documents hereto.

b. Franchisee may relocate Franchisee's Center (even within the Territory) only with MBE's prior written consent, and upon such terms and conditions as MBE may prescribe in the Manuals, which may include: (i) modification of the boundaries of the Territory; and (ii) upgrading, renovating or remodeling the proposed new location to the then-current design, and other criteria or specifications indicated in the Manuals.

1.2 Territory

During the Term:

a. Except as set forth in this Section 1.2, neither MBE or its Affiliates will own or operate a Center, as that term is specifically defined herein, nor license or franchise others to do so at any site located within the Territory.

b. Subject to "Franchisee's Right of First Refusal for Special Venue Development" set forth in Section 1.3 below, MBE or its Affiliates may own or operate, or license or franchise others to own or operate, Centers at Special Venues at any site within the Territory.

c. MBE expressly reserves (for itself and for its Designees) the exclusive, unrestricted right to produce, franchise, license, sell, distribute and market any products or services (under any brands, including but not limited to the Marks) from any Retail Outlets (including, but not limited to, traditional Centers or Special Venues) the physical premises of which are located outside of the Territory, regardless of (i) the proximity of such Retail Outlet to the Franchisee's Center at the Location, or (ii) whether or not such products or services are purchased by customers whose residences or places of business are located within the Territory.

d. MBE expressly reserves (for itself and for its Designees) the exclusive, unrestricted right to sell, distribute and market any products or services (under any brands, including but not limited to the Marks) to any customers (wherever located) through all Retail Outlets and other distribution channels physically located or otherwise operating within or outside the Territory (but not through traditional Centers the physical premises of which are located within the Territory).

Without limiting the generality of the foregoing, MBE (and its Designees) may utilize the following alternative channels or methods of distribution under this Section 1.2(d): the Internet and other electronic communications methods, mail order catalogs, direct mail advertising, and telemarketing. In addition, United Parcel Service, Inc. and its operating subsidiaries (but not including MBE) have the right to sell UPS products and services through customer counters, air service counters, drop boxes, and independently-owned businesses (CMRA and non-CMRA) that also function as authorized shipping outlets but do not operate under the System, whether such alternative channels or methods of distribution are physically located or otherwise operating within or outside the Territory.

e. MBE and its Affiliates may, without any restrictions whatsoever, engage in any other activities they desire within or outside of the Territory that are not specifically prohibited under this Section 1.2 or elsewhere in this Agreement, including, but not limited to, the activities described in Sections 1.2(c) and (d) above.

f. Nothing herein shall grant Franchisee any options, rights of first refusal or similar rights to acquire additional franchises within the Territory or areas contiguous to the Territory or anywhere else, and Franchisee acknowledges that Franchisee and other franchisees, and MBE and its Affiliates, are not prohibited from serving customers based on their residence or place of business, and that such customers, including customers located in Franchisee's Territory, are free to patronize any Center or MBE business of their own choosing.

g. Franchisee's rights to the Territory described herein shall continue during the initial term hereof and shall be subject to modification, at MBE's reasonable sole discretion, at the time of transfer or renewal of this Agreement.

h. Franchisee may not open or operate any Kiosk, within or outside the Territory, without MBE's prior written consent and MBE may require Franchisee to sign a separate form prescribed by MBE.

1.3 Franchisee's Right of First Refusal for Special Venue Development

a. During the Term, MBE grants to Franchisee a right of first refusal to attempt to secure the real estate rights and franchise rights for Centers at Special Venue Sites within the franchise Territory solely in conformance with the procedures and the conditions described in Sections 1.3(b) through 1.3(g) below.

b. If and when (i) MBE receives any bona fide opportunity from a qualified franchisee or prospective franchisee (in the form of a lease or option or letter of intent signed by a landlord and containing a contingency provision requiring franchisor's approval, hereafter "Third Party Notice") to develop a Special Venue within Franchisee's Territory, and (ii) MBE decides that the proposed terms and conditions are acceptable, then MBE must promptly forward a copy of such Third Party Notice to Franchisee via Certified Mail, return receipt requested, or via overnight mail service (with recipient's signature required).

c. If Franchisee seeks to exercise its right of first refusal, then Franchisee will have ten (10) days from the date of its receipt of the Third Party Notice to deliver to

MBE a written "Franchisee Exercise Notice" that must unconditionally accept any and all terms and conditions that were contained in the Third Party Notice. Such delivery must be via Certified Mail (return receipt requested) or via overnight mail service (with recipient's signature required).

d. Franchisee understands that its attempt to exercise its right of first refusal under this provision will not be effective unless, after providing Franchisee Exercise Notice to MBE, Franchisee also promptly delivers to MBE a fully executed "Addendum to Lease" that would modify the lease corresponding to such Special Venue.

e. Franchisee further understands and agrees that its attempted exercise of its right of first refusal may be prevented from becoming effective if and when the party with whom the third party has contracted (i.e., landlord) refuses for any reason to permit the assignment of such third party's contract rights in such Special Venue to Franchisee.

f. If Franchisee effectively exercises its right of first refusal for Special Venue development under this provision, then such Special Venue may be developed without having to execute a "Center Option Agreement" and without having to pay a Center Option Fee.

g. Notwithstanding the foregoing, Franchisee understands that the right of first refusal described above shall not be granted to Franchisee with regard to any opportunities to develop a Special Venue within Franchisee's Territory where such opportunity is part of a multiple location opportunity with either (i) a governmental organization (including, but not limited to, a U.S. military service), or (ii) a privately or publicly owned business organization, or (iii) an educational organization, or any authorized representative of any such organization, in which case MBE or its Affiliates may pursue and develop such Non-Traditional sites within Franchisee's Territory with such organization.

## 2. TERM AND RENEWAL

2.1 The term of this Agreement shall begin on the Effective Date and shall continue for a period of ten (10) years, unless sooner terminated as provided herein (the "Term"). In the event Franchisee fails to renew or MBE elects not to renew this Agreement (in accordance with Sections 2.2 and 2.3), this Agreement will expire. Expiration of this Agreement shall constitute termination for all purposes and effects.

2.2 Provided that Franchisee shall have complied with all the terms of this Agreement, and subject to fulfillment of the conditions in Section 2.3 below, Franchisee shall have the right and option to renew the franchise granted pursuant to this Agreement for successive periods of ten (10) years each.

2.3 As conditions to renewal, Franchisee must:

a. provide MBE written notice ("Renewal Notice") of Franchisee's intent to renew this Agreement not less than 6 months nor more than 18 months prior to the end of the Term;

b. pay a renewal fee in an amount equal to 25% of the initial franchise fee specified in the Then-Current Agreement for new Centers (the "Renewal Fee") not later than 6 months prior to the end of the Term, except that ten percent (10%) of this renewal fee will be either refunded or credited to Franchisee if MBE determines that all conditions and requirements for renewal have been successfully completed by Franchisee no later than thirty (30) days prior to the conclusion of this Agreement's ten (10) year term.

c. execute the then-current Agreement for new Centers, and all other documents or instruments required by MBE in connection therewith;

d. be in compliance with this Agreement, including payment of all fees due, the requirements described in the Manuals and all other agreements then in effect between MBE or its Affiliates and Franchisee;

e. be current with all financial obligations to third parties, including Franchisee's landlord and other vendors of products or services of Franchisee's Center at the Location;

f. upgrade, remodel and refurbish, prior to the conclusion of this Agreement's ten (10) year term, the Center at the Location both exterior and interior as mandated by MBE to comply with MBE's then-current Standards and Specifications as described in the Manuals;

g. execute a general release (in a form prescribed by MBE) in favor of MBE and MBE's Affiliates from any claims arising during the term of this Agreement; and

h. provide MBE written confirmation, satisfactory to MBE, that Franchisee maintains the right to possession of the Center at the Location for the ten (10) year term of the renewal Franchise Agreement.

i. If Franchisee leases its Center from a third party lessor (landlord), then Franchisee must deliver to MBE (if it has not already done so) an "Addendum to Lease" that is fully executed between the lessor and the renewing franchisee, covering the ten (10) year term, plus any extensions thereof. A sample of the "Addendum to Lease" that must be signed and provided to MBE is attached as an exhibit to this Agreement.

j. At or prior to the renewal, the Center must be upgraded to then-current System Standards and Specifications for POS/CMS, hardware, software and any other computer-related systems required for Centers.

k. If MBE, in its sole discretion, deems necessary, Franchisee must successfully complete a "refresher" training course at Franchisee's sole expense.

2.4 If and when MBE receives Franchisee's timely renewal notice, MBE agrees to give Franchisee notice, not later than 60 days after receipt of the Renewal Notice, of MBE's decision as to whether Franchisee has the right to enter into a renewal Franchise Agreement. Notwithstanding that MBE's notice may state that Franchisee has the right to enter into a renewal Franchise Agreement, any such right would be subject to

Franchisee's continuing compliance with all of the provisions of this Agreement up to the date of its expiration/termination.

## 3. SITE LOCATION AND CONSTRUCTION OF CENTER

### 3.1 Site Location

The location of Franchisee's Center, set forth on page one of this Agreement, has been accepted by MBE. Nevertheless, MBE's acceptance of the location set forth above as the Location shall in no way constitute a representation nor an express or implied warranty as to the viability or success of a Center at such location. Upon MBE's acceptance of such proposed location, such location shall be deemed to be the "Location", as defined herein.

### 3.2 Franchisee's Lease

Franchisee shall not enter into any lease or purchase agreement for the Location unless and until (i) Franchisee shall have submitted to MBE all site-related information required by MBE; and (ii) MBE shall have accepted such proposed Location and the terms of said purchase agreement or Franchisee's Lease for the Location, as applicable. Franchisee shall deliver to MBE a true and correct copy of Franchisee's Lease for the Location, if applicable, fully executed, promptly upon MBE's request. Nevertheless, Franchisee acknowledges that MBE is not obligated to review Franchisee's Lease (or real estate purchase agreement) prior to or after MBE's acceptance or rejection of the proposed Location and contract. Franchisee shall duly and timely perform all of the terms, conditions, covenants and obligations imposed upon Franchisee under Franchisee's Lease. Franchisee promises that its Center's lease shall be subject to the "Addendum to Lease" (attached as an exhibit to this Agreement), which provides (in summary) as follows:

(a) that MBE has the right (but not the duty) to assume Franchisee's Lease upon (i) Franchisee's (tenant's) uncured default under Franchisee's Lease, (ii) Franchisee's (tenant's) non-renewal of Franchisee's Lease, or (iii) the termination and/or expiration of this Agreement; and

(b) that Franchisee's landlord shall not unreasonably withhold or delay its consent if and when MBE (if it has exercised its rights under the "Addendum to Lease") seeks to assign the Lease to any third party that is creditworthy and meets MBE's then-current standards and requirements for franchisees; and

(c) if Franchisee's Lease or this Agreement is terminated and/or expires, and MBE fails to exercise its right to assume Franchisee's Lease, Franchisee agrees to promptly de-identify the Premises and to promptly remove signs, decor and other items which Franchisor reasonably requests be removed as being distinctive and indicative of a Center. MBE (or its designee) may enter upon the leased premises without being guilty of trespass to effect such de-identification if Franchisee fails to do so within ten (10) days after such termination or expiration. Franchisee shall pay MBE for its reasonable costs in effecting de-identification.

3.3 Center Design

Upon receipt from MBE's Center Development Coordinator of completed pre-construction forms and as-built drawings of the Location, MBE shall provide to Franchisee a Center design for the Location containing MBE's design requirements, including building specifications (locations of walls, counters, retail displays, fixtures, and equipment) (the "Center Design"). MBE does not represent or warrant design compliance with Applicable Laws, including ADA (Americans with Disabilities Act). Franchisee shall, at its sole cost and expense, ensure that the Center Design complies with all Applicable Laws (including ADA) and Franchisee shall obtain any required architectural seals, engineering seals and other required approvals. The cost of any leasehold improvements, equipment, fixtures and displays, and of any architectural and engineering drawings, are Franchisee's sole responsibility. Franchisee must utilize MBE's design department for the preparation and completion of all construction drawings for new Centers, remodels, relocations, conversions, Kiosks and upgrades, which services shall be subject to MBE's then-current fees, as described in the Manuals.

3.4 Center Development Coordination

MBE's designated "Center Development Coordinator" shall supervise and coordinate construction at the Center at the Location (the "Center Development Coordination Services"), including the initial construction of the Center (as provided in Section 3.5), remodels, relocations, conversions, Kiosks and image upgrades. MBE's designated Center Development Coordinators shall provide such services as are customarily provided by a construction supervisor, including acting as a liaison with the general contractor. Franchisee shall utilize the Center Development Coordination Services as provided above and pay MBE's designated Center Development Coordinator the then-current Center Development Fee.

MBE assumes no responsibility for any damages, delays, cost overruns, disputes, or otherwise regarding construction or the Construction Coordination Services performed by MBE's designated Center Development Coordinator.

3.5 Construction of the Center

a. Upon receipt by MBE's designated Center Development Coordinator of the Center Design, Franchisee shall at its sole cost and expense promptly cause the Center to be constructed, equipped and improved in accordance with the Center Design, unless MBE shall, in writing, consent to modifications thereof. Franchisee shall employ licensed architects and general contractors selected by MBE's designated Center Development Coordinator at its sole cost and expense, to prepare such architectural, engineering and construction drawings and site plans as necessary to supplement the Center Design in order to obtain all permits required to construct, remodel, renovate, and/or equip the Center at the Location.

b. Subject only to causes beyond the reasonable control of Franchisee, such as, by way of illustration, strikes, material shortages, fires and acts of God, which Franchisee could not by the exercise of due diligence have avoided, Franchisee shall complete construction or renovation, as the case may be, of the Center at the Location and all improvements therein, including installation of all fixtures, signs, equipment and furnishings, as soon as possible, but in any event within 3

months after commencement of construction. The operation of the Center at the Location by Franchisee shall commence not later than 12 months following the Effective Date.

c. The time periods for the commencement and completion of construction and the installation of fixtures, signs, machinery and equipment as referred to in this Section 3.5 and in the Manuals are of the essence of this Agreement. If Franchisee fails to perform its obligations contained in this Section, MBE may deem the Franchisee's failure to so perform its obligations a material breach of this Agreement.

3.6 Maintaining and Remodeling of the Center

a. Franchisee shall maintain the condition and appearance of the Center at the Location in a "like new" level of cosmetic appearance consistent with the image of Centers as attractive, clean, and efficiently operated, offering high quality products and services. If at any time, in MBE's reasonable judgment, the state of repair, appearance or cleanliness of the Center at the Location or its fixtures, equipment, furnishings, or signs fails to meet MBE's image Standards and Specifications, Franchisee shall immediately upon receipt of notice from MBE (or from Area Franchisee) specifying the action to be taken by Franchisee (within the time period specified by MBE but in any event within 30 days of such notice) correct such deficiency, repair and refurbish the Center at the Location, and make such modifications and additions to its layout, decor and general theme, as may be required by MBE, including replacement of worn out or obsolete fixtures, equipment, carpet, furniture, graphics, internal window and external signage, and repair and repaint the interior and exterior of the Center at the Location.

b. If the Center at the Location is damaged or destroyed by fire or any other casualty, Franchisee, within 30 days thereof, shall initiate such repairs or reconstruction, and thereafter in good faith and with due diligence continue (until completion) such repairs or reconstruction in order to restore the Center at the Location to its original condition prior to such casualty; any such repair and reconstruction shall be completed as soon as reasonably practicable but in any event within 6 months following the event causing the damage or destruction. If, in MBE's reasonable judgment, the damage or destruction is of such a nature or to such extent that it is feasible for Franchisee to repair or reconstruct the Center at the Location in conformance with the then-current specifications of MBE, MBE may require that Franchisee repair or reconstruct the Center at the Location in conformance with the then-current Standards and Specifications.

## 4. TRAINING AND FRANCHISOR'S CONTINUING OBLIGATIONS

4.1 Training

a. Initial Training

MBE provides to Franchisee a multi-phase "tiered" learning program. Even if Franchisee will not be the primary operator (the person managing the day-to-day Center operations) of the Center. Franchisee must attend and successfully complete, in the prescribed sequence, the Pre-course, In-Store Experience (ISE)

Part I, the University Class, and ISE Part II of the Franchisee learning program by the deadlines set forth in the Manuals, regardless of whether Franchisee is (i) opening a newly constructed Center, or (ii) taking possession of an existing (i.e., transfer) Center. Franchisee's primary operator must successfully complete in the prescribed sequence, all parts of the ISE and before or within 90 days after assuming and/or continuing the responsibility as the primary operator of the Center.

If the primary operator is ever replaced, then the new primary operator must attend and successfully complete all phases of the ISE (i) before assuming the responsibility of Center manager, or, at minimum (ii) no later than 90 days after such replacement.

b. Multiple Center Owner Training

Even if Franchisee has previously graduated from MBE's Initial Training program and if this is Franchisee's second or greater franchised Center, then Franchisee must attend and successfully complete a 5-day Multiple Center Owner Training (MCOT) learning program held at our Global Headquarters, no later than six months after Franchisee's acquisition and operation of such Center. (If Franchisee has attended and successfully completed the MCOT learning program within five years prior to execution of this Agreement, such MCOT learning program requirement shall not apply.)

c. In-Center Training

In addition to the University training provided at our Global Headquarters pursuant to Section 4.1.a., Franchisee must successfully complete: (i) precourse computer based training modules (CBT's minimum 24 hours) to be taken prior to attending the In-Store Experience (ISE). ISE Part I training at a certified training Center designated by MBE, for a minimum period of 5 days (45-hour minimum) prior to the University class training specified in Section 4.1.a.; and (ii) ISE Part II in-center training at a MBE-certified training Center, for a minimum period of 5 days (45-hour minimum) after successfully completing the University class and no earlier than 4 weeks before the Center's projected opening as specified in Section 4.1.a.

d. MBE shall determine the contents and manner of conducting the Franchisee learning program in its sole discretion, however, the learning program will be structured to provide business management and practical training in the implementation, managing and operation of a Center. Franchisee shall pay all travel, living, compensation, and other nominal expenses, if any, incurred by Franchisee and/or Franchisee's employees in connection with attendance at such initial Training. Franchisee may not open its Center at the Location, and in the case of a transfer of an existing Center, Franchisee may not assume active operation of the Center, until all phases of the learning program of the individuals indicated above have been completed to the satisfaction of MBE. Franchisee acknowledges that because of MBE's superior skill and knowledge with respect to the training and skill required to manage and operate the Center in accordance with the System, its judgment as to whether or not the individuals indicated above have satisfactorily completed such training shall be determined by MBE in

its sole subjective judgment, exercised in good faith. All phases of the learning program pursuant to Section 4.1 shall only apply if this is the first Center operated by Franchisee, and shall not be required if this Agreement is executed as a renewal franchise agreement.

e. Additional Training

MBE, at its sole discretion, may require Franchisee or, if Franchisee is an Entity, its Owners, and, if Owners do not manage the Center's day-to-day operations, then the Owner and the Franchisee's primary operator, to attend such supplemental or additional training programs, which may be offered from time to time during the Term, including at MBE's option, distance learning (e.g., training over the Internet). Franchisee shall pay all travel, living, compensation, and other expenses, if any, incurred by Franchisee and/or Franchisee's employees in connection with attending such additional training. Franchisee shall pay MBE's then current reasonable charges (as set forth in the Manuals) for any such training performed by MBE.

f. Franchisee shall ensure that each of its employees is adequately trained and certified to the extent necessary to enable the Center at the Location to comply with the System, and shall use curricula and certification forms designated by MBE.

4.2 Franchisor's Continuing Obligations

From time to time during the Term, Area Franchisee, MBE or MBE's designee, shall provide the following assistance and services to Franchisee:

a. Non-exclusive software licenses, upon such terms and conditions as specified in the Manuals, for the computer software programs specified in the Manuals, including software for such functions as accounting, administration, financial reporting and manifesting.

b. Provide, upon Franchisee's written request, reasonable continuing consultation and advice regarding operation of the Center at the Location by telephone, fax, MBEweb, or other electronic means, or if the situation warrants in MBE's judgment, through on-site assistance by Area Franchisee, or if none, MBE or MBE's designee (which, in the case of on-site assistance by MBE, shall be subject to the availability of personnel, MBE's scheduling requirements and shall be at MBE's sole discretion).

c. Development of certain creative materials (including such items as billboard design, radio and videotape material, public relations releases, copy for newspaper and magazine advertisements and flyers) for local and regional marketing, and shall make such materials available to Franchisee for publication or reproduction and distribution by Franchisee, at Franchisee's expense. MBE reserves the right to require reimbursement from Franchisee for costs for producing such promotional material.



EXHIBIT A PAGE 34

## 5. FEES AND OTHER PAYMENTS

5.1 Franchisee shall, in accordance with the following, pay to MBE the following fees:

a. An Initial Franchise Fee (as defined in section 23 of this Agreement) on or before execution of this Agreement. The Initial Franchise Fee is fully earned by MBE upon receipt and is not refundable.

b. However, the Initial Franchise Fee shall not apply if Franchisee is:

i. signing this Agreement as a renewal of a previous franchise agreement with MBE. In such cases, the Renewal Fee set forth in Section 2.3(b) of this Agreement shall apply instead of the Initial Franchise Fee; or

ii. signing this Agreement in connection with the purchase of an existing Center. In such cases, instead of MBE's having to receive payment of the Initial Franchise Fee, MBE must receive (either from Franchisee, also known, for these purposes, as "buyer" or "transferee"; and/or from Franchisee's "seller" or "transferor"):

A. a "Transfer Fee" (as defined in Section 23 of this Agreement); and

B. a "Processing Fee" (as defined in Section 23 of this Agreement); and

C. a "Pro-Rated Renewal Fee for Transfers" (as defined in Section 23 of this Agreement).

c. A continuing royalty in an amount equal to 5% of STR, payable in accordance with Section 5.2 (the "Royalty"), payable via EFT.

d. A marketing fee in an amount equal to 1% of STR, payable in accordance with Section 5.2 (the "The UPS Store Marketing Fee") and used in accordance with Section 8.1, payable via EFT.

e. A national advertising fee in an amount equal to 2.5% of STR, payable in accordance with Section 5.2 (the "National Advertising Fee"). The National Advertising Fee will be subject to certain annual contribution caps, as provided in Section 8.2, payable via EFT.

f. Fees for all phases of the Franchisee learning program and (as applicable) for the Center Owner Training (MCOT) learning program, in the amounts set forth in the then-current The UPS Store Franchise Offering Circular.

g. An advertising cooperative fee in the amount, and payable in the manner, specified in Sections 8.3 and 8.4 (the "Co-op Fee"), payable via EFT.

h. Any other applicable fees, as set forth in the then-current The UPS Store Franchise Offering Circular.

5.2 Manner of Payment

a. Franchisee shall calculate the Royalty, The UPS Store Marketing Fee, National Advertising Fee, and Co-op Fee due to MBE each Accounting Period and cause MBE to receive payment of the Royalty, The UPS Store Marketing Fee, National Advertising Fee, Co-op Fee, and all other amounts then owed to MBE, together with any and all documents required to be submitted to MBE via MBE's then-current method of electronic delivery, within 14 days after the end of the applicable Accounting Period, or such other period as may be specified in the Manuals.

b. MBE requires an electronic funds transfer ("EFT") payment program, under which MBE will electronically debit from Franchisee's bank account the fees described herein including but not limited to those specified above as payable via EFT. Franchisee shall comply with the procedures specified in the Manuals for such electronic funds transfer program and shall perform the acts and sign the documents, including authorization forms that MBE, Franchisee's bank and MBE's bank may require to accomplish payment by electronic funds transfer, including authorizations for MBE to initiate debit entries and/or credit correction entries to a designated checking or savings account for payments of fees and other amounts, including interest, payable to MBE. If Franchisee fails to timely report STR to MBE for any calendar month, then, MBE, in addition to any applicable late charges, has the right, but not the obligation, to debit from such account an estimated amount equal to the fees due and payable to MBE during the most recent calendar months for which the reports were received by MBE.

5.3 In order to secure full and prompt payment of the fees and other charges to be paid by Franchisee, and to secure performance of Franchisee's other obligations and covenants under this Agreement, concurrently herewith, Franchisee shall execute the Security Agreement attached hereto as Exhibit F.

5.4 Other Payments

In addition to all other payments provided herein, it shall be a material requirement for Franchisee to pay to MBE, its Affiliates, designees and others, promptly when due:

a. all obligations, royalties, trade accounts, promissory notes, financing agreements and equipment lease payments arising out of the operation of Franchisee's Center;

b. all lease or rental payments for Franchisee's Location;

c. all amounts advanced by MBE or which MBE has paid, or for which MBE has become obligated to pay on behalf of Franchisee for any reason whatsoever;

d. the amount of all sales taxes, use taxes, personal property taxes and similar taxes, which shall be imposed upon Franchisee and required to be collected or paid by MBE (a) on account of STR, or (b) on account of the Royalty, The UPS Store Marketing Fee, Initial Franchise Fee, National Advertising Fee, or Co-op Fee collected by MBE from Franchisee (but excluding ordinary income taxes). MBE, at its sole discretion, may collect the taxes in the same manner as the Royalty is

collected herein and promptly pay the tax collections to the appropriate Governmental Authority; provided, however, that unless MBE so elects, it shall be Franchisee's responsibility to pay all sales, use or other taxes now or hereinafter imposed by any Governmental Authority on the Royalty, Initial Franchise Fee, The UPS Store Marketing Fee, National Advertising Fee, or Co-op Fee. It shall also be Franchisee's sole duty to timely pay any and all taxes that become payable in connection with Franchisee's Center;

e. any amounts due on account of purchases of goods, supplies or services relating to the Center at the Location; and

f. for re-designs by MBE of transferring, existing, or relocating Centers, a then-current Design Fee.

5.5 Finance Charges and Late Fees on Delinquencies Owed to MBE

a. If Franchisee fails to pay to MBE the entire amount of any payment due to MBE hereunder promptly when due, Franchisee shall pay to MBE, in addition to all other amounts that are due but unpaid (including the late fee described below), finance charges on the unpaid amounts, for the period beginning on the day after the original due date and continuing until the date of actual payment, at a rate up to the highest (annual) rate allowed under applicable law.

b. In addition to the finance charges on unpaid amounts as set forth in Section 5.5(a), MBE may, at its option, charge a late fee equal to the greater of: (i) ten percent (10%) of any Royalty, The UPS Store Marketing Fee, National Advertising Fee, or Co-op Fee not paid when due for each and every month unpaid, or (ii) $35.00 per month until paid, or (iii) the maximum (annual) rate allowed under applicable law.

c. Section 9.3(b) of this Agreement sets forth Franchisee's interest and late fees in connection with MBE's audit of Franchisee.

d. The parties stipulate that the finance charges and late fees set forth in Sections 5.5(a) and 5.5(b) represent reasonable estimates of the additional administrative costs that will be incurred by MBE and shall be in addition to and not in lieu of any other remedies available to MBE at law or in equity on account of any such default. MBE will invoice Franchisee for such late fee amounts, which shall be due and payable immediately when billed. In no event will any late fee or interest exceed the maximum rate allowed by law.

5.6 All payments required hereunder shall be made by Franchisee without deducting any amounts that (i) are owed by MBE to Franchisee, or (ii) that Franchisee believes are owed to Franchisee by MBE or by any Affiliate of MBE.

5.7 If Franchisee is delinquent in the payment of any obligation to MBE hereunder, or under any other agreement with MBE, MBE shall have the absolute right to apply any payments received from Franchisee to any obligation owed, whether under this Agreement or otherwise, notwithstanding any contrary designation by Franchisee as to application. If MBE owes any monies to Franchisee or to any Affiliate of Franchisee, MBE shall have the absolute and unconditional right to first deduct any such payment

against any or all amounts owed to MBE (or owed to any Affiliate of MBE) by Franchisee or by any Affiliate of Franchisee.

6. **OWNERSHIP OF INTELLECTUAL PROPERTY**

6.1 Franchisee hereby acknowledges and agrees that all right, title and interest (including goodwill) in and to the System and the Marks are and shall remain vested solely in MBE (or, as applicable, in MBE's Affiliate) and that any use thereof by Franchisee shall inure to the benefit of MBE (and, as applicable, MBE's Affiliate). Franchisee hereby disclaims any right or interest in the System, the Marks or in the goodwill derived therefrom. Upon termination or expiration of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Marks.

6.2 Franchisee agrees not to contest, either directly or indirectly, the validity of the Marks or MBE's (or, as applicable, MBE's Affiliate's) ownership, right, title or interest in the Marks and/or the System and/or MBE's (or, as applicable, MBE's Affiliate's) sole right to register, use or license others to use the same.

6.3 Franchisee understands and agrees that any use of the Marks other than as expressly authorized by this Agreement, without MBE's prior written consent, constitutes infringement of MBE's (and, as applicable, MBE's Affiliates's) rights therein and that Franchisee's right to use the Marks does not extend beyond the termination and/or expiration of this Agreement.

6.4 If Franchisee is an Entity, Franchisee shall not use any of the Marks, or any abbreviations or variations thereof, or any words deemed by MBE to be confusingly similar to the Marks as part of the name of any Entity or Franchisee's name, including any of the following words: "The UPS Store" or "UPS" or "Store" or "Mail" or "Boxes" or "Etc." or the combined letters "MBE".

6.5 Franchisee shall immediately notify MBE of any infringements or imitations of the Marks or the System, and of any challenges to Franchisee's use of any of the Marks or the System, of which Franchisee becomes aware. MBE (and its Affiliates) shall have sole discretion to take any action, administrative proceeding or litigation affecting the Marks or the System. Franchisee shall cooperate in the prosecution or defense of any such action as requested by MBE. MBE shall bear the legal expenses incidental to Franchisee's participation in such action, except for the cost of Franchisee's separate legal counsel if Franchisee elects to be represented by counsel of Franchisee's choosing.

6.6 MBE reserves the right, in its sole discretion, to designate one or more new, modified or replacement Marks for use by Franchisee and, upon written notice from MBE, Franchisee shall implement such new, modified or replacement Marks in addition to or in lieu of any previously designated Marks, as prescribed by MBE. Any expenses or costs associated with the use by Franchisee of any such new, modified or replacement Marks shall be the sole responsibility of Franchisee.

6.7 In the event of any legal actions that are brought against Franchisee by a third party alleging that Franchisee's uses of the Marks violate the rights of the third party, MBE will indemnify Franchisee against (and reimburse Franchisee for) all directly-related costs (including attorneys' fees) and damages for which Franchisee is held liable, so long as: (i) Franchisee notifies MBE of the claim(s) within ten (10) days of receiving notice of

the potential violation; (ii) Franchisee's use of the Marks was fully authorized by MBE; (iii) Franchisee is not in default of this Agreement or any other agreement between Franchisee and MBE; and (iv) Franchisee executes any and all documents and does whatever is deemed necessary or advisable in MBE's (or, as applicable, MBE's Affiliate's) or its counsel's opinion to protect its interests in the Marks. MBE reserves the right to defend any action at its own expense for Franchisee's benefit.

6.8 MBE grants to Franchisee a limited, non-exclusive license to use Improvements in the System, Manuals, and Standards and Specifications for the purpose of operating the Center in compliance with the terms of this Agreement. By providing any suggestion, idea, or information to MBE or its affiliates that could be useful in the operation of the System or a Center ("Improvement"), Franchisee grants to MBE the right to use and incorporate, and disclose, without limitation, that Improvement into its System, Manuals, and Standards and Specifications to further the business activities of MBE and its affiliates.

## 7. STANDARDS AND SPECIFICATIONS; CONFIDENTIAL OPERATIONS MANUALS

7.1 Operating Standards and Specifications

a. Throughout the Term, Franchisee shall adhere to the System developed by MBE for the operation of the Center, including the system for postal, packaging, shipping, business and communication retail service centers under the Marks, as provided herein and in the Manuals.

b. Throughout the Term, Franchisee shall operate the Center at the Location as specified herein and in compliance with MBE's then-current Standards and Specifications, including MBE's then-current Standards and Specifications for external/internal center image specifications, center design, advertising, computer hardware and software, equipment, stationery, business cards, business forms, promotional material, franchise sales materials (e.g., referral card) and such changes or modifications to the System or the Manuals (including refurbishment or improvement of the Center at the Location from time to time) as are adopted by MBE from time to time.

MBE's Standards and Specifications also include restrictions on Franchisee's maximum retail prices for various UPS shipping services. Franchisee may not charge customers more than the maximum retail prices designated by MBE's Affiliate for various UPS shipping services offered by the Center to its customers. These maximum prices are specified in Franchisee's UPS Incentive Program Contract Carrier Agreement (the "Carrier Agreement"). In reliance on Franchisee's commitment to comply with the designated maximum prices, MBE agrees to use best efforts to ensure that its Affiliate gives Franchisee discounts and incentives on Franchisee's wholesale cost for such UPS services. These discounts and incentives also will be reflected in the Carrier Agreement. MBE's Affiliate periodically may modify the required maximum retail prices for shipping services as well as the wholesale discounts and incentives. Maximum retail prices and wholesale discounts and incentives may differ among franchisees due to various factors, including the differing costs of doing business with different franchisees operating in different geographic markets.

c. Franchisee shall do business under Franchisee's legal name followed by the initials "d/b/a" and the business name "THE UPS STORE" or such other business name as designated by MBE. If Franchisee is required to do so by Applicable Law, Franchisee shall promptly upon the execution of this Agreement file a notice of its intent to conduct its business under the name "THE UPS STORE". Promptly upon the expiration or termination of this Agreement for any reason whatsoever, Franchisee shall promptly execute and file such documents as may be necessary to revoke or terminate such assumed name registration, and if Franchisee shall fail to promptly execute and file such documents as may be necessary to effectively revoke and terminate such assumed name registration, Franchisee hereby irrevocably appoints MBE as its attorney-in-fact to do so for and on behalf of Franchisee.

d. At the time Franchisee's Center opens for business, Franchisee shall stock and display the initial inventory of products, accessories, equipment and supplies specified in the Manuals. Throughout the Term, Franchisee shall stock and maintain such inventory in quantities sufficient to meet reasonably anticipated customer demand, all in accordance with the Manuals.

e. Throughout the Term, Franchisee shall be connected to and participate in MBE's Virtual Private Network ("VPN") as designated by MBE. Franchisee shall comply with the Internet Policies.

f. Franchisee shall utilize the MBEWeb and shall execute MBE's software license in the form attached as Exhibit E.

g. MBE may revise its Standards and Specifications for all Franchisees from time to time. Consequently Franchisee may be required to upgrade or update its (i) computer (hardware and software) system, or (ii) Center image and trade dress. There is no contractual limitation on the frequency and cost of this obligation, though MBE's industry reflects an update or upgrade every two to three years. Franchisee must purchase, install and utilize ongoing upgrades as specified in the Manuals. Franchisee must upgrade to these Standards and Specifications as MBE may direct. There is no limitation on the frequency or cost of this obligation.

h. Franchisee must participate in certain programs (for example, MBE's corporate accounts program) designated from time to time by MBE. Participation in such required programs will require Franchisee to have, obtain or upgrade certain equipment such as specific computer systems and communications systems and other equipment, facilities and skills as MBE may specify from time to time in the Manuals.

i. Franchisee shall submit to MBE, in such form as required by the Manuals, reports containing information about customers of the Center at the Location, including periodic reports as designated by MBE of all the names and addresses of mailbox holders at Franchisee's Center. MBE may also access such information from Franchisee electronically. All such information and customer lists shall become the property of MBE, and MBE shall have the right to contact such customers at any time.

7.2 Confidential Operations Manuals

a. Upon the execution of this Agreement, MBE shall furnish to Franchisee one copy of the Manuals, unless Franchisee purchased the Center from an existing franchisee or Franchisee has executed this Agreement to renew its franchise for the Center at the Location. Franchisee shall not make, or cause or allow to be made, any copies, reproductions or excerpts of all or any portion of the Manuals without MBE's express prior written consent. MBE shall make available (either electronically or in print) to Franchisee, throughout the Term, the most current edition of the Manuals. MBE may modify the Manuals at any time and from time to time. Modifications in the Manuals shall become effective upon publication by MBE on MBEWeb, or as otherwise specified by MBE by written notice thereof to Franchisee. The Manuals, as modified from time to time, shall be an integral part of this Agreement and reference made in this Agreement, or in any amendments, exhibits or schedules hereto, to the Manuals shall be deemed to mean the Manuals kept current by amendments from time to time. The Manuals, including the Center Operations Manual, are made available to Franchisee on MBE's Internet system by means of a password. Upon expiration or earlier termination of this Agreement, the password will be changed. The provisions of the Manuals and other materials and information, as well as any print-outs or copies (whether electronic or otherwise) made by Franchisee, are licensed to Franchisee from MBE. All such Manuals, print-outs, copies (whether electronic or otherwise) and other information shall be returned to MBE promptly upon the expiration or earlier termination of this Agreement.

b. Franchisee shall strictly adhere to the Standards and Specifications set forth in the Manuals.

c. MBE possesses and continues to develop, and during the course of the relationship established hereunder, Franchisee shall have access to some of MBE's Proprietary Information. MBE will disclose some of its Proprietary Information to Franchisee in the Manuals, bulletins, supplements, confidential correspondence, or other confidential communications, and through Training and other guidance and management assistance, and in performing MBE's other obligations and exercising MBE's rights under this Agreement. The Proprietary Information is to be used by Franchisee only in connection with the operation of the Center at the Location consistent with the terms of this Agreement and shall not be used for any other purpose and shall not be disclosed to any third party except its employees who have a need to know such Proprietary Information and who are subject to obligations of confidentiality as to such information that are no less stringent than those provided in this Agreement without MBE's prior written consent.

d. Franchisee will notify MBE promptly in writing of any known or suspected misuse or unauthorized disclosure of any Proprietary Information. If Franchisee is required by law to disclose any portion of the Proprietary Information, then Franchisee shall promptly notify MBE in advance of any such disclosure to provide MBE with a reasonable time to take measures to protect the confidentiality of the information.

e. Return of Proprietary Information. Upon termination or expiration of this Agreement or upon MBE's earlier request, Franchisee shall within ten (10) days return all Proprietary Information in its possession or control or, at the option of MBE, destroy same and certify to its destruction.

f. The covenants of confidentiality and limited use set forth in this Agreement will apply after the Effective Date to all Proprietary Information received by Franchisee before and after the Effective Date and will continue from the Effective Date through the termination or expiration of this Agreement and for a period of three (3) years thereafter. Notwithstanding anything to the contrary herein, however, the covenants of confidentiality and limited use set forth in this Agreement shall, for information that constitutes a Trade Secret, continue for such three-year period or the period of time that the information retains its status as a Trade Secret under applicable law, whichever is longer.

g. Remedies. Franchisee acknowledges that money damages alone would be an inadequate remedy for the injuries and damage that would be suffered and incurred by MBE as a result of a breach of any of the provisions of this Section 6. MBE accordingly, in addition to any other remedies it may have at law or in equity, will be entitled to a restraining order, injunction, or other similar remedy in order to enforce the provisions of this Section 6. Franchisee further agrees that it will reimburse MBE for the reasonable attorney's fees and expenses it incurs as a result of a breach of this Section 6 by Franchisee.

h. The provisions of the Manuals are incorporated herein and shall constitute provisions of this Agreement as if fully set forth herein. All references to this Agreement shall include the Manuals and all mandatory Standards and Specifications contained therein.

7.3 Certified Manager

Franchisee shall designate and retain at all times a Manager, acceptable to MBE, to direct the operation and manage the Center at the Location. The Manager may be Franchisee or, if Franchisee is an Entity, one of the Owners or a designated employee. Franchisee must maintain the following conditions relating to the Manager during the term of this Agreement:

a. The Manager shall have satisfactorily completed all Training and shall have been designated by MBE as "certified". Certification may be earned by successfully completing MBE's training program for Managers.

b. Subject to Section 10.1.b., the Manager shall devote full time and attention to the operation of the Center at the Location.

c. If Franchisee loses the services of the Manager, a replacement certified Manager must be employed as soon as practicable, but in no event more than 90 days thereafter. Franchisee acknowledges that MBE's and the Area Franchisee's expenditure of time and effort may be increased to support the operations of the Center in the event Franchisee does not employ a Certified Manager within 90 days after losing the services of the Manager. Accordingly, Franchisee shall compensate MBE for this extra responsibility by paying MBE $50 per week until

Franchisee employs a replacement certified Manager. Franchisee acknowledges that MBE will not act as Franchisee's Manager nor does MBE promise any specific level of involvement in Franchisee's business in exchange for such fee.

d. Upon the permitted Assignment of this Agreement, the assignee must employ a certified Manager as of the effective date of such Assignment.

7.4 Purchase and Sale of Goods and Services

a. At all times throughout the Term, Franchisee shall offer, sell and provide in connection with the Center at the Location only those goods and services that are authorized in the Manuals. Franchisee shall only purchase authorized goods and services from MBE-approved suppliers; Franchisee must use products purchased from MBE-approved suppliers solely for the purposes of operating the Center at The Location and not for any other purpose.

b. If Franchisee should desire to purchase products from a supplier other than one previously approved or designated by MBE, Franchisee shall deliver written notice to MBE of its desire to seek approval of such proposed supplier together with such evidence of conformity with the Standards and Specifications stated in the Manuals. MBE or its representatives shall have the right to inspect the proposed supplier's facility and may thereupon request that the proposed supplier furnish MBE or its representative, at no cost to MBE, product samples for evaluation and testing. Franchisee shall pay MBE a charge not to exceed the reasonable costs of evaluation and testing of such supplier and its products. MBE will use its good faith efforts to notify Franchisee of its approval or disapproval of such supplier within 60 days after MBE's receipt of the completed request and completion of the evaluation and testing, if any. MBE shall not unreasonably withhold its approval of a proposed supplier, however: (i) MBE may revoke approval of particular products or suppliers upon such supplier's failure to continue to meet any of MBE's criteria; and (ii) MBE reserves the right to limit the number of MBE-approved suppliers. Upon receipt of written notice of such revocation, Franchisee must cease to order and/or sell any disapproved product and cease to purchase from any disapproved supplier. This process that allows MBE to consider (and possibly approve) Franchisee's proposed use of alternative suppliers does not apply, and is not available to, suppliers of products and services used in the construction, build-out, remodeling or image/décor of Franchisee's Center.

7.5 Corporate Accounts Program

The following are the terms and conditions under which Franchisee must participate in the Corporate Accounts Program (the "CAC Program"). The CAC Program includes, but is not limited to, any transactions where: (i) the Client (as defined below) pays MBE and MBE pays Franchisee, and (ii) the Client refers customers and customers pay Franchisee directly.

a. Franchisee agrees to comply with the terms and conditions of the CAC Program, as set forth in the Operations Manual ("Manual"), which may be available online, as amended from time to time.

b. Franchisee agrees to participate in all services and programs made available by MBE to every Corporate Account Client ("Client") whether currently existing or brought into the CAC Program in the future. Franchisee agrees to follow and comply with all CAC Program work orders and instructions, which may differ among individual Clients. Franchisee agrees to comply with all of MBE's equipment standards as announced by MBE from time to time, including, but not limited to, installation and use of the Virtual Private Network communications system designated by MBE for use by Franchisee and POS system. Franchisee agrees to comply with all of MBE's CAC insurance requirements as announced by MBE from time to time. For current CAC equipment and insurance standards, please refer to the Manuals.

c. Franchisee agrees to remain financially current with all obligations to MBE. At MBE's election, MBE may apply any sums owed Franchisee under the CAC Program against any sums owed MBE by Franchisee, including royalties, The UPS Store Marketing Fees, and National Advertising Fees.

d. All CAC transactions must be entered at the time of the transaction into POS, or as otherwise designated by MBE, in order to qualify for CAC payment. MBE will use best efforts to remit such funds to Franchisee within twenty-five (25) days of the last day of the month in which the report of the transaction was received by MBE.

e. Franchisee will be reimbursed by MBE for services rendered to CAC customers the amounts specified in the applicable agreement between MBE and Clients, including, but not limited to, carrier rates, packing rates, storage rates, declared value coverage rates, facsimile rates, copy rates or any other service or product rates designated.

f. Franchisee shall be liable for items in its possession under the CAC Program and must perform all work in accordance with the procedures as described in the Manual or work order or CAC instructions including packaging and shipping all Client packages. Franchisee agrees to indemnify, defend and hold harmless MBE, Client, their affiliates, subsidiaries, officers, directors, agents and employees from and against any and all claims, liabilities, judgments, or costs arising out of Franchisee's acts or omissions in carrying out its obligations under the CAC Program.

g. Franchisee agrees that any Client has the right upon thirty (30) days' notice to audit the Franchisee's financial records and books pertaining to its CAC Program. Franchisee must maintain all records and logs pertaining to the CAC Program for a period of two years.

h. If, for any reason, Franchisee violates any provision of Section 7.5 or becomes bankrupt or insolvent, MBE may terminate Franchisee's participation in the CAC Program upon ten (10) days' written notice.

i. Franchisee may not assign nor delegate its duties under the CAC Program without the prior written consent of MBE.

j. Franchisee understands that any Client trademark is the exclusive property of that Client, and nothing contained herein shall confer upon Franchisee any right to use such Client trademarks without the express written consent of Client and MBE.

k. Franchisee agrees to preserve in strict confidence any information or document it receives from any Client or from MBE that is designated or marked confidential.

**8. ADVERTISING AND MARKETING**

The parties acknowledge the value of standardized advertising and marketing programs to the growth of the goodwill and public image associated with the Marks and the System and agree as follows:

8.1 An amount equal to all The UPS Store Marketing Fee revenues shall be expended by MBE, in its sole discretion, for public relations, research and development, testing, and pilot programs to promote the sale of existing or new products and services for the System; for promotional programs to assist specific regions or franchisees; for promoting the sale of new franchises; for marketing research; and for producing common promotional material for use by MBE' s franchisees on a local, regional or national basis. MBE shall have complete discretion as to the use and allocation of these funds, which may be used for payment of direct program costs and/or overhead expenses related to the above described activities.

8.2 MBE has decision-making control of all activities and (except as provided below in this Section) expenditures of the National Advertising Fund for as long as the NAF remains in existence, including the creation and production of all advertising and marketing concepts and materials and their geographic, market, and media placement and allocation. The Manuals contain additional information regarding the NAF. NAF monies need not be spent in any manner that is proportionate or equivalent to National Advertising Fees paid by particular Centers or in any geographic area. If MBE terminates the NAF, unspent monies will be distributed to franchisees in proportion to their respective NAF contributions during the preceding 12-month period.

The Marketing Advisory Council ("MAC"), a committee comprised of representatives of Center franchisees, Area Franchisees, and MBE, will serve only in an advisory capacity with respect to the NAF's administration and operation, except that the MAC has the right to determine whether the NAF should pay for the media plans proposed, created, and to be implemented by MBE. Subject to MBE's candidate eligibility criteria and other MAC policies and rules that MBE may update from time to time, franchisees and Area Franchisees will elect their representatives to participate in the MAC. The MAC will be governed by bylaws that may be amended from time to time as provided in the MAC's charter. No portion of the NAF will be used for advertising that is principally a solicitation for the sale of franchises.

Franchisee's National Advertising Fee is subject to certain monthly and annual dollar caps ("NAF Cap"). The current NAF Cap is set forth in the franchise offering circular associated with this Agreement. MBE may adjust the NAF Cap annually. As of the date of this Agreement, the following is the formula for calculating annual adjustments to the NAF Cap. The Annual NAF Cap is multiplied by the most recent annual percentage rate of inflation as stated in the Consumer Price Index. This adjusted Annual NAF Cap

amount then is divided by 13 (months) to establish the adjusted January through November monthly NAF Cap amount. This adjusted January through November monthly NAF Cap amount then is multiplied by 2 to establish the adjusted December monthly cap. Adjusted monthly NAF Caps are rounded down, if necessary, to stay under the adjusted Annual NAF Cap. MBE reserves the right at any time, upon written notice to Franchisee, to change the formula it uses for adjusting the NAF Cap.

8.3 Franchisee acknowledges that MBE has established an Advertising Co-op for the designated marketing area ("DMA") in which Franchisee's Center is located. By signing this Agreement, Franchisee automatically becomes a member of the Co-op in its DMA (the "DMA Co-op"). Franchisee agrees to participate in the DMA Co-op as MBE specifies in its Advertising Co-op Guidebook for Centers, which includes bylaws, media guidelines, sample forms and reports, operational procedures, and other materials relating to the DMA Co-op's administration and operation. MBE controls the DMA Co-op's operation and periodically may modify the Guidebook as it deems best. Franchisee agrees to comply with all changes in the Guidebook.

8.4 MBE may have the DMA Co-op changed, dissolved, or merged with another Advertising Cooperative whenever it thinks best. MBE will control the DMA Co-op's marketing, advertising materials and activities, selection of ad agency, and expenditures. Franchisee agrees to send its Co-op Fee directly to MBE in the manner and by the date MBE specifies. A majority vote of the franchisee members of Franchisee's DMA Co-op will determine the Co-op Fee's fixed-dollar amount. However, MBE may require DMA Co-op Fees of 0.5% of the Center's STR (if this is more than the fixed-dollar amount). In addition, if 51 % or more of the franchisees in Franchisee's DMA Co-op vote to increase the fee to more than 0.5% of STR, they may do so up to a cap of 3% of STR. The DMA Co-op's Fees will not be changed more than once per year. No promotional or advertising plans or materials shall be used by the DMA Co-op or by any of its members without MBE's prior written approval.

8.5 Franchisee shall follow all advertising and marketing Standards and Specifications established from time to time by MBE. Franchisee shall use, sell or distribute only those advertising or marketing materials that are authorized by MBE in writing prior to use.

8.6 Franchisee must advertise as a single business if Franchisee's Center is the only one in the area covered by the telephone directory. If more than one The UPS Store Center is established in the area served by the telephone directory, Franchisee shall advertise together as a group with other such Centers in order to maximize ad size and minimize each Center's cost. The vendor, content, format and placement of the Yellow Page ads will be according to MBE's requirements and the coordination will be provided by the Area Franchisee or a person or committee designated by MBE.

8.7 For all newly constructed Centers (not renewals or transfers), Franchisee shall pay to MBE a Initial Marketing Plan Fee. Details regarding the Initial Marketing Plan Fee and associated program are set forth in the Manuals as may be updated from time to time. MBE shall have complete and absolute discretion to determine the ways in which the Initial Marketing Plan Fee is spent in support of the initial marketing plan of Franchisee's Center.

8.8 Any advertising or other presence or promotion by Franchisee on the Internet must comply with the Internet Policies. Franchisee's home page must reside on MBE's Web

server and must be linked from MBE's corporate web site. MBE may require changes to Franchisee's home page or other Internet presence on the Internet should MBE determine that any information contained therein is not in compliance with the Internet Policies.

8.9 Franchisee shall use the Marks, trade styles, color combinations, designs, symbols and slogans only in the manner and to the extent specifically permitted by this Agreement or the Manuals. Franchisee shall not cause or allow the Marks, or any of them, to be used or displayed, in whole or in part, as an Internet domain name, or on or in connection with any Internet home page, web site or other Internet-related activity without MBE's express prior written consent, and then only in such a manner and in accordance with such procedures, standards and specifications as MBE may establish. MBE reserves the right to approve all advertising or promotional materials, such as signs, stationery, business cards, forms and supplies which were not provided by MBE but which contain or use the Marks. All advertising (including any Internet advertising), publicity signs, decorations, furnishings, equipment or other materials employing the Marks in any way must be approved in writing by MBE prior to publication or use.

## 9. STATEMENTS, RECORDS, INSPECTIONS AND AUDIT

9.1 Statements and Records

a. Franchisee shall keep, maintain and retain for such period(s) specified in the Manuals true and accurate accounts and records, implement inventory, POS and accounting systems, submit statistical control forms, customer data and other reports or information concerning the finances and operation of the Center at the Location in the manner specified in the Manuals and as MBE may otherwise require, and Franchisee shall upon MBE's request implement computer and other electronic hardware and software to: (1) assist Franchisee in the operation of its Center at the Location in accordance with the System and the Manuals; (2) allow MBE to monitor STR, purchases, sales, costs and expenses, inventory, sales mix, usage, and other aspects of the operation of the Center; (3) enable MBE to develop chain wide statistics; (4) assist MBE in the development of new authorized products or the removal of existing unsuccessful products; (5) enable MBE to refine existing authorized products; and/or (6) generally improve chain-wide understanding of the System (collectively, the "Information"). Without limiting the generality of the foregoing:

i. On or before the 14th calendar day following each Accounting Period, or at such other interval as MBE may establish, Franchisee shall electronically submit to MBE and Area Franchisee, if any, a Monthly Royalty Report signed or otherwise verified by Franchisee, on a form prescribed by MBE, reporting STR for the preceding accounting period, together with such additional financial information as MBE may from time to time request.

ii. On or before the 45th day following each calendar quarter during the Term, Franchisee shall submit to MBE financial statements for the preceding quarter, including a balance sheet and profit and loss statement, prepared in the form and manner prescribed by MBE in the Manuals and in accordance with generally accepted accounting

principles, which shall be certified by Franchisee to be accurate and complete.

iii. Within 60 days following the end of each calendar year, Franchisee shall submit to MBE a statement of cash flow and cash on hand, unaudited annual balance sheet, and unaudited profit and loss statement, each prepared in accordance with generally accepted accounting principles, and in such form and manner prescribed by MBE, which shall be certified by Franchisee to be accurate and complete. Franchisee shall submit to MBE a copy of the original signed IRS 1120 or IRS 1120S tax form each and every year or any other forms which take the place of the IRS 1120 or IRS 1120S forms. Franchisee shall also provide MBE with copies of signed original sales and use tax forms contemporaneously with their filing with the appropriate state or local authority. MBE reserves the right to require such further information concerning the Center at the Location as MBE may specify in the Manuals.

iv. Upon MBE's request, Franchisee shall cause the aforesaid Information systems to be electronically linked to MBE, which may poll and retrieve such Information on a daily basis, or at such other interval as MBE may determine.

b. Franchisee hereby authorizes MBE to publish and/or incorporate in reports for use within its network of Centers any or all such Information.

9.2 Inspections

MBE or its designated agent shall have the right to enter upon the entire premises of the Center at the Location, with or without notice, and obtain full and complete access during business hours to inspect, photograph and videotape the Center at the Location and its operation. MBE shall also be permitted to inspect and photocopy any books, records and documents relating to the operation of the Center at the Location. If any such inspection indicates any deficiency or unsatisfactory condition with respect to any matter required under this Agreement or the Manuals, including quality, services, and authorized products, MBE shall notify Franchisee in writing of such non-compliance with the Manuals, the System or this Agreement and Franchisee shall promptly correct or repair such deficiency or unsatisfactory condition. Franchisee shall cooperate with MBE in connection with any such inspections. MBE shall endeavor to exercise its rights under this section in a manner intended to minimize interference with the operation of Franchisee's Center.

9.3 Audit

a. Upon ten (10) days' prior written notice, Franchisee grants to MBE or its representatives the right, at any time, to conduct an investigation and/or audit of all of Franchisee's financial books and records relating to Franchisee's Center and to make copies thereof. Franchisee shall cooperate with the audit process, shall provide a reasonable work area at the Center being audited and make a knowledgeable representative of Franchisee available to MBE to answer questions and explain transactions. Franchisee shall keep and maintain at the

Location such books and records specified herein and in the Manuals for such duration as specified in the Manuals.

b. If any audit or other investigation reveals an under-reporting or under-recording error of 5% percent or more of STR, then in addition to any fees normally due on the under-reported STR, the following will be due: (i) the expenses of the audit/inspection shall be borne and paid by Franchisee upon billing by MBE ($475 minimum), (ii) interest will be assessed at the maximum rate permitted by applicable law, and (iii) a late fee of $25 per week will be charged from December 31st of each year showing under-reporting of 5% of greater, or from the end of the audit period for a partial year audited, calculated until the audit fees are paid in full.

c. In connection with any such investigation or audit, Franchisee further agrees and authorizes any vendors with whom Franchisee does business to release to MBE or MBE's agents any information, reports, or data that any such vendor may possess or obtain from the Franchisee in connection with providing goods or services to the Franchisee.

d. In addition to field audits conducted at the Center, MBE has the right to perform audits of royalty reports at its office and to retrieve documentation from Franchisee to support the accuracy of such reports. Upon written request from MBE, Franchisee is required to promptly provide MBE with all information requested (and otherwise responsive) in order to verify the accuracy of one or more royalty reports previously submitted to MBE.

## 10. REPRESENTATIONS, WARRANTIES AND COVENANTS

10.1 During the term of this Agreement, Franchisee, and its Owners, covenant, represent and warrant that they and each of them shall:

a. use best and continuing efforts to promote and develop the business at Franchisee's Center;

b. devote full time and attention to the operation of the Center at the Location unless MBE shall otherwise expressly consent in writing (which consent may be conditioned, among other things, on the requirements set forth in Section 10.2), or shall employ a certified Manager;

c. maintain a sufficient number of competent, conscientious, trained staff to operate Franchisee's Center;

d. comply with all Applicable Laws;

e. attend, at Franchisee's expense, all networking meetings as arranged by MBE or Area Franchisee, if any, and attend and participate in MBE's regional and/or national conventions;

f. arrange for the Manager and other employees to attend and complete such training as required by MBE from time to time;

g. not disclose, except to Franchisee's employees on a need to know basis, and shall not make copies of, any Confidential Information, directly or indirectly, or use it in any way, either during the term of this Agreement or any time thereafter, except as authorized in this Agreement;

h. not use the Confidential Information in any business or other endeavor other than in connection with the Center at the Location;

i. maintain absolute confidentiality of the Confidential Information during and after the Term of this Agreement;

j. make no unauthorized copy, facsimile or notes of any materials containing in whole or in part the Confidential Information;

k. operate and implement all reasonable procedures prescribed from time to time by MBE to prevent unauthorized use and disclosure of the Confidential Information, including, without limitation, restrictions on disclosure to employees. If Franchisee has any reason to believe that any employee has violated such employee's duty to not disclose the Confidential Information to unauthorized third parties, Franchisee shall promptly notify MBE and shall cooperate with MBE to protect MBE against infringement or other unlawful use including, but not limited to, the prosecution of any lawsuits if, in the reasonable judgment of MBE, such action is necessary or advisable; and

l. operate (open to the public for business) the Center at least fifty eight (58) hours per week, unless MBE has authorized (in writing) some lesser amount of hours.

10.2 If (and only if) MBE: (i) provides to Franchisee its prior written consent to Franchisee's (or Owners') proposal to engage in a business other than the operation of a Center and (ii) confirms that such other business does not violate Section 2 (titled "Covenanter's In-Term Non-Competition and Non-Solicitation Covenants") of the Owners' Non-Competition and Non-Solicitation Agreement {attached as Exhibit D hereto}, then MBE's consent shall be further subject to Franchisee's satisfaction of all of the following conditions:

a. such other business shall be conducted at a location other than the Location and shall not interfere with the effective operation and maintenance of Franchisee's Center at the Location;

b. Franchisee shall maintain separate books and records, maintain a separate and distinct image as a separate business, and shall not commingle funds or expenses with the business of the Center;

c. such other business shall not interfere with, injure or otherwise diminish the integrity or value of MBE's Marks or goodwill;

d. such other business shall not directly or indirectly compete with Franchisee's Center or have an adverse commercial impact on Franchisee's business; and

e. Franchisee shall pay for and/or reimburse any direct or indirect costs incurred by such other business for goods and services provided by Franchisee's Center.

10.3 As of the Effective Date, the information provided in the Ownership Information Form by Franchisee is true, accurate and complete. Franchisee shall not cause or permit any act or event to occur during the Term which would cause the information provided in the Ownership Information Form to be untrue, except with MBE's prior written consent, or as otherwise expressly permitted hereunder.

10.4 Franchisee affirms that all information set forth in applications, financial statements and submissions to MBE is, and all future submissions to MBE shall be, true, accurate and complete in all material respects, and Franchisee acknowledges that MBE has relied and may hereafter rely upon the truthfulness, accuracy and completeness of such information.

10.5 Franchisee shall display prominently in Franchisee's Center such promotional literature about MBE's franchise opportunities as MBE shall from time to time specify, including the method and location of such display.

## 11. TRANSFER AND ASSIGNMENT

11.1 By MBE

MBE may assign all of its right, title and interest in and to this Agreement, and the rights hereunder shall inure to the benefit of its successors and assigns, provided that any such successors and assigns shall agree in writing to assume all of MBE's obligations hereunder. Such assignment shall discharge MBE from any further obligation hereunder. In addition, upon such terms as MBE may determine, MBE may delegate or assign all or some of its obligations and rights under this Agreement to an agent, the Area Franchisee whose territory includes all or part of Franchisee's Territory, or such other Area Franchisee as selected by MBE.

11.2 By Franchisee

a. Franchisee is permitted to pledge, encumber or otherwise give any third party a security interest in this Agreement (and the franchise rights associated with this Agreement), only if such third party irrevocably agrees that if and when it seeks to pursue its rights related to the security interest via a replevin (repossession) action, it shall not be permitted, without the prior written consent of MBE, to (i) operate the Center associated with this Agreement, nor (ii) resell to a third party the franchise rights associated with this Agreement. In determining whether to grant its consent, MBE shall apply its standard criteria, as if the third party (or, as applicable, the third party's proposed assignee) were a candidate to become a franchisee of an existing Center.

b. The rights and duties created by this Agreement are personal to Franchisee and MBE has entered into this Agreement in reliance on many factors, including the character, skill, aptitude and business and financial capacity of Franchisee and its Owners, in the case of a Franchisee which is an Entity. Accordingly, neither Franchisee's (or any Owner's) interest in this Agreement nor any of its (or any Owner's) rights or privileges thereunder, shall be sold, conveyed, assigned, transferred, shared or divided, voluntarily or involuntarily, by operation of law or otherwise (including the division of any community property interest in connection with any divorce proceeding), in any manner (an "Assignment"), without MBE's prior written consent as provided in Section 11.3. Any such

purported Assignment occurring by operation of law or otherwise, including any Assignment by a trustee in bankruptcy, without MBE's prior written consent, shall be null and void and a material default of this Agreement.

c. Any sale, assignment, transfer, conveyance, gift, pledge, mortgage, or other encumbrance of more than 50% of the outstanding and issued stock, membership interests, Partnership Rights or other ownership interest of Franchisee by one or more transfers, by operation of law, or any other event(s) or transaction(s) which, directly or indirectly, effectively changes management control of Franchisee shall constitute an "Assignment" hereunder.

d. It shall also constitute an "Assignment" hereunder if transfer of less than 50% of the ownership interest in Franchisee effectively changes management control of Franchisee. Example: A owns 49%, B owns 20% and C owns 31%. Sale of C's 31% to B would transfer controlling interest and constitute an "Assignment".

e. Notwithstanding anything to the contrary in Section 11 of this Agreement, a "Family Transfer" shall not constitute an "Assignment". "Family Transfer" is defined in Section 20 of this Agreement as such definition may be supplemented and updated by MBE in the Manuals. Franchisee must pay to MBE a "Family Transfer Fee" in the amount set forth in the then-current The UPS Store Franchise Offering Circular (i.e., the circular that is in effect at the time of the Family Transfer).

11.3 Franchisee acknowledges the vital importance of Franchisee to the market position and overall image of MBE. Franchisee also recognizes that there are many objective and subjective factors that comprise the process by which MBE selects a suitable franchisee; therefore, MBE may impose any reasonable condition to its consent to any Assignment, including, without limitation, the satisfaction of all of the following conditions:

a. Franchisee and the proposed transferee must complete, execute and comply with all requirements of MBE's then-current transfer materials as provided in the Manuals;

b. The proposed transferee must be a person or Entity that meets MBE's then-current Standards and Specifications and qualifications for new franchisees of Centers;

c. The proposed Assignment shall be for commercially reasonable terms. MBE's consent to any Assignment does not ensure the transferee's success as a franchisee nor should the transferee rely upon MBE's consent to the Assignment in determining whether to acquire the Center at the Location;

d. As of the effective date of the proposed Assignment, all obligations of Franchisee hereunder and under all other agreements between Franchisee and MBE (and MBE's Affiliates) shall be fully satisfied;

e. The transferee must execute a new franchisee agreement, on MBE's Then-Current Agreement, for a full ten (10) year initial term;

f. At or prior to the Assignment, MBE must receive payment of the following fees from Franchisee (also known, for these purposes, as the "transferor" or "seller") and/or from Franchisee's "buyer" or "transferee":

i. a "Transfer Fee" (as defined in Section 23 of this Agreement); and

ii. a "Processing Fee" (as defined in Section 23 of this Agreement); and

iii. a "Pro-Rated Renewal Fee for Transfers" (as defined in Section 23 of this Agreement).

g. Transferee must complete all phases of Training to MBE's satisfaction and pay all then-current training fees;

h. No later than sixty (60) days after the Assignment, Franchisee's Center (exterior and interior) must be upgraded, remodeled and refurbished by Transferee to MBE's then-current Center image Standards and Specifications;

i. Franchisee shall enter into a general release (in a form prescribed by MBE) that will release MBE and its Affiliates from any and all suits, claims or causes of action arising from or in any way connected with the sale or operation of Franchisee's Center during Franchisee's ownership;

j. MBE shall not incur any liability on account of withholding its consent of any proposed Assignment; and

k. No later than sixty (60) days after the Assignment, the Center must be upgraded by Transferee to then-current System Standards and Specifications for POS/CMS, hardware, software and other computer-related systems required for Centers.

11.4 MBE's Right of First Refusal

If Franchisee desires to make any Assignment for value, Franchisee shall, at least thirty (30) days prior to such proposed sale or Assignment, notify MBE in writing. Said notice must set forth the name of the proposed purchaser, all terms and conditions of the proposed sale or Assignment, and must be accompanied by fully completed current MBE transfer materials, including a fully executed Purchase and Sale Agreement. The effectiveness of the Purchase and Sale Agreement must be contingent upon MBE's waiver of its right of first refusal as described herein and upon MBE's consent to the transaction. The thirty (30) day notice period shall commence upon receipt by MBE of all required documents and information stated herein.

11.5 Within such thirty (30) day period, MBE may elect to purchase Franchisee's rights under this Agreement and the assets of Franchisee's Center on the same terms and conditions set forth in said notice. In the event that MBE exercises its right of first refusal regarding such transaction, the closing shall take place on the earlier of the date stated in the notice of proposed Assignment or ninety (90) days following MBE's receipt of all required documents as described in Sections 11.3. and 11.4, above.

11.6 If MBE does not exercise its right of first refusal, MBE shall notify Franchisee whether it consents to the proposed Assignment, which approval shall not be unreasonably withheld upon compliance with MBE's Assignment requirements.

11.7 If Franchisee desires to assign its rights under this Agreement and the assets of Franchisee's Center to an Entity that is owned or controlled by Franchisee, such Assignment may only be made with MBE's prior written consent. Franchisee understands and agrees that conditions of MBE's consent to any such Assignment include the following:

a. the assignee Entity must execute all agreements then required by MBE for a new Franchisee, including an assignment of Franchisee's Lease (including "Addendum to Lease") for the premises where the Center is located;

b. all of the assignee Entity's Owners must personally guarantee the full and faithful performance of each and every term, covenant and condition of this Agreement by such transferee Entity;

c. the Owners of such transferee Entity shall personally supervise the operation of the Center;

d. Franchisee must deliver to MBE copies of organizational documents of such Entity (e.g., Articles of Incorporation or Association), certified by the appropriate Governmental Authority;

e. Franchisee must pay the then-current Incorporation Fee; and

f. The assignee entity shall not use any of the Marks, or any abbreviations or variations thereof, or any words deemed by MBE to be confusingly similar to the Marks as part of the name of any assignee entity, including any of the following words: "Mail" or "Boxes" or "Etc." or the combined letters "MBE", "The UPS Store", "UPS", or "Store".

11.8 Death or Incapacity of Franchisee or any Controlling Owner

a. In the event of the death or Incapacity of Franchisee (which is not an Entity) or any of its Controlling Owners (if Franchisee is an Entity), MBE shall upon the written request of the heirs or representatives, subject to Section 11.8.b., allow the heirs or representatives a period of six (6) months from date of death or Incapacity to:

i. Demonstrate that such heirs or representatives meet MBE's Standards and Specifications for new Center franchisees and execute and agree to the terms of the Then-Current Agreement (except that the term of such agreement shall be the remaining Term hereof and no Initial Franchise Fee shall be payable); or

ii. As an alternative to 11.8(a)(i) above only if Franchisee's (or, if applicable, Controlling Owners') heir or representative(s) is/are Immediate Family Member(s) that meet MBE's Standards and Specifications for new Center franchisees, such Immediate Family

Member(s) must execute MBE's form of amendment to franchise agreement replacing the name of Franchisee (or, if applicable, of Controlling Owner(s)) with the name(s) of such Immediate Family Member(s); and pay to MBE its then-current Non-Transfer Ownership Change Fee; or

iii. Assign this Agreement to a third party acceptable to MBE who meets MBE's Standards and Specifications for new Center franchisees.

If MBE agrees in its discretion and at the request of the heirs or representatives to act as a non-exclusive agent for sale of Franchisee's rights under this Agreement and the Center, the parties shall execute a sales agreement upon terms mutually agreed upon between MBE and the heirs or representatives, but which shall provide for a sales fee to MBE equal to one-quarter of the then-current Initial Franchise Fee.

b. MBE may impose reasonable conditions to the rights granted under Section 11.8(a), including the following which shall be deemed reasonable: (i) the Center at the Location must continue to be operated in conformity with this Agreement, the System and the Manuals; (ii) if MBE determines in its discretion that the Center at the Location is not being operated in accordance with this Agreement, the System or the Manuals, MBE shall have the right, but not the obligation, to appoint a Manager for the Center at the Location, upon which it shall be entitled, in addition to all other fees to be paid by Franchisee pursuant hereto, to be reimbursed (payable on an estimated basis in advance) for its actual direct and indirect costs in connection with such services and to be indemnified and held harmless from and against any and all risks, losses, costs and liability associated therewith.

11.9 If Franchisee seeks MBE's required consent (and a required waiver of MBE's right of first refusal) to change less than a controlling ownership interest in the Franchised Business, then a $350 "Non-Transfer Ownership Change Fee" shall be paid by Franchisee to MBE.

11.10 If Franchisee is an Entity and seeks MBE's required consent to change the name of such Entity (without changing the ownership structure or percentages set forth on the Ownership Information Form), then Franchisee shall pay to MBE a $350 "Entity Name Change Fee".

## 12. DEFAULT AND TERMINATION

### 12.1 Termination by Franchisee

Franchisee may terminate this Agreement due to a material default by MBE of its obligations hereunder, which default is not cured by MBE within 60 days after MBE's receipt of prompt written notice by Franchisee to MBE detailing the alleged default with specificity; provided, that if the default is such that it cannot be reasonably cured within such 60 day period, MBE shall not be deemed in default for so long as it commences to prosecute such default within 60 days and diligently continues to prosecute such cure to completion. Such notice must be given within one year of the alleged default. Failure to give such notice shall constitute a waiver of any such alleged default. If Franchisee

terminates this Agreement pursuant to this Section 12.1, Franchisee shall comply with all of the terms and conditions of Section 14 and Section 7.2(d) of this Agreement, and Franchisee (or, if applicable, Owners) shall fully comply with the Non-Competition and Non-Solicitation Agreement.

12.2 Termination by MBE

MBE has the right to terminate this Agreement only for "cause". "Cause" is hereby defined as a material breach of this Agreement.

12.3 Termination with Notice and Opportunity to Cure

Except for any default under Section 12.4, and as otherwise expressly provided elsewhere in this Agreement or by Applicable Laws, Franchisee shall have 30 days after MBE's written notice of default in which to remedy any default under this Agreement and to provide evidence of such remedy to MBE. If any such default is not cured within that time period, or such longer time period as Applicable Law may require or as MBE may specify in the notice of default, this Agreement and all rights granted by it shall thereupon automatically terminate without further notice or opportunity to cure.

12.4 Termination by MBE without Notice or Opportunity to Cure

Subject to any controlling Applicable Laws to the contrary, Franchisee shall be deemed to be in material default and MBE may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon delivery or attempted delivery to Franchisee of notice by MBE of the occurrence of any of the following events:

a. Franchisee is adjudicated bankrupt or judicially determined to be insolvent (subject to any contrary provisions of any applicable state or federal laws), or fails to meet its financial obligations as they become due, or makes a disposition for the benefit of its creditors;

b. Franchisee or any of its Owners allows a judgment against it or them in the amount of more than $25,000 to remain unsatisfied for a period of more than 30 days (unless a supersedeas or appeal bond has been filed);

c. the Center, the Location (including the real property or building thereon), or the Franchisee's assets are seized, taken over or foreclosed by a government official in the exercise of its duties, or seized, taken over, or foreclosed by a creditor or lienholder provided that a final judgment against the Franchisee remains unsatisfied for 30 days (unless a supersedeas or appeal bond has been filed);

d. a levy of execution or attachment has been made upon the franchise granted by this Agreement or upon any property used in the Center, and it is not discharged within 5 days of such levy or attachment;

e. Franchisee allows or permits any judgment to be entered against MBE or its subsidiaries or affiliated corporations, arising out of or relating to the operation of Franchisee's Center;

f. a condemnation or Assignment in lieu of condemnation;

g. if Franchisee abandons the Center at the Location. (For purposes of this Agreement, "abandon" shall mean (i) Franchisee's failure, at any time during the term of this Agreement, to keep the Center open and operating for business for a period of 3 consecutive days, except as provided in the Manuals, (ii) Franchisee's failure to keep the Center open and operating for any period after which it is not unreasonable under the facts and circumstances for MBE to conclude that Franchisee does not intend to continue to operate the Center, unless such failure to operate is due to fire, flood, earthquake or other similar causes beyond Franchisee's control, (iii) the withdrawal of permission from the applicable lessor that results in Franchisee's inability to continue operation of the Center at the Location; (iv) closing of the Center at the Location required by law if such closing was not the result of a violation of this Agreement by MBE; or (v) any act or statement by Franchisee from which MBE reasonably concludes that Franchisee intends to relinquish Franchisee's rights to the Center.)

h. if Franchisee receives 3 or more written notices of default from MBE, within any period of 12 consecutive months, concerning any material breach by Franchisee, whether or not such breaches shall have been curable or cured after receipt of notice, such repeated course of conduct itself shall be considered incurable and be grounds for termination of this Agreement at the same time as, or any time after, MBE notifies Franchisee of the third material default;

i. if Franchisee or any of its officers, directors, or key employees is convicted of or pleads guilty or nolo contendere to a felony or any other crime or offense that is reasonably likely, in the sole opinion of MBE, to adversely affect MBE's reputation, System, Marks or the goodwill associated therewith, or MBE's interest therein;

j. if Franchisee purports to make any Assignment without MBE's prior written consent or otherwise violates Section 11 of this Agreement;

k. if Franchisee materially misuses or makes any unauthorized use of the Marks or otherwise materially impairs the goodwill associated therewith or MBE's rights therein, takes any action that reflects materially and unfavorably upon the operation and reputation of the Center at the Location or upon MBE's network of Centers generally, or engages in any unauthorized use, disclosure, or duplication of the Confidential Information, excluding independent acts of employees or others if Franchisee shall have exercised its best efforts to prevent such disclosures or use;

l. if Franchisee makes any material misrepresentations in connection with the execution of this Agreement or the acquisition of the Center at the Location;

m. if Franchisee suffers expiration or termination of the lease for Franchisee's Center as a result of a default thereunder; or

n. if Franchisee (or, if applicable, any Owner) shall violate the in-term non-competition or non-solicitation covenant set forth in Section 2 of the Non-

Competition and Non-Solicitation Agreement(s), as attached hereto as exhibits(s).

12.5 Any material default by Franchisee under the terms and conditions of this Agreement, or any other agreement between MBE (or its Affiliate) and Franchisee or Franchisee's Lease, or any default by Franchisee of its obligations to any DMA Co-op of which it is a member, shall be deemed to be a material default of each and every said agreement. Furthermore, in the event of termination, for any cause, of this Agreement or any other agreement between the parties hereto, MBE may, at its option, terminate any or all said agreements.

Notwithstanding anything to the contrary contained in this Section 12, if Franchisee's UPS Incentive Program Contract Carrier Agreement is terminated by MBE's Affiliate due to Franchisee's failure to cure any material default of that Carrier Agreement, that termination will be considered a simultaneous uncured and incurable material default under this Agreement and will automatically and simultaneously result in the immediate termination of this Agreement without any required notice or other action by MBE. Grounds for Carrier Agreement termination include Franchisee's material violation of MBE's Affiliate's designated maximum retail prices for various shipping services and options.

12.6 Notwithstanding anything to the contrary contained in this Section 12, in the event any valid Applicable Law of a competent Governmental Authority having jurisdiction over this Agreement and the parties hereto shall limit MBE's rights of termination hereunder or shall require longer notice or cure periods than those set forth above, this Agreement shall be deemed amended to conform to the minimum notice or cure periods or restrictions upon termination required by such laws and regulations. MBE shall not, however, be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, arbitration, hearing or dispute relating to this Agreement or the termination thereof.

12.7 MBE's rights as stated in this Section shall be without prejudice to any other rights or remedies provided by law or under this Agreement, which include, but are not limited to, injunctive relief, damages or specific performance. MBE's failure to terminate this Agreement upon the occurrence of one or more of the above events shall not constitute a waiver or otherwise affect the right of MBE to terminate this Agreement because of any other occurrence of one or more of the events set forth above. Further, MBE's failure to enforce any term or condition of any other agreement (whether or not with Franchisee) or to terminate such agreement upon the occurrence of one or more of the above events shall not constitute a waiver of MBE's right to enforce or terminate any term or condition of this Agreement.

## 13. MBE'S RIGHTS' UPON FRANCHISEE'S TERMINATION

Upon the termination of this Agreement as set forth above, in addition to all other rights and remedies of MBE (including as set forth in Section 14), MBE may, at its option:

13.1 commence proceedings for damages, injunctive relief or specific performance.

13.2 purchase from Franchisee or assign such right to a third party the tangible assets (equipment, decor, etc.) of Franchisee's Center at a purchase price equal to such assets'

appraised fair market value, from which shall be deducted the following, in the following order:

a. All outstanding and unpaid obligations of Franchisee to MBE, including all unpaid fees, late payment fees and interest, promissory notes and equipment leases;

b. All of MBE's costs of collection of such unpaid obligations, if any;

c. The cost of upgrading Franchisee's Center to MBE's then-current requirements for Centers, including image and equipment upgrades; and

d. All outstanding claims of Franchisee's creditors and all accrued but unpaid amounts owed to Franchisee's lessor for the Center as of the date of the purchase, prorated as necessary.

If MBE exercises its right to receive liquidated damages in accordance with Section 13.5, MBE shall then be prohibited from exercising its rights under this Section 13.2 to purchase the tangible assets of Franchisee's Center.

13.3 Because the termination of Franchisee's Agreement extinguishes all intangible franchise rights that were formerly held by Franchisee, Franchisee acknowledges that the purchase described in Section 13.2 would not be in exchange for any such intangible assets or intangible rights that were formerly held by Franchisee.

13.4 If this Agreement is terminated due to Franchisee's abandonment of Franchisee's Center as described in Section 12.4(g) above, Franchisee has thereby abandoned any rights to the former business, including but not limited to, any potential proceeds from a potential purchase or sale as described above, or any payment or remuneration of any kind.

13.5 Payment of Liquidated Damages

a. If this Agreement terminates prior to its expiration (i) by MBE in accordance with the terms of this Agreement, or (ii) by Franchisee not in accordance with Section 12.1 of this Agreement, MBE has the right, but not the obligation, to require that Franchisee pay MBE liquidated damages ("Liquidated Damages") as set forth in 13.5(c) below. Franchisee's payment of Liquidated Damages to MBE shall not be considered as a penalty for Franchisee's breaching this Agreement, but rather a reasonable estimate of MBE's damages and lost future fees MBE would have received from Franchisee under this Agreement had it not prematurely terminated.

b. Franchisee acknowledges that its obligation to pay to MBE Liquidated Damages is in addition to, not in lieu of, (i) Franchisee's obligations to pay any amounts then due to MBE, (ii) Franchisee's obligation to fully comply with all of its post-termination duties set forth in this Agreement, and (iii) any other post-termination remedies that may be available to MBE under the law. However, if MBE exercises its right to receive Liquidated Damages in accordance with this provision, MBE shall then be prohibited from exercising its rights, under Section 13.2 of this Agreement, to purchase the tangible assets of Franchise's MBE Center.

c. "Liquidated Damages" shall mean the amount of five percent (5%) Royalty revenue that MBE would likely have earned during the period of time from the date of termination until the Agreement's expiration date but in no event greater than two (2) years ("Liquidated Damages Period"). Franchisee acknowledges that the following formula for calculating such damage amounts is applicable and reasonable.

i. If the Franchisee's Center has been open for at least one year, then the Liquidated Damages shall be calculated by multiplying the Royalties paid by Franchisee to MBE during the year immediately prior to the Liquidated Damages Period by the number of years (maximum two years) in the Liquidated Damages Period. Any Liquidated Damages Period days in addition to full years shall be pro-rated accordingly.

ii. If the Franchisee's Center has been open for less than one year, then the Liquidated Damages shall be calculated by multiplying the average monthly Royalty paid by Franchisee to MBE during the Term by the number of months in the Liquidated Damages Period. Any Liquidated Damages Period days in addition to full months shall be pro-rated accordingly.

iii. To the extent that Franchisee has failed to either pay and/or report Royalties owed to MBE during the Term, MBE shall be permitted to reasonably estimate the amount of such Royalties for the purpose of calculating Liquidated Damages.

## 14. FRANCHISEE'S OBLIGATIONS UPON EXPIRATION AND/OR TERMINATION

14.1 Upon expiration and/or termination (subject to Section 13) of this Agreement, Franchisee shall immediately:

a. Cease to operate the former Center at Franchisee's Location, cease to use the System and Marks in any form, cease to hold itself out as a Franchisee of MBE, and Franchisee shall not use or identify in any business name any of the words "The UPS Store", or "UPS", or "Store", or "Mail" or "Boxes" or "Etc." or the combined letters "MBE" in any combination, form or fashion or any words or letters confusingly similar to any of the words listed above, including, but not limited to, "Mail Boxes", "Mailboxes" or "MailBoxes". Franchisee shall take such action as MBE may require to accomplish the foregoing;

b. Pay all sums due to MBE, including all sums required to satisfy in full all obligations, trade accounts, promissory notes, financing agreements and equipment leases owing to MBE;

c. Return to MBE or to its designee the Manuals, proprietary hardware, software, computer disks and all other trade secrets and other Confidential Information and instructions delivered to Franchisee, all copies thereof, and certify the deletion of all electronic copies of the foregoing;

d. Surrender to MBE such stationery, printed matter, signs and advertising materials containing the Marks, as may be requested by MBE;

e. Take such action as may be required by MBE, including:

i. transfer and assign the business telephone number, fax number and business Internet e-mail address for Franchisee's Center to MBE or its designee;

ii. disconnect and forward all such telephone numbers and Internet addresses to MBE or its designee;

iii. transfer "white" and "yellow" page telephone listings, references and advertisements and all trade and similar name registrations and business licenses and cancel any interest which Franchisee may have in the same; and

iv. implement all actions stated on MBE's "Franchisee De-Identification Checklist"; and

f. At MBE's request, provided MBE or its designee does not take possession of Franchisee's Location, make such changes in signs and the furniture, fixtures, decor and equipment at Franchisee's Location as MBE may require to distinguish the premises from its former appearance as a Center.

14.2 In the event of termination and/or expiration of this Agreement, Franchisee hereby authorizes and appoints MBE to act as special agent or attorney-in-fact for Franchisee to transfer any listed telephone and fax numbers, transfer "white" pages and "yellow" pages listings, e-mail address and Internet presence relating to Franchisee's Center and to enforce the "Addendum to Lease" executed between Franchisee and Franchisee's lessor.

14.3 In the event of termination and/or expiration of this Agreement, Franchisee hereby authorizes MBE to notify Franchisee's customers, vendors, suppliers, landlord, banks, local advertisers and any other appropriate party that this Agreement has expired and/or been terminated.

14.4 Termination and/or expiration of this Agreement shall be without prejudice to any other rights or remedies that MBE or Franchisee, as the case may be, shall have in law or in equity, including, without limitation, the right to recover benefit of the bargain damages. In no event shall a termination and/or expiration of this Agreement affect Franchisee's obligations to take or abstain from taking any action in accordance with this Agreement. The provisions of this Agreement that constitute post-Term covenants and agreements, including the obligation of MBE and Franchisee to resolve any and all disputes, shall survive the termination and/or expiration of this Agreement.

14.5 Franchisee acknowledges and agrees that the goodwill and other rights in and to the Marks and System and the use thereof shall be and remain the property of MBE.

14.6 Upon expiration and/or termination of the Term, if Franchisee does not renew pursuant to Sections 2.2 and 2.3, MBE shall have the right and option, but not the obligation, to purchase the tangible assets (equipment, decor, etc.) of Franchisee's Center at the Location at a purchase price equal to such assets' appraised fair market value, from which the following shall be deducted:

a. All outstanding and unpaid obligations of Franchisee to MBE, including all unpaid fees, late payment fees and interest, promissory notes and equipment leases;

b. All of MBE's costs of collection of such unpaid obligations, if any;

c. The cost of upgrading Franchisee's Center to MBE's then-current requirements for Centers, including image and equipment upgrades; and

d. All outstanding claims of Franchisee's creditors, and all accrued but unpaid amounts owed to Franchisee's lessor for the Center as of the date of purchase, prorated as necessary.

14.7 Because the expiration and/or termination of Franchisee's Agreement extinguishes all intangible franchise rights that were formerly held by Franchisee, Franchisee acknowledges that the purchase described in Section 14.6 would not be in exchange for any such intangible assets or intangible rights that were formerly held by Franchisee.

## 15. INSURANCE

15.1 Franchisee shall obtain and maintain throughout the Term insurance coverage in the types and amounts of coverage and deductibles specified in the Manuals, which shall in each instance designate MBE and its designated Affiliates as additional insureds and loss payee as their interests may appear. All insurance must be placed with a reputable insurance company licensed to do business in the state in which the Center is located and having a Financial Size Category equal to or greater than IX and Policyholders Rating of "A" as assigned by Alfred M. Best and Company, Inc.

15.2 In the event of damage to the Center at the Location that is covered by insurance, the proceeds of any such insurance shall be used to restore such Center to its original condition as soon as possible, unless such restoration is prohibited by Franchisee's Lease or MBE has otherwise consented in writing.

15.3 Franchisee shall, prior to opening the Center at the Location, and from time to time thereafter, within 10 days after a request therefor from MBE, and annually thereafter, provide evidence of the renewal or extension of each insurance policy by filing with MBE certificates of such insurance. In addition, the policies shall contain a provision requiring 30 days' prior written notice to MBE of any proposed cancellation, modification, or termination of insurance.

15.4 If Franchisee fails to comply with the requirements specified in this Section 15, MBE may, but is not obligated to, obtain such insurance or bonds and keep the same in force and effect, and Franchisee shall pay MBE, on demand, the cost thereof.

## 16. COMPLIANCE WITH LAWS AND OBLIGATIONS

16.1 Franchisee shall comply with all Applicable Laws and timely obtain any and all permits, certificates and licenses for the full and proper conduct of business at Franchisee's Center.

16.2 Franchisee shall operate the Center in conformity with all U.S. Postal Service regulations. Franchisee shall implement all changes in U.S. Postal Service regulations immediately upon receipt of notice of any changes provided by the U.S. Postal Service or MBE. Franchisee shall implement any changes by the U.S. Postal Service and follow all guidelines as directed by the post office in Franchisee's area.

## 17. INDEMNIFICATION AND INDEPENDENT CONTRACTOR

17.1 Franchisee shall, at Franchisee's sole cost, defend and indemnify MBE, its Affiliates, and their respective Owners, directors, officers, employees, agents, attorneys, accountants, successors and assigns, and hold each of them harmless from and against, and reimburse them for, all losses, claims, liabilities, obligations, damages, attorneys' fees, costs, settlement amounts, judgments, lost profits, charges, expenses and taxes based upon, arising out of, or in any way related to the operation of the Center at the Location, Franchisee's acts or omissions, or the breach by Franchisee of any provision of this Agreement. MBE and its Affiliates have the right to defend and/or settle any such matter in such manner, as they deem appropriate, in their sole discretion, and without the consent of Franchisee. Franchisee shall also reimburse each of the foregoing indemnified parties for all costs reasonably incurred in investigating and defending any such matter, including, without limitation, attorneys' fees and court costs. This Section shall continue in full force and effect subsequent to and notwithstanding the expiration and/or termination of this Agreement.

17.2 In all dealings with third parties, including, without limitation, employees, suppliers and customers, Franchisee shall disclose in a manner acceptable to MBE that Franchisee is an independently owned and operated entity licensed by MBE under this Agreement. Nothing in this Agreement is intended by the 'parties to create a fiduciary relationship between them; nor to constitute Franchisee an agent, legal representative, subsidiary, joint venturer, partner or employee of MBE for any purpose whatsoever. It is understood and agreed that Franchisee is an independent contractor, and is in no way authorized to make any contract, warranty or representation or to create any obligation on behalf of MBE. Neither MBE nor Franchisee shall guarantee the obligations of the other or in any way become obligated for the debts or expenses of the other.

## 18. WAIVERS, FORMS OF AGREEMENT AND AMENDMENT

18.1 No failure of MBE to exercise any power reserved to it by this Agreement and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of MBE's right to demand exact compliance with any of the terms herein. No waiver or acceptance by MBE of any particular breach or default by Franchisee, nor any delay, forbearance or omission by MBE to act or give notice of default or to exercise any power or right arising by reason of such default hereunder, nor acceptance by MBE of payments due hereunder shall be considered a waiver or acceptance by MBE of any preceding or subsequent breach or default by Franchisee of any term, covenant or condition of this Agreement.

18.2 No warranty or representation is made by MBE that all franchise agreements heretofore or hereafter issued by MBE for Centers do or will contain terms substantially similar to those contained in this Agreement. Further, Franchisee recognizes and agrees that MBE may, in its reasonable business judgment, due to local business conditions or otherwise,

waive or modify comparable provisions of other franchise agreements heretofore or hereafter granted to other franchisees of MBE in a non-uniform manner.

18.3 No amendment, change or variance from the terms and conditions in this Agreement shall be binding on either MBE or Franchisee except by mutual written agreement signed by the parties hereto.

## 19. NOTICES

All notices and other communications (including notices of default or termination) permitted or required to be given pursuant to this Agreement shall be deemed delivered: (a) at the time personally delivered to Global Headquarters (if to MBE) or Franchisee's address as described in this Agreement (if to Franchisee); (b) on the next day after placing in the hands of a commercial courier service or the United States Postal Service for next day delivery; or (c) five days after placement in the United States Mail by Certified Mail, Return Receipt Requested, postage prepaid and addressed to Global Headquarters (if to MBE) or Franchisee's address (if to Franchisee), or on the date of actual receipt, whichever is earlier.

## 20. GOVERNING LAW AND DISPUTE RESOLUTION

20.1 Validity, Choice of Law, Venue and Jurisdiction

a. This Agreement shall become valid when counter-executed and accepted by MBE, it shall be deemed made and entered into in the State of California and shall be governed and construed under and in accordance with the laws of the State of California, without giving effect to any conflict of laws, except: (i) that the Non-Competition and Non-Solicitation Agreement (Exhibit D to the Franchise Agreement) shall be deemed made and entered into, and governed and construed under and in accordance with, the laws of the State that is determined by the "Choice of Law" provision (Section 9) of such Non-Competition and Non-Solicitation Agreement; and (ii) to the extent governed by such federal laws protective of MBE's or MBE's Affiliates' intellectual property rights in the Marks and in the System, including, but not limited to, the Federal Trademark Act, the Federal Copyright Act, the Federal Lanham Act and the Federal Uniform Trade Secrets Act.

b. Exclusive venue and jurisdiction of any suit arising hereunder shall lie within the courts of the State of California located in San Diego or within the courts of the United States of America located within the Southern District of California.

20.2 Mediation

(a) Subject to the limitation provided in the last sentence of this Section 20.2(a), and subject to 20.2(b), before either party may initiate suit or action against the other, the parties pledge to attempt first to resolve the controversy or claim arising out of or relating to the Franchise Agreement ("Dispute") pursuant to mediation conducted in accordance with the Commercial Mediation Rules of the American Arbitration Association, unless the parties agree on alternative rules and a mediator within 15 days after either party first gives notice of such Dispute (the "Mediation Notice"). Mediation shall be conducted at Global Headquarters. The fees and expenses of the mediator shall be shared equally by the parties. The

mediator shall be disqualified as a witness, expert or counsel for any party with respect to the Dispute and any related matter. Mediation is a compromise negotiation and shall constitute privileged communications under California and other Applicable Laws. The entire mediation process shall be confidential and the conduct, statements, promises, offers, views and opinions of the mediator and the parties shall not be discoverable or admissible in any legal proceeding for any purpose; provided, however, that evidence that is otherwise discoverable or admissible shall not be excluded from discovery or admission as a result of its use in the mediation. Mediation shall be deemed completed 30 days after the date of the Mediation Notice unless extended by mutual consent of the parties.

(b) MBE shall not be required to attempt first to mediate a controversy or claim against Franchisee through mediation as set forth in Section 20.2(a) if such claim or controversy concerns an allegation or allegations by MBE that Franchisee has violated (or threatens to violate, or poses an imminent risk of violating) any of MBE's federally protected intellectual property rights in the Marks or in the System, in which case MBE shall reserve the right to immediately seek injunctive relief within the courts of the United States of America located within the Southern District of California.

20.3 MBE may be granted injunctive relief without the necessity of a bond, but upon notice.

20.4 IN ALL CASES, EXCEPT WHERE EXPRESSLY PROHIBITED BY APPLICABLE STATUTORY LAW, FRANCHISEE AND FRANCHISOR EACH WAIVES ANY RIGHT TO A TRIAL BY JURY.

20.5 If MBE institutes any action at law or in equity against Franchisee to secure or protect MBE's rights under or to enforce the terms of this Agreement, in addition to any Judgment entered in its favor, MBE shall be entitled to recover such reasonable attorneys' fees as may be allowed by the court together with court costs and expenses of litigation.

## 21. SEVERABILITY AND CONSTRUCTION

21.1 Every part of this Agreement will be considered severable as set forth below.

a. If a court of competent jurisdiction declares any provision of this Agreement (or any exhibit or other document referred to herein) pertaining to the subject matters referenced in Section 21.1(b) to be invalid or unenforceable, but such provision could be rendered valid and enforceable if modified, then Franchisee and MBE hereby agree that such provision shall then be deemed modified to the extent required to make it valid and enforceable to the fullest extent under applicable state law and public policy.

b. The subject matters that are made subject to Section 21.1(a) are any provisions of this Agreement (or any exhibit or other document referred to herein) pertaining to (i) termination of this Agreement, (ii) non-renewal of this Agreement, (iii) designation of jurisdiction and venue for dispute resolution proceedings, (iv) waivers of rights to a jury trial, (v) "choice of law" provisions that specify which state's law would apply in a dispute resolution proceeding, (vi) certain types of mandatory franchisee "releases", and (vii) any other provision that is inconsistent

with a valid and applicable state law that was specifically intended to protect the rights of franchisees.

c. If a mediator, arbitrator or court of competent jurisdiction declares any provision of this Agreement (or any exhibit or other document referred to herein), other than the provisions corresponding to the subject matters referenced in Section 21.1(b), to be invalid or unenforceable, but such provision could be rendered valid and enforceable if modified, then Franchisee and MBE hereby agree that MBE shall have the right, in its sole discretion, to modify such invalid or unenforceable provision to the extent required to render such provision valid and enforceable, including, without limitation, the right to delete the provision in its entirety.

d. The remainder of this Agreement shall in no way be affected and shall remain valid and enforceable for all purposes, both parties hereto declaring that they would have executed this Agreement without inclusion of such provision. In the event such total or partial invalidity or unenforceability of any provision of this Agreement exists only with respect to the laws of a particular jurisdiction, this Section shall operate upon such provision only to the extent that the laws of such jurisdiction are applicable to such provision. Each party shall execute and deliver to the other any further documents that may be reasonably required to effectuate fully the provisions hereof.

21.2 This Agreement and all other writings referred to herein, including the exhibits (including, but not limited to, the executed Contract Carrier Agreement), Manuals, and Advertising Co-op Guidebook, contain the entire agreement of the parties pertaining to the subject-matter hereof and no prior or contemporaneous representations, inducements, promises, or agreements, oral or otherwise, between the parties not set forth herein shall be of any force and effect.

21.3 The table of contents, headings and captions contained herein are for the purposes of convenience and reference only and are not to be construed as a part of this Agreement. All terms used herein shall be construed to include the number and gender as the context of this Agreement may require. The terms of all Exhibits hereto are hereby incorporated into and made a part of this Agreement as if the same had been set forth in full herein. As used in this Agreement, the words "include," "includes" or "including" are used in a non-exclusive sense. Unless otherwise expressly provided herein to the contrary, any consent, acceptance, approval or authorization of MBE which Franchisee may be required to obtain hereunder may be given or withheld by MBE in its sole discretion, and on any occasion where MBE is required or permitted hereunder to make any judgment or determination, including any decision as to whether any condition or circumstance meets MBE's Standards and Specifications or satisfaction, MBE may do so in its sole subjective judgment. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against the drafter hereof, whether under any rule of construction or otherwise. To the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto. MBE and Franchisee intend that if any provision of this Agreement is susceptible to two or more constructions, one of which would render the provision enforceable and the other or others of which would render the provision unenforceable, then the provision shall be given the meaning

that renders it enforceable. The parties agree that each section of this Agreement shall be construed independently of any other section or provision of this Agreement.

## 22. MISCELLANEOUS

22.1 In addition to all other remedies herein granted, if Franchisee shall default in the performance of any of its obligations or breach any term or condition of this Agreement or any related agreement, MBE may, at its election, immediately or at any time thereafter, without waiving any claim for breach hereunder and without notice to Franchisee, cure such default for the account and on behalf of Franchisee, and the cost to MBE thereof shall be due and payable on demand and shall be deemed to be additional compensation due to MBE hereunder and shall be added to the amount of compensation next accruing hereunder, at the election of MBE.

22.2 This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

22.3 The submission of this Agreement does not constitute an offer and this Agreement shall become effective only upon the counter-execution thereof by MBE. This Agreement shall not be binding on MBE unless and until it shall have been accepted and signed on its behalf by an authorized signing officer of MBE. This Agreement shall not become effective until and unless Franchisee shall have been furnished by MBE with all disclosure documents, in written form, as may be required under or pursuant to Applicable Law, for requisite time periods.

22.4 Franchisee, and its Owners, jointly and severally acknowledge that they have carefully read this Agreement and all other related documents to be executed concurrently or in conjunction with the execution hereof, that they have had the opportunity to consult with counsel and financial advisers in connection with entering into this Agreement, that they understand the nature of this Agreement, and that they intend to comply herewith and be bound hereby.

## 23. DEFINITIONS

In this Agreement, the following words and phrases shall have the following meanings:

**"Accounting Period"** means each calendar month during the Term or such other interval as MBE may establish from time to time.

**"Advertising Co-op"** means a local advertising or regional marketing association or cooperative comprised of The UPS Store® franchisees in a geographic area determined by MBE, which administers regional advertising, public relations, and/or marketing programs and develops standardized materials for use by its members in local advertising. Franchisee's specific Advertising Co-op is referred to as the DMA Co-op.

**"Allowable Exclusions"** means the total amount permitted to be deducted from Gross Sales as specified in the Manuals or the Monthly Royalty Report.

**"Affiliate"** when used herein in connection with MBE or Franchisee, means and includes each Entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under

common control with MBE or Franchisee, as applicable. Without limiting the foregoing, the term "Affiliate" when used herein in connection with Franchisee means and includes any Entity more than 50% of whose stock; membership interests; Partnership Rights; or other equity ownership interests (collectively "Equity") or voting control is held by person(s) or Entities who jointly or severally hold more than 50% of the Equity or voting control of Franchisee.

**"Applicable Laws"** means and includes applicable common law, and all applicable statutes, rules, regulations, ordinances, policies and procedures established by any Governmental Authority, as in effect on the Effective Date, and as may be amended or supplemented from time to time. This includes, without limitations, all U.S. Immigration laws authorizing Franchisee and its owners to legally reside in the U.S. and own and operate a franchise business in the U.S.

**"Area Franchisee"** means an individual or Entity that has executed an Area Franchise Agreement with MBE and whose territory includes the Center at the Location, or such other individual or Entity designated by MBE that has executed an Area Franchise Agreement with MBE.

**"Center"** means a postal, packaging, shipping, business and communication retail service center operated under the Marks and in accordance with the System and, if company-owned, owned and operated by either MBE or an Affiliate of MBE or, if franchised, owned and operated by a franchisee pursuant to a validly existing Franchise Agreement.

**"Confidential Information"** means any data or information, other than Trade Secrets, that is of value to MBE and is not generally known to competitors of MBE. To the extent consistent with the foregoing, Confidential Information includes, but is not limited to, the business methods that comprise the System, including, but not limited to, know-how, plans, strategies, sales techniques, pricing, advertising format, accounting systems, operation systems, policies, procedures, systems, compilations of information, records, specifications, and manuals, all of which shall be provided in written form to Franchisee. Confidential Information also includes information that is subject to a duty owed by MBE to a third party to maintain the information as confidential. Provided, however, that Confidential Information shall not include any information that was already in the public domain prior to its disclosure to Franchisee by MBE.

**"Center Development Fee"** means the fee charged by Area Franchisee or MBE' s designee for services provided in connection with the supervision of the construction of the Center at the Location, as set forth in the then-current Franchise Offering Circular.

**"Controlling Owner"** means if Franchisee is an Entity, a person or Entity owning 50% or more of the Equity of such Entity.

**"Co-op Fee"** shall have the meaning set forth in Section 5.1.

**"Designee"** means any Affiliate of MBE or any independent contractor, agent, or other third party that is not an Affiliate of MBE but is designated and/or authorized by MBE to take certain action, whether or not on behalf of MBE.

**"Effective Date"** means the date this Agreement was counter-executed by MBE.

**"Entity"** means any limited liability partnership, general partnership or limited partnership (each of which shall be referred to as a "Partnership"), and any trust, association, corporation, limited liability company or other entity which is not an individual.

**"Family Transfer"** means: (1) Franchisee's conveyance to an "Immediate Family Member" of a controlling ownership interest in Franchisee's rights under this Agreement, either (a) directly, or (b) indirectly such as through a conveyance of a controlling interest in a legal entity (corporation, LLC, etc.) that owns Franchisee's rights under this Agreement; and (2) in compliance with all of MBE's additional Family Transfer-related criteria, requirements and processes as are set forth in the Manuals, as may be updated by MBE from time to time.

**"Franchisee's Lease"** means the real property lease for the Location.

**"Global Headquarters"** means MBE's offices located at 6060 Cornerstone Court West, San Diego, California, 92121, or such location to which MBE's offices may be relocated.

**"Governmental Authority"** means and includes all federal, state, county, municipal and local governmental and quasi-governmental agencies, commissions and authorities.

**"Gross Commissions"** means the total amount of all commissions actually received by Franchisee during the Term on account of those transactions occurring at the Center at the Location in which Franchisee acts as agent for those certain vendors or service providers specified in the Manuals.

**"Gross Sales"** means the total of all revenues derived from products and/or services sold by or through the Center at the Location during the Term, whether evidenced by cash, services, credit, property, barter, electronic funds transfer, or other means of exchange, and whether or not such products and/or services are sold in any other Center, including: (a) revenues from sales of any nature or kind whatsoever derived by Franchisee or by any other person or Entity (including Franchisee's Affiliates) from the Center at the Location; (b) sales of products and/or services in contravention of this Agreement at locations other than the Center at the Location or a permitted Kiosk; (c) the proceeds of any business interruption insurance, after the satisfaction of any applicable deductible; (d) sales from vending devices, including pay telephones; (e) mail or telephone orders received or filled in or from the Center at the Location; (f) orders taken in or from the Center at the Location although filled elsewhere; and (g) proceeds from insurance payments for theft of revenue, if revenue was not previously reported on royalty reports.

**"Immediate Family Member"** means, either through natural blood relations or through legal adoption, a father, mother, child, grandparent, grandchild, spouse or sibling of the person (either Franchisee or, if Franchisee is an Entity, Controlling Owner(s)) seeking to convey a controlling interest in Franchisee's rights under this Agreement to that Immediate Family Member.

**"Incapacity"** means an individual who suffers from a physical or mental impairment, or a combination of both, rendering Franchisee, or its Owner, unable to substantially perform all of the Franchisee's obligations and duties provided herein and in the Manuals, which is verifiable by medical findings and has continued or is reasonably certain to continue for at least six (6) months without substantial improvement that would allow such individual to perform.

**"Incorporation Fee"** means the fee set forth in the Manuals that shall be paid by Franchisee to MBE in connection with the Assignment of this Agreement to an Entity in which one of its Owners is the Franchisee named herein.

**"Initial Franchise Fee"** means the then-current applicable initial franchise fee in effect on the Effective Date for the type of Center operated by Franchisee pursuant to this Agreement. MBE's then-current Franchise Offering Circular and/or Operations Manual shall set forth all applicable amounts.

"**Initial Marketing Plan Fee**" means the Fee (amount disclosed in the then-current Franchise Offering Circular), which shall be used to conduct a promotional campaign for the initial Marketing of the Center operated pursuant to this Agreement.

"**Internet**" means the interactive, multimedia, global communications network.

"**Internet Policies**" means MBE's policies and procedures regarding the Internet as specified in the Manuals.

"**Kiosk**" means an MBE-authorized (i) temporary staffed or unstaffed, or (ii) permanent staffed or unstaffed installation, which offers some or all of the products and services customarily offered by Centers.

"**Location**" means the location of Franchisee's Center constructed, owned, and operated pursuant to this Agreement.

"**Manager**" means an individual who has successfully completed Training, who has been certified by MBE pursuant to Section 7.3, who provides full-time, direct, day-to-day on-site management of the Center at the Location, and who is fluent in English.

"**Manuals**" means those manuals, whether in hardcopy or electronic format, developed and produced by MBE and licensed to Franchisee, including, but not limited to, all center operations manuals, operating manuals, policy manuals, training manuals, marketing manuals, and all bulletins, supplements, and ancillary and additional written materials distributed by MBE to Franchisee as revised from time to time.

"**Marks**" means those certain trademarks, service marks, trade names, logos and/or indicia of origin (identified in Item 13 of MBE's then-current The UPS Store Franchise Offering Circular and/or in the Manuals) and such other trademarks, service marks, trade names, slogans, logos and/or indicia of ownership as MBE may authorize Franchisee to use from time to time.

"**MBE**" means Mail Boxes Etc., Inc., a Delaware corporation.

"**Monthly Royalty Report**" means a report in a form specified by MBE, which may be changed from time to time, reporting transactions at the Center at the Location.

"**National Advertising Fee**" shall have the meaning set forth in Section 5.1.

"**National Advertising Fund**" or "NAF" collectively mean all National Advertising Fees received by MBE from its franchisees.

"**Owner**" means any shareholder, member, general or limited partner, trustee or beneficiary, or other equity owner of an Entity; provided, that if MBE or any Owner or Affiliate of MBE has any ownership interest in such Entity, the term Owner shall not include or refer to MBE or MBE's Owners or Affiliates, and no obligation or restriction upon Franchisee or its Owners, officers, directors, or managers shall bind MBE, its Owners or Affiliates, or their respective Owners, officers, directors or managers.

"**Partnership Rights**" means voting power, property, profits or losses, or partnership interests of a Partnership.

**"Pilot Center"** means a Center constructed and maintained by an Area Franchisee pursuant to a Franchise Agreement and designated as the "Pilot Center".

**"Principal"** means "Owner" as defined above.

**"Pro-Rated Renewal Fee for Transfer"** means that portion of the Renewal Fee required to bring the transferee's Franchise Agreement Term up to a full ten (10) year term.

With regard to when the Franchisee under this Agreement is the transferee (buyer) in the applicable transaction {See Section 5.1(b)(ii)(C)}, the "Renewal Fee" for purposes of pro-ration shall mean the amount of the "Renewal Fee" set forth in the transferor's (seller's) franchise offering circular unless there is no such amount so specified, in which case the "Renewal Fee" for purposes of pro-ration shall mean the amount of the "Renewal Fee" set forth in the franchise offering circular associated with this Agreement.

If the Franchisee under this Agreement is the transferor (seller) in the applicable transaction {See Section 11.3(f)(iii)}, then the "Renewal Fee" for purposes of pro-ration shall be the amount of the "Renewal Fee" set forth in the franchise offering circular associated with this Agreement.

Pro-ration is achieved by subtracting the amount of time left on the transferor's (seller's) franchise agreement from the amount of the time set forth in the term of the transferee's (buyer's) franchise agreement.

For example, if the transferor has one (1) year left on its franchise agreement term and the transferor's agreement sets forth a term of ten (10) years for franchisees who buy "new" (i.e., not via transfer) MBE franchises, then the transferor and/or transferee must pay MBE a "Pro-Rated Renewal Fee for Transfers" equal to 90% of the Renewal Fee.

**"Processing Fee"** with regard to when the Franchisee under this Agreement is the transferee (buyer) in the applicable transaction {See Section 5.1(b)(ii)(B)}, the "Processing Fee" shall mean the amount of the "Processing Fee" set forth in the transferor's (seller's) franchise offering circular unless there is no amount so specified, in which case the "Processing Fee" shall mean the amount of such fee as set forth in the franchise offering circular associated with this Agreement.

With regard to when the Franchisee under this Agreement is the transferor (seller) in the applicable transaction {See Section 11.3(f)(ii)}, the "Processing Fee" shall mean the amount of the "Processing Fee" set forth in the franchise offering circular associated with this Agreement.

**"Proprietary Information"** means, collectively, the Confidential Information and the Trade Secrets; provided, however, that Proprietary Information shall not include information that Franchisee can prove: (a) becomes generally known in its entirety prior to or after the time of receipt by Franchisee, through no improper action of Franchisee; (b) was known to Franchisee prior to receipt under this Agreement; (c) is received by Franchisee from a third party, other than an affiliate of MBE, which is not under an obligation of confidentiality to MBE; or (d) is developed independently by Franchisee without the benefit of the Proprietary Information. A combination of features shall not be deemed to be within any of the above exceptions merely because individual features are within such exceptions.

**"Proprietary Software"** means those certain software programs developed by MBE for use in Centers and such other software programs as MBE may require Franchisee to use from time to time.

**"Renewal Fee"** means an amount equal to 25% of the Initial Franchise Fee specified in the Then-Current Agreement for new Centers. If such then current Agreement provides for different initial Franchise Fee amounts (e.g., discounts for multiple ownership), it is understood that the Renewal Fee shall always be 25% of the highest of these different fees.

**"Retail Outlet"** means any retail store outlet that has an actual physical location at a specific site.

**"Royalty"** shall have the meaning set forth in Section 5.1.

**"Security Agreement"** means the Security Agreement attached hereto as Exhibit F.

"Special Venues" means colleges, universities, hotels, convention centers, airports, resorts, military bases, self-storage facilities, inside other retailers ("store-within-store"), office buildings, regional or outlet malls, bus or train stations, and other similar facilities that are different from the sites approved for traditional Centers.

**"STR"** or **"Subject to Royalty"** means Gross Sales plus Gross Commissions less Allowable Exclusions during each calendar month

**"Standards and Specifications"** means the standards of quality, appearance, and service for Centers, and all standards, specifications, requirements and procedures specified from time to time by MBE in the Manuals or in other written directives, pertaining to the business activities of franchisees, including MBE's standards in sign quality and appearance, Center appearance, advertising, maximum retail prices, computer hardware and software, stationery, business cards, business forms and other promotional material, general decor and standards.

**"System"** means MBE's business operating methods for Centers, including interior and exterior Center design; other items of trade dress; copyrights; trade names; logos; specifications for equipment, software, fixtures and uniforms; defined product offerings for a postal, packaging, business and communication retail service center; standard operating and administrative procedures; management and technical training programs; and marketing and public relations programs, all as in effect and as revised from time to time.

**"Term"** shall have the meaning set forth in Section 2.1.

**"Territory"** means that certain geographic area specified in Exhibit B attached hereto; the boundaries of the Territory shall extend only to the middle of the line of demarcation, i.e., to the middle of a street or highway, or in the case of a written description of the Territory, the middle of the street or highway indicated in such written description.

**"The UPS Store Marketing Fee"** shall have the meaning set forth in Section 5.1.

**"Then-Current Agreement"** means the form of franchise agreement then currently provided to prospective franchisees or, if not then being so provided, then such form selected by MBE in its sole discretion which from previously has been delivered to and executed by a franchisee of MBE. The terms of the Then-Current Agreement may differ from the terms of this Agreement.

**"Trade Secret"** means any information including but not limited to technical or non-technical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers, which (a) derives economic value, actual or potential, from not being generally known to and not being readily

ascertainable by proper means by other persons who can obtain economic value from its disclosure or use and (b) is the subject of efforts by MBE and its affiliates that are reasonable under the circumstances to maintain its secrecy.

**"Training"** means MBE's comprehensive training program, as the same is constituted from time to time, providing training to Franchisees in the System, including, but not limited to, business management, retail and sales skills along with training in the day-to-day operations of a Center.

**"Transfer Fee"** with regard to when the Franchisee under this Agreement is the transferee (buyer) in the applicable transaction {See Section 5.1(b)(ii)(A)}, shall mean the amount of the "Transfer Fee" set forth in the transferor's (seller's) franchise offering circular unless there is no such amount specified, in which case the "Transfer Fee" shall mean the amount of the "Transfer Fee" set forth in the franchise offering circular associated with this Agreement.

With regard to when the Franchisee under this Agreement is the transferor (seller in the applicable transaction) {See Section 11.3(t)(i)}, the "Transfer Fee" shall mean the amount of the "Transfer Fee" set forth in the franchise offering circular associated with this Agreement.

**"Upgrade Review Fee"** means the fee that Franchisee pays to MBE to determine the types (and estimated expenses) of computer, equipment, fixtures and decor (exterior and interior) upgrades that the Center must achieve in order to comply with Section 11.3(h) of this Agreement. MBE's then-current offering circular specifies the amount of such Upgrade Review Fee, and the Manuals and Item 6 of the then-current offering circular provide additional information regarding the Upgrade Review program.

[THIS SPACE LEFT INTENTIONALLY BLANK]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed effective as of counter-execution by MBE's authorized signing officer shown as follows:

**"FRANCHISEE"**

If the "Franchisee" is a legal entity (corporation, limited liability company, partnership, etc.), then (1) insert the name of such legal entity Franchisee in the following space: Stups, Inc, and (2) next to the name of the person(s) that is/are signing this agreement as authorized representative(s) of such legal entity, insert their title within such legal entity (president, member, partner, etc.). If the "Franchisee" is not a legal entity, but rather one or more persons, then (1) please insert an "X" in the following space: ________ and (2) do not fill-in the title line(s) below.

1. Stuart Berk ______________________ July 6, 2005
Signature of Franchisee (or of equity owner of Franchisee, if Franchisee is a legal entity) Date

Printed name of person that signed above: Stuart Berk

Title: ______________________

2. ______________________ ________, 200__
Signature of Franchisee (or of equity owner of Franchisee, if Franchisee is a legal entity) Date

Printed name of person that signed above: ______________________

Title: ______________________

3. ______________________ ________, 200__
Signature of Franchisee (or of equity owner of Franchisee, if Franchisee is a legal entity) Date

Printed name of person that signed above: ______________________

Title: ______________________

4. ______________________ ________, 200__
Signature of Franchisee (or of equity owner of Franchisee, if Franchisee is a legal entity) Date

Printed name of person that signed above: ______________________

Title: ______________________

**"MBE"**

MAIL BOXES ETC, INC.
A Delaware Corporation

Date of MBE's Counter-Signature
*(Effective Date of Franchise Agreement)

BY: ______________________
Authorized Signing Officer

7/25, 2005
*Date

BY: ______________________ Walter Kaufman Albate
Assistant Secretary





EXHIBIT A PAGE 44

## OWNERSHIP INFORMATION FORM

1. FULL NAME(S) OF FRANCHISEE [If this franchise is owned by a legal entity, only insert the name of the legal entity; if this franchise is owned by one or more persons, only insert the name(s) of such person(s)] : Stups, Inc

2. THE FRANCHISE WILL BE OWNED BY: (Check which one applies)

| | | |
|---|---|---|
| SOLE PROPRIETOR | ____ | Fed. Tax ID # ____ |
| PARTNERSHIP | ____ | Fed. Tax ID # ____ |
| CORPORATION | ✓ | Fed. Tax ID # 42-1667035 |
| LIMITED LIABILITY COMPANY | ____ | Fed. Tax ID # ____ |
| OTHER BUSINESS ENTITY (Please explain on a separate piece of paper) | ____ | Fed. Tax ID # ____ |

3. FULL NAMES OF ALL OWNERS, PARTNERS, SHAREHOLDERS OR MEMBERS AND PERCENTAGE OF OWNERSHIP INTEREST: (Please print names, use separate sheet if necessary)

| NAME | % OF OWNERSHIP | SOCIAL SECURITY NUMBER |
|---|---|---|
| Stuart Berks | 100 | 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 |
| | | |
| | | |
| | | |

4. LIST OF DIRECTORS (Please print names, use separate sheet if necessary) — SOCIAL SECURITY NUMBER

| | |
|---|---|
| | |
| | |
| | |
| | |

5. LIST OF OFFICERS (Please print names, use separate sheet if necessary)

| | | |
|---|---|---|
| (Name) | (Title) | (S.S.#) |
| (Name) | (Title) | (S.S.#) |
| (Name) | (Title) | (S.S.#) |
| (Name) | (Title) | (S.S.#) |

6. DESIGNATED CONTACT PERSON (Please print name)

____________________
(Name)

# EXHIBIT B

Exhibit A to Franchise Agreement

## CONTINUING PERSONAL GUARANTEE

As an inducement to MAIL BOXES ETC., INC., a Delaware corporation ("MBE"), to enter into that certain Franchise Agreement of July 6, 2005 (the "Franchise Agreement") by and between MBE and Stups, Inc ("Franchisee"), the undersigned Guarantor(s), jointly and severally, absolutely and unequivocally personally guarantee the performance by Franchisee of all obligations of Franchisee to MBE, including, without limitation, royalty fees, marketing fees, credit sales in the form of trade receivables, performance of all other covenants pursuant to the Franchise Agreement and any extensions or renewals thereof, equipment leases or sales, promissory notes and all other obligations now due MBE or hereafter incurred in favor of MBE ("Obligations") should Franchisee fail to perform. My Obligations under this Continuing Personal Guarantee are not transferable.

I, the undersigned waive: (a) all presentments, demands for performance, notices of nonperformance, protests, and all other notices, including but not limited to notices of protest, dishonor, any default, partial payment or nonpayment of all or any part of the obligations guaranteed hereunder and the existence, creation, or incurring of new or additional obligations guaranteed hereunder; (b) any right to require MBE to proceed against Borrowers or any other person, to proceed against or exhaust any security held by Borrowers or any other person for the obligations guaranteed hereunder or to pursue any other remedy in MBE's power whatsoever; (c) any defense arising by reason of the invalidity, illegality or lack of enforceability of the obligations guaranteed hereunder or any part thereof, or by reason of any incapacity, lack of authority, death, disability or other defense of Borrowers or any other person, or by reason of the failure of MBE to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of Borrowers or any other person, or by reason of the cessation from any cause whatsoever of the liability of Borrowers or any other person with respect to all or any part of the obligations guaranteed hereunder, or by reason of any act or omission of MBE or others which directly or indirectly results in the discharge or release of Borrowers or any other person or any obligations guaranteed hereunder or any security therefore, whether by operation of law or otherwise; (d) any defense arising by reason of MBE's failure to obtain, perfect, or maintain a perfected or prior security interest in, lien or encumbrance upon, any property of Borrowers or any other person, or by reason of any interest of MBE in any property, whether as owner thereof or the holder of a security interest therein or lien or encumbrance thereon, being invalidated, avoided, declared void, fraudulent or preferential or otherwise set aside, or by reason of any impairment of MBE of any right to recourse or collateral; (e) any right to require MBE to marshall any assets in favor of the undersigned; (f) any defense based upon any failure of MBE to give Borrowers or the undersigned notice of any sale or other disposition of any property securing any or all of the obligations guaranteed hereunder or any guarantee thereof, or any defect in any notice that may be given in connection with any sale or other disposition of any such property, or any failure of MBE to comply with any provision of applicable law in enforcing any security interest in or lien upon any such property, including any failure by MBE to dispose of any such property in a commercially reasonable manner; and (g) any defense based upon or arising out of any bankruptcy, insolvency, reorganization, arrangement. readjustment of debt, liquidation or dissolution proceeding commenced by or against Borrowers or any other person, including any discharge of, or bar against collecting, any of the obligations guaranteed hereunder (including any interest thereon), in or as a result of any such proceeding.

I shall not have any right of subrogation until all indebtedness of Franchisee to MBE shall be paid in full. I waive any right to collateral and waive any right to participate in any collateral, until all indebtedness of Franchisee to MBE shall have been paid in full.

I shall pay reasonable attorneys' fees and all other costs and expenses which may be incurred by MBE in the enforcement of this Continuing Personal Guarantee.

This is a continuing personal guarantee and it shall remain in full force during and after the Franchise Agreement's term, until all obligations owed by Franchisee to MBE pursuant to the Franchise Agreement are fully performed.

In the event of any default by Franchisee or by Guarantors, Guarantors acknowledge and agree that MBE may exercise all rights of offset to recoup any obligations owed to MBE.

I subordinate any debts and obligations of Franchisee to me to all the debts and obligations of Franchisee to MBE.

Should any one or more provisions of this Continuing Personal Guarantee be determined to be illegal or unenforceable, all other provisions shall nevertheless remain effective.

This Agreement shall inure to the benefit of and bind, as the case may require, MBE, its successors and assigns, including the assignees of any credit guaranteed hereby, and my heirs, executors, administrators, successors and assigns.

I specifically acknowledge that I have read all the terms of this Continuing Personal Guarantee, have received a true copy of it and agree to be bound by its terms.

Dated: July 6 2005, at Bellmore NY
(City/State)

[signature]
Signature of Individual

Signature of Individual

Signature of Individual

Signature of Individual

# EXHIBIT C

Exhibit D to Franchise Agreement

**INSTRUCTION: Each co-owner of the franchise or of the legal entity (corporation, LLC, etc.) must sign their name, NOT the name of the legal entity.**

NON-COMPETITION AND NON-SOLICITATION AGREEMENT

This Non-Competition and Non-Solicitation Agreement ("Agreement") is entered into by and between Mail Boxes Etc., Inc. ("MBE") and Stuart Berls ("Covenantor"), and becomes effective on the date counter-signed below by MBE.

**RECITALS**

**WHEREAS,** Covenantor is either (1) the "Franchisee" named in a Franchise Agreement ("Franchise Agreement") that is being executed corresponding to this Agreement, or (2) an equity owner of the legal entity (corporation, LLC, partnership, etc.) that is named as the "Franchisee" in such Franchise Agreement;

**WHEREAS,** Covenantor acknowledges that MBE has a legitimate business interest in protecting its franchisees from unfair competition by an existing or former franchisee that has or had special, intimate knowledge of MBE's valuable trade secrets and confidential information and proprietary operating methods;

**WHEREAS,** Covenantor acknowledges that MBE has a legitimate business interest in protecting its franchisees from unfair competition by an existing or former MBE franchisee that transfers (without permission) the goodwill associated with MBE's trademarks to a business that competes with MBE's franchisees;

**WHEREAS,** Covenantor acknowledges that MBE has a legitimate business interest in protecting its franchisees from unfair competition by an existing or former franchisee of that is able to take advantage of the knowledge and experience gained as a franchisee by operating its new business without having to continue to pay royalties and other fees for such information, thereby placing at a competitive disadvantage such remaining franchisees that continue to abide by their contractual obligations;

**WHEREAS,** Covenantor acknowledges that (1) MBE has a legitimate business interest in refranchising the formerly protected territory of a former franchisee, and (2) MBE would suffer irreparable harm absent this Agreement because it would be unable to attract new franchisees to the area served by its former franchisee;

**WHEREAS,** Covenantor acknowledges that MBE has a legitimate business interest in protecting its franchisees from unfair competition by an existing or former franchisee that (1) diverts or attempts to divert business from a Center to a competitor of MBE, or (2) induces or attempts to induce an employee of any Center to discontinue their employment with such Center;

**WHEREAS,** Covenantor acknowledges that MBE requires the execution of this Agreement as an ancillary requirement to MBE's simultaneous grant of a franchise to, as applicable, (i) Covenantor, or (ii) a legal entity (corporation, LLC, partnership, etc.) of which Covenantor is an equity owner.

**NOW, THEREFORE,** in express acknowledgement and recognition of the importance of the foregoing recitals, the parties agree as follows:

1. **Consideration In Exchange For Covenantor's Covenants in This Agreement.** Covenantor hereby expressly acknowledges and confirms that all of the valuable benefits, advantages and

Initial

opportunities enjoyed by Covenantor immediately upon (and solely as a result of) Covenantor's (or, as applicable, Covenantor's legal entity) becoming a franchisee under the Franchise Agreement (which occurs simultaneous to, and corresponding with, the execution of this ancillary Agreement) serve as valuable and adequate consideration received in simultaneous exchange for all of Covenantor's promises and covenants made in this Agreement below.

2. **Covenantor's In-Term Non-Competition and Non-Solicitation Covenants.** During the term of the Franchise Agreement corresponding to this Agreement, and without geographic restriction, Covenantor shall not directly or indirectly (such as through corporations or other entities controlled by Covenantor or by or through or in conjunction with any other individual person or persons including, but not limited to, Covenantor's spouse (if any) and employees):

a. divert or attempt to divert any business or customer of any Mail Boxes Etc. or The UPS Store Center to any competitor or do anything injurious or prejudicial to the goodwill associated with MBE's proprietary Marks or System; and

b. persuade, entice, or attempt to persuade or entice, any employee of any Center to discontinue their employment with such Center; and

c. own, maintain, engage in, be associated with, be employed by, advise, assist, invest in, be landlord to, franchise, make loans to or have any interest in any business which is the same or competitive with or substantially similar to any Mail Boxes Etc. or The UPS Store Center; and

d. enter into a business relationship with an MBE Corporate Account, outside of MBE's Corporate Account program, unless pre-authorized by MBE in writing.

3. **Covenantor's Post-Term Non-Competition and Non-Solicitation Covenants**

a. For purposes of this Section 3, the word "Conclusion" means the termination/expiration of the Franchise Agreement corresponding to this Agreement, regardless of whether such termination/expiration occurs prior to, or at the end of, such Franchise Agreement's ten (10) year term.

b. Upon the Conclusion of the Franchise Agreement corresponding to this Agreement, and for the time period thereafter and geographic restriction set forth below, Covenantor shall not directly (or indirectly, such as through corporations or other entities controlled by Covenantor or by or through or in conjunction with any other individual person or persons, including, but not limited to, Covenantor's spouse (if any) and employees):

i. for a two (2) year period following the Conclusion of the Franchise Agreement corresponding to this Agreement and without geographic restriction, divert or attempt to divert any business or customer of any Center to any competitor, or do anything injurious or prejudicial to the goodwill associated with MBE's proprietary Marks or MBE's System; and

ii. for a two (2) year period following the Conclusion of the Franchise Agreement corresponding to this Agreement and without geographic restriction, persuade, entice or attempt to persuade or entice any employee of any Mail Boxes Etc. Center or The UPS Store Center to discontinue their employment with such Center; and

Initial

iii. own, maintain, engage in, be associated with, be employed by, advise, assist, invest in, be landlord to, franchise, make loans to, or have any interest in any business which is the same or competitive with, or substantially similar to any MBE Center, and which is located within what was formerly the protected franchise territory granted under the Franchise Agreement corresponding to this Agreement (with such restriction limited to a two (2) year period following the Conclusion of the Franchise Agreement corresponding to this Agreement); and

iv. for a one (1) year period following MBE's termination of any of its Corporate Accounts, enter into any business relationship with such terminated (former) Corporate Account(s).

c. As an alternative to Section 3(b)(iii) above, and only if the applicable former Center is located in a state that maintains a statutory or common law public policy disfavoring the enforceability of post-term non-competition covenants against franchisees, then upon the Conclusion of the Franchise Agreement corresponding to this Agreement, and for the time period thereafter and geographic restriction set forth below, Covenantor shall not directly (or indirectly, such as through corporations or other entities controlled by Covenantor or by or through or in conjunction with any other individual person or persons, including, but not limited to, Covenantor's spouse (if any) and employees) own, maintain, engage in, be associated with, be employed by, advise, assist, invest in, be landlord to, franchise, make loans to, or have any interest in any business which is the same or competitive with, or substantially similar to any Center, and:

i. which sells packaging and shipping services (which constitute only a limited portion of all services and products sold by Centers); and

ii. which is located at the premises of the Center for the Franchise Agreement corresponding to this Agreement; and

iii. with such partial restriction limited to a six (6) month period following the Conclusion of the Franchise Agreement corresponding to this Agreement.

d. MBE may (in its sole discretion) at any time unilaterally reduce the scope of any part of the post-term non-competition covenant to something less than the restriction provided in Section 3 of this Agreement, and Covenantor agrees and promises to comply with any such reduced restriction upon receipt of written notice from MBE.

4. **Mail Boxes Etc.® and The UPS Store®.** Covenantor acknowledges that its obligations and MBE's rights under this Agreement extend to both of MBE's brands: (a) Mail Boxes Etc®, and (b) The UPS Store®. Therefore, Covenantor further acknowledges and agrees that this Agreement's use of the following terms apply to both Mail Boxes Etc. and The UPS Store: "Center", "Centers", "Marks", "Systems", "Franchise Agreement", "Franchise Agreements", "franchisee", "former franchisee" and "Corporate Account".

Example: "Center" means both: (i) a Mail Boxes Etc. Center, and (ii) a The UPS Store Center.

AB
Initial

5. **Exception to Non-Competition Covenants.** The non-competition covenants described above shall not apply to the ownership by Covenantor of less than five percent (5%) beneficial interest in the outstanding equity securities of any publicly held corporation.

6. **Suspension of Non-Compete Time Periods During Dispute Resolution Proceedings.** In the event that this Agreement or this Agreement's corresponding Franchise Agreement become the subject of any mediation, arbitration or litigation, then the applicable post-term time periods referenced above in Section 3 (or as may be determined by any mediator, arbitrator or judge) shall (a) be suspended during the entirety of any such dispute resolution proceedings; and to the maximum extent found enforceable, (b) begin to run from the date that Covenantor complies with this Agreement.

7. **Severability.** It is the parties' desire and intention that the covenants contained in this Agreement shall be construed as agreements severable from and independent of each other and of any other provision of this or any contract or agreement between the parties, except that any violation of Section 2 of this Agreement by Covenantor shall also constitute a default by the Franchisee of the Franchise Agreement corresponding to this Agreement. It is the parties' further desire and intention that if any court of competent jurisdiction finds (in a final judgment to which MBE and Covenantor are parties) that any portion of any covenant in this Agreement is invalid or unenforceable, then, the maximum legally allowable restriction permitted by applicable law shall control and bind Covenantor.

8. **Injunction.** Covenantor recognizes and agrees that the injury that MBE and certain of its franchisees will suffer in the event of Covenantor's breach of any covenant contained in this Agreement cannot be compensated by monetary damages alone, and Covenantor therefore agrees that in the event of a breach of threatened breach by Covenantor of this Agreement, MBE, in addition to and not in limitation of, any other rights, remedies, or damages available to MBE at law, in equity, under this Agreement or otherwise, shall be entitled to seek an injunction from any court of competent jurisdiction in order to prevent or restrain any such breach by Covenantor or by Covenantor's agents, representatives, partners, co-owners, or any and all other persons directly or indirectly acting for or with him/her.

9. **Enforcement Costs.** Covenantor promises to pay to MBE all of the costs and expenses (including reasonable attorneys' fees) incurred by MBE in connection with its enforcement of this Agreement.

10. **Choice of Law, Venue and Jurisdiction.** This Agreement shall be (a) deemed made and entered into, and (b) construed and governed under and in accordance with the laws of the State where the Center associated with the Franchise Agreement (that is owned and operated by Covenantor or, as applicable, Covenantor's legal entity) is located. Exclusive venue and jurisdiction of any suit arising under this Agreement shall lie within the federal or state courts located within the State where the Center for the Franchise Agreement corresponding to this Agreement is located.

11. **Counter-Parts, Entire Agreement, Amendments.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument. The parties may execute such counter-parts via facsimile ("fax"). This Agreement contains the entire agreement of the parties pertaining to the subject-matter hereof and no prior or contemporaneous representations, inducements, promises, or agreements, oral or otherwise, between the parties not set forth herein shall be of any force and effect. Any modifications to this Agreement must be accomplished by a written agreement signed by both parties.

Initial

5. **Exception to Non-Competition Covenants.** The non-competition covenants described above shall not apply to the ownership by Covenantor of less than five percent (5%) beneficial interest in the outstanding equity securities of any publicly held corporation.

6. **Suspension of Non-Compete Time Periods During Dispute Resolution Proceedings.** In the event that this Agreement or this Agreement's corresponding Franchise Agreement become the subject of any mediation, arbitration or litigation, then the applicable post-term time periods referenced above in Section 3 (or as may be determined by any mediator, arbitrator or judge) shall (a) be suspended during the entirety of any such dispute resolution proceedings; and to the maximum extent found enforceable, (b) begin to run from the date that Covenantor complies with this Agreement.

7. **Severability.** It is the parties' desire and intention that the covenants contained in this Agreement shall be construed as agreements severable from and independent of each other and of any other provision of this or any contract or agreement between the parties, except that any violation of Section 2 of this Agreement by Covenantor shall also constitute a default by the Franchisee of the Franchise Agreement corresponding to this Agreement. It is the parties' further desire and intention that if any court of competent jurisdiction finds (in a final judgment to which MBE and Covenantor are parties) that any portion of any covenant in this Agreement is invalid or unenforceable, then, the maximum legally allowable restriction permitted by applicable law shall control and bind Covenantor.

8. **Injunction.** Covenantor recognizes and agrees that the injury that MBE and certain of its franchisees will suffer in the event of Covenantor's breach of any covenant contained in this Agreement cannot be compensated by monetary damages alone, and Covenantor therefore agrees that in the event of a breach of threatened breach by Covenantor of this Agreement, MBE, in addition to and not in limitation of, any other rights, remedies, or damages available to MBE at law, in equity, under this Agreement or otherwise, shall be entitled to seek an injunction from any court of competent jurisdiction in order to prevent or restrain any such breach by Covenantor or by Covenantor's agents, representatives, partners, co-owners, or any and all other persons directly or indirectly acting for or with him/her.

9. **Enforcement Costs.** Covenantor promises to pay to MBE all of the costs and expenses (including reasonable attorneys' fees) incurred by MBE in connection with its enforcement of this Agreement.

10. **Choice of Law, Venue and Jurisdiction.** This Agreement shall be (a) deemed made and entered into, and (b) construed and governed under and in accordance with the laws of the State where the Center associated with the Franchise Agreement (that is owned and operated by Covenantor or, as applicable, Covenantor's legal entity) is located. Exclusive venue and jurisdiction of any suit arising under this Agreement shall lie within the federal or state courts located within the State where the Center for the Franchise Agreement corresponding to this Agreement is located.

11. **Counter-Parts, Entire Agreement, Amendments.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument. The parties may execute such counter-parts via facsimile ("fax"). This Agreement contains the entire agreement of the parties pertaining to the subject-matter hereof and no prior or contemporaneous representations, inducements, promises, or agreements, oral or otherwise, between the parties not set forth herein shall be of any force and effect. Any modifications to this Agreement must be accomplished by a written agreement signed by both parties.

______
**Initial**

**AGREED TO AND ACCEPTED BY**

**COVENANTOR:**

**Print Your Name:** Stuart Berk

**Signature:** Stuart Berk

**Date of Signature:** 7/6/5

**Signed in Connection with Center #** 5603

**MAIL BOXES ETC., INC.**

**Printed Name of Signing Officer:** Phil Thomison

**Signature of Signing Officer:**

***Date of Signing Officer's Counter Signature:** 7/25/05
*Effective Date of Agreement*

**Initial**

# EXHIBIT D

DLA PIPER

DLA Piper US LLP
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1293
www.dlapiper.com

Samuel B. Isaacson
samuel.isaacson@dlapiper.com
T 312.368.2163
F 312.251.5827

March 13, 2008

*VIA HAND DELIVERY*

Stups, Inc.
c/o Stuart Berk
the UPS Store #5603
1936 Hempstead Turnpike
East Meadow, NY 11554-1712

Re: **Notice of Material Default and Termination of Franchise Agreement for the UPS Store Center #5603**

Dear Mr. Berk:

DLA Piper US LLP represents Mail Boxes Etc. Inc. ("MBE") and its parent company, United Parcel Service of America, Inc. ("UPS"), in connection with various franchise related matters, including MBE's franchise relationship with Stups, Inc. concerning The UPS Store® Center #5603 located at 1936 Hempstead Turnpike, East Meadow, New York 11554 (the "Center"). This letter notifies both you and Stups, Inc. (collectively "you") that, as a result of your ongoing pattern of erratic and abusive behavior, which recently culminated in your threats of imminent harm endangering the safety of MBE and UPS-affiliated personnel, as well as the public at large, you are in material breach of your franchise agreement with MBE dated July 25, 2005 (the "Franchise Agreement"). As further described in detail below, your grave actions constitute an incurable default of the Franchise Agreement and necessitate MBE's termination thereof, without further notice from, or other action required by, MBE to cancel your franchise rights to own and operate the Center.

In recent communications with MBE, you have made clear your belief that MBE and UPS are anti-Semitic organizations who have discriminated against you due to your Jewish faith. While your accusations in this regard are patently false and abhorrent to both MBE and UPS, you have recently acted upon your beliefs and frustration as an MBE franchisee by making unlawful, terrorist threats against a UPS facility. In particular, on February 26, 2008, you placed a call to a UPS call center in Newport News, Virginia and stated that, "I am going to go down and blow up that [UPS] center [in Hicksville, New York]. I am a dangerous person and they don't know me."

In an email that same day sent to MBE's regional coordinator for the Center's area, you wrote that "I will not tolerate. . . [MBE personnel] that have attitude problems or will not face me one on one. . . . I am now going back to basics and handling this my own way unless you or MBE intervene in a timely manner." Around the same time, you left a voicemail for an MBE district consultant saying that "Now I know I am dealing with thieves, liars and stupid morons. If they want to play that game, I'm not playing it any more. I'm doing it my way, and hopefully there won't be a major body count. As they said in *First Blood*, 'It's only over when I say it's over.'"

Since February 26, 2008, you have repeated your assertion that MBE and UPS have engaged in anti-Semitic, discriminatory behavior against you, and that you would be contacting the Anti-Defamation League ("ADL") about such conduct. In correspondence to Stuart Mathis, MBE's President, on March 6, 2008, you further complained about your then-current problems and suggested that "MBE or UPS would have to come up with some money" to resolve such problems. MBE and UPS will not succumb to such unlawful threats.

UPS and MBE have informed law enforcement of your threats to carry out a terrorist act.

DLA PIPER



Your interactions with MBE and UPS in the form of verbal and written invective reflect a pattern of harmful conduct which has escalated to intolerable and unlawful proportions. MBE has a record of reports and documentation dating back to April 2006 that substantiates flagrantly offensive and profane remarks and abusive behavior designed to intimidate various MBE and UPS-affiliated personnel and service providers. While this list is certainly not exhaustive, it is representative of your tactics leading up to the February 26, 2008 terrorist threats:

- on May 1, 2006, demanding an answer within a few hours of contacting an MBE representative or "I will handle this in my own way which will give me satisfaction";
- on August 2, 2006, characterizing an MBE employee who had tried to assist you as being "as useless as my 18-month old grandson";
- on November 14, 2006, claiming that "I will do what is necessary to protect my investment at anyone else's expense";
- on multiple occasions, berating MBE representatives that you intended to contact various media outlets about problems related to your Center, and the New York State Attorney General's office in at least one instance regarding tax payments, if those representatives did not immediately accede to your then-specified demands;
- on February 28, 2007, yelling at and then hanging up on the MBE representative that attempted to address your complaint;
- on June 20, 2007, writing that "I do not care what I have to do to the inspectors, they will approve this package. Believe me I am no small person, and they will approve it or I will handle them too."; and
- on August 24, 2007, threatening to call the police if certain MBE personnel were to visit the Center in person in response to one of your complaints.

By engaging in the described conduct culminating in your threat last month to "blow up" the UPS facility, you have materially breached the terms of your Franchise Agreement. Pursuant to Section 12.4(k) of the Franchise Agreement, your actions "reflect materially and unfavorably upon the operation and reputation of the Center. . . ." Your dangerous remarks and demonstrable disregard for public safety substantially damage the MBE and UPS brands and the public as a whole. Your threatened endangerment of the lives and safety of MBE and UPS-related personnel, customers, as well as the welfare of the general public, constitutes inconceivable conduct that unequivocally impairs MBE's reputation, System, Marks, and its goodwill and interests therein. Neither MBE nor UPS will tolerate such behavior any longer. Furthermore, regarding your allegations of anti-Semitism, discriminatory treatment, and associated remarks that MBE "come up with some money" to appease you, MBE categorically denies any such allegations of wrongdoing and will not accede to a demand it deems to be an overture of extortion.

Accordingly, MBE is exercising its right to terminate your Franchise Agreement effective immediately without notice or opportunity to cure. In order to enable you to sell your Center to a third party in

DLA PIPER

Stups, Inc.
c/o Stuart Berk
March 13, 2008
Page Three

accordance with the Franchise Agreement, however, MBE will extend the termination date until May 31, 2008, provided you consent to the following conditions for this extension:

1. You will absolutely and unequivocally refrain from any manner of unprofessional, abusive, harmful, or otherwise offensive conduct in relation to your operation of the Center pending the termination or sale, as the case may be. You agree that MBE may tape record all future conversations with you to ensure we have no dispute about any statements you may make;

2. You will immediately undertake reasonable efforts to sell the Franchise to a third party buyer and (i) submit to MBE a fully executed purchase and sale agreement with an MBE approved purchaser no later than April 30, 2008, and (ii) close the sale transaction no later than May 31, 2008. Should you fail to satisfy either of these deadlines, the termination shall take effect immediately upon expiration of the applicable deadline; and

3. No material harm or damage occurs during the extension period to MBE's Marks or goodwill as a result of, or arising from, any of your past, present, or future conduct;

4. You will comply with all terms and conditions of the Franchise Agreement from this date forward.

Unless you accept this conditional extension of your termination date by counter-signing this letter and returning it to me at (312) 251-5827 via fax no later than March 14, 2008 at 5:00 PM EST, your termination will be effective immediately. You should also understand that MBE may terminate the Franchise Agreement at any time during the extension period should there be any breach of the conditions upon which the extension is being granted. You should govern yourself accordingly. Finally, please note that, should MBE be required to take further legal action to enforce termination of the Franchise Agreement, including collection of any outstanding amounts owed by you to MBE, fulfillment of de-identification procedures, or enforcement of any post-termination covenants, MBE will seek reimbursement of all attorneys' fees and costs incurred in connection with this matter.

MBE reserves all of its rights and remedies under the Franchise Agreement. Please give this matter your immediate attention.

Very truly yours,

**DLA Piper US LLP**

Samuel B. Isaacson
Partner

SBI:jh

cc: United Parcel Service of America, Inc.
Mail Boxes Etc., Inc.

**EXHIBIT** D **PAGE** 86

DLA PIPER



**Consent:**

______________________________
**Stups, Inc.**

______________________________
**Stuart Berk**